1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    : 22-CR-194(EK)
                             :
                             :
                             :
                             :
                             : United States Courthouse
     -against-               : Brooklyn, New York
                             :
                             :
ANTHONY ROMANELLO AND        : Wednesday, November 29, 2023
JOSEPH CELSO,                : 9:30 a.m.
                             :
         Defendants.         :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: DANA RHENQUIST, ESQ.
                            IRISA CHEN, ESQ.
                            REBECCA SCHUMAN, ESQ.
                            Assistant United States Attorneys

For the Defendant:     GERALD J. MCMAHON, ESQ.
                       Attorney for the Defendant -
                       Anthony Romanello
                            11 Burnham Court
                            Scotch Plains, New Jersey 07076

```
  For the Defendant:      THE LAW OFFICE OF GERARD MARRONE, P.C.
                          Attorney for the Defendant -
                          Joseph Celso
                               66-85 73rd Place
                               Second Floor
                               Middle Village, New York 11379
                          BY: GERARD M. MARRONE, ESQ.




Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.
```

*Proceedings*                                                                3

1           (In open court.)

2           COURTROOM DEPUTY:  Criminal cause for trial,

3    United States v. Romanello, et al., Docket No. 22-CR-194.

4           Counsel, please state your appearances for the

5    record beginning with the Government.

6           MS. RHENQUIST:  Dana Rehnquist, Irisa Chen,

7    Rebecca Schuman with Paralegal Specialist Theodore Rader and

8    Special Agent Joseph Costello.

9           MR. MCMAHON:  Gerald McMahon for the defendant

10   Mr. Romanello.  My assistant Cassandra Williams is here with

11   us today.

12          THE COURT:  Good morning.

13          MR. MARRONE:  Your Honor, good morning.  My name

14   is Gerard Marrone, M-a-r-r-o-n-e, for Mr. Celso who is

15   seated with me.

16          THE COURT:  Good morning to you as well.

17          We're going to bring the jury in relatively soon,

18   but for the moment I just want to chose whatever loops we

19   need to close before opening statements.

20          One is the question of reputation evidence which I

21   did not include in my written order on the motions in

22   limine.  But I think everybody knows where we are on that

23   which is the reputation evidence will be admitted subject to

24   the limitations and caveats that we discussed on the record

25   which include, among other things, that the witnesses will

*Proceedings*                                                    4

1    be scrupulous in limiting their testimony to the reputation,

2    rumor, or statement or innuendo or whatever that they

3    actually heard and not their own private framing of that

4    thereafter.

5              Anything else from the Government's perspective

6    before we bring in the jury and anything else we need to

7    resolve before, or should resolve, before opening

8    statements?

9              MS. RHENQUIST:  Just three things, your Honor.

10             The first is we passed out the binders under the

11   jurors' chairs.  I'm not sure that they will notice them,

12   but to the extent they do, they should just be instructed

13   not to look at them until asked to do so by the parties.

14             THE COURT:  Okay.

15             MS. RHENQUIST:  The second point is...

16             THE COURT:  Before you move on to point number

17   two, let me find a place in my opening instructions to

18   mention that.

19             And I have one more housekeeping matter to mention

20   about a comment from a juror to the Court's deputy yesterday

21   that I'll put on the record but don't think affects our

22   progress here.

23             MS. RHENQUIST:  Would you like to do that?

24             THE COURT:  Which I'll do now.  Thank you.

25             A juror, I'm not even sure which one, because I

*Proceedings*                                                    5

1  did not inquire further, after my instructions not to Google

2  anybody associated with the case helpfully, and I think

3  honorably, confided to the Court's deputy that he Googled

4  me.  And I don't see any reason even for further inquiry on

5  that subject given that I don't think the Google results

6  that one would turn up on my name are that interesting.  And

7  I think the likelihood of anybody spelling my name correctly

8  in the Google search is low.  But if anybody on either side

9  wants to inquire further about that you'll let me know.

10         MS. RHENQUIST:  There's no issue from the

11  Government, your Honor.

12         MR. MCMAHON:  Not from us.

13         MR. MARRONE:  Perhaps, Judge, if we could

14  reiterate not to Google anybody.

15         THE COURT:  We need you on a microphone.

16         I think Mr. Marrone was asking me to reiterate the

17  instructions about not doing outside research and everyone

18  can rest assured that the jury will be very soon, very sick

19  of hearing me reiterate those instructions.

20         MS. RHENQUIST:  The second point is there was a

21  reference yesterday by defense counsel about a potential

22  argument in closing in relation to the immunity issues that

23  have been discussed but not yet resolved.  And we would just

24  request those issues since they have not come to a head yet

25  or been resolved not be addressed in opening.

*Proceedings*                                                    6

1    THE COURT:  And you know what issues we're talking

2    about.

3            MR. MCMAHON:  Yes, Judge.  No problem.

4            MR. MARRONE:  No problem, your Honor.

5            MS. RHENQUIST:  The third issue is there was a

6    Daily News article this morning that discussed the case in

7    which defense counsel gave comments yesterday about the

8    facts of this case including their view of the evidence and

9    what the evidence would show.

10           Pursuant to the Joint Local Rules in both the

11   Eastern and Southern District that is prohibited.  Once the

12   jury selection and trial has begun, no parties are allowed

13   to comment to the press or comment in any way that they

14   think could be publicly disseminated.

15           THE COURT:  So, obviously, a violation of the

16   Local Rules, if one occurred, would be a serious thing.  I

17   think for now it should suffice to instruct everybody to be

18   scrupulously aware of the contents of those rules and

19   everything else that might be maybe during trial and to

20   follow them like your reputation and law license depends on

21   it and we can take that up later if need be.

22           MS. RHENQUIST:  Nothing else from the Government,

23   your Honor.

24           MR. MCMAHON:  And that same Daily News article, of

25   more concern, was the fact that they have reference to my

*Proceedings*                                                          7

1   co-defendant's prior arrest for murder and an acquittal.

2   And that, to me, that's extremely damaging even though he's

3   acquitted of it.  I don't know what your Honor can do about

4   it given the First Amendment.

5          THE COURT:  I mean, there is a First Amendment

6   issue there for sure.  I'll note for the record, to the

7   extent this is helpful to anybody later reviewing this

8   record, that we asked every juror what newspapers they read

9   and I don't think a single person indicated the Daily News

10  in response to that question.  Apologies to any employee of

11  that great newspaper who may be in the Court with us today.

12  I don't know that there's anything to do at this point but

13  defense counsel will send a letter if they believe

14  otherwise.

15         MR. MARRONE:  So, Judge, as I'm sitting here, I'm

16  contemplating the same issue and I'm not sure what your

17  Honor could do about that when this acquittal was mentioned

18  this morning in the Daily News.

19         THE COURT:  There are two, just to be clear, two

20  levels of safeguard here.  One is that I think we picked a

21  jury where nobody indicated they read the Daily News.  And

22  two, is that I have already instructed the jurors in advance

23  of this morning for sure not to consume any media about this

24  case.  And so, I don't think there's anything to do at this

25  point but, again, if you want to think about this and put

*Proceedings*                                              8

1   your thoughts in a letter with whatever authority you think

2   I should be looking at, I am, of course, of course, happy to

3   consider that.

4              MR. MARRONE:  Thank you, Judge.

5              I think just in the instruction again from your

6   Honor would suffice for now no Googling.  That admonishment,

7   so to speak, of the jury I think would be appropriate.

8              THE COURT:  Yes.  My practice is to be remind the

9   jurors every time they leave the jury box not to discuss the

10  case with one another and every time they're leaving the

11  courthouse not to do any outside research.  I may forget

12  that on one or two occasions but I'm confident that the jury

13  will hear that from me with some frequency.

14             Anything else from the Government's perspective?

15             MS. RHENQUIST:  No, your Honor.  Thank you.

16             THE COURT:  Anything else, Mr. McMahon?

17             MR. MCMAHON:  No.

18             THE COURT:  Mr. Marrone?

19             MR. MARRONE:  No, Judge.

20             THE COURT:  Let's bring in the jury.

21             I am, sorry, just in the interest of efficiency

22  and time, I'm trying to arrange to serve lunch in the jury

23  room because if jurors have to go out and get a table

24  somewhere or sandwich somewhere and then come back, clear

25  security, reassemble in the jury room, lunch breaks are

*Proceedings*                                                      9

1   going to take much longer than is ideal.  But we don't know

2   exactly yet whether we can accomplish that logistically.

3   I'm going to leave out the part about what happens at lunch

4   for my standard instruction and we'll take that up once we

5   know.

6              I think we're ready.

7              (A brief pause in the proceedings was held.)

8              THE COURT:  We're waiting on one juror but we're

9   calling that person now.

10             (A brief pause in the proceedings was held.)

11             THE COURT:  I feel people can often hear me even

12  without the microphone for better for worse.  We've called

13  the juror who is not yet here.  That person reports that

14  they are 20ish minutes out.  I was just saying that my

15  experience is that when people say they're 20 minutes away,

16  they're usually 30 or 40.  I don't know if there is anything

17  we can do at this point but wait.  But I don't know if

18  anybody has a poem they want to read or something.

19             MR. MCMAHON:  Judge, can we know who it is?

20             THE COURT:  Why?

21             MR. MCMAHON:  Then I'll want to know whether I

22  want to move to get him out, him or her.  I don't want to

23  wait 20, 30, 40 minutes.

24             THE COURT:  Why does it depend on which juror it

25  is?

*Proceedings*                                    10

1          MR. MCMAHON:  Because if it's a good juror for the

2    defense I'm going to wait.

3          THE COURT:  That's a little bit of an admission of

4    pretext that's really not about lateness.

5          MS. RHENQUIST:  Your Honor, I think we should just

6    wait for the juror to arrive.

7          THE COURT:  That seems advisable to me.  Let's at

8    least hear, if necessary, what the reasons for the lateness

9    were and see whether we have a pattern here.  We'll collect

10   a little more information before we start thinking about

11   motions.

12         MS. RHENQUIST:  Since we have time, we can raise a

13   couple issues.

14         THE COURT:  Sure.

15         MS. RHENQUIST:  One is the -- in your order the

16   other day about the business record.  You did not rule on

17   the DMV records --

18         THE COURT:  Yes.

19         MS. RHENQUIST:  -- because they're not

20   certificates.  The DMV records are admissible under a

21   different rule of evidence as a self-authenticating records

22   because they're signed and sealed.

23         THE COURT:  Okay.

24         MS. RHENQUIST:  So they don't need a certificate.

25   So what we were planning to do is just prior to a witness

*Proceedings*                                                    11

1    taking the stand, move them in pursuant to that rule of

2    evidence.

3              THE COURT:  They have the seal of the Department

4    of Motor Vehicles on them?

5              MS. RHENQUIST:  Yes.

6              THE COURT:  Mr. McMahon, any objection?

7              MR. MCMAHON:  No, your Honor.

8              THE COURT:  Mr. Marrone.

9              MR. MARRONE:  No, your Honor.

10             THE COURT:  That's settled then.  And I appreciate

11   you doing that outside of the jury's hearing.

12             MS. RHENQUIST:  And there were, I think, a few

13   other categories of business records that also weren't

14   included in the order.  The parties have actually reached a

15   stipulation on those records that they'll be admitted

16   pursuant to a stipulation.

17             THE COURT:  Okay.

18             MS. RHENQUIST:  And does your Honor have a

19   preference as to how the stipulations are read in?  At least

20   today, we are planning to admit two stipulations, one of

21   which will be read during a witness's testimony and the

22   other we were planning to read in between witnesses.

23             THE COURT:  I don't have a preference.  I'm often

24   asked if I have a preference as to who reads the

25   stipulation.  I don't think it much matters to me, but speak

*Proceedings*                                    12

1   to each other and if there is some live dispute here you'll

2   bring it to my attention.

3            (A brief pause in the proceedings was held.)

4            MS. RHENQUIST:  Your Honor, I believe I saw a

5   juror come in through the elevator.

6            THE COURT:  We're getting close.

7            MS. RHENQUIST:  We might be getting close.

8            (A brief pause in the proceedings was held.)

9            (Defendant enters the courtroom at 10:34 a.m.)

10           THE COURT:  Please be seated, everyone.

11           Ladies and gentlemen, good morning.

12           THE JURY: (Collectively) Good morning.

13           THE COURT:  Thank you for being with us this

14   morning.  I hope everybody is well rested and in a position

15   to focus here today.

16           I'll reiterate just briefly that it is

17   exceptionally important that everybody be in at or before

18   the appointed time in the morning.  We have a dynamic here

19   where even one person being late can cause 40 or 50 people

20   to end up waiting a very long time.  That time that could

21   otherwise be used productively.

22           So, with that, we're going to begin this morning

23   with my preliminary instructions to you.  I'm going to come

24   down momentarily if we have a portable microphone, which I

25   see we do -- thank you -- just so I can be a bit closer to

*Proceedings*                                                13

1    the jury itself when I walk you through the preliminary

2    instructions.

3              Before we begin, and starting with counsel for the

4    Government, are you ready to proceed?

5              MS. RHENQUIST:  Yes, your Honor.

6              THE COURT:  And Mr. McMahon?

7              MR. MCMAHON:  Yes, your Honor.

8              THE COURT:  Mr. Marrone?

9              MR. MARRONE:  Yes, your Honor.

10             THE COURT:  The jury has been sworn, correct?

11             COURTROOM DEPUTY:  Yes, Judge.

12             THE COURT:  Okay.  So I'm going to put on this

13   microphone now and give you some preliminary instructions

14   that will prepare you at least a bit for the presentations

15   that will follow.  And I will reiterate for anybody, anybody

16   who might have a phone in the courtroom to please make sure

17   that the ringer is turned off.

18             I think the microphone is going to pick up what

19   I'm saying.  The Court reporter will let me know if you have

20   any difficulty hearing me.

21             Ladies and gentlemen of the jury, we're about to

22   begin the trial of this criminal case.  You've already

23   learned something about the case during the process of jury

24   selection but before the trial begins, there are certain

25   things I wish to tell you to help you understand what will

*Proceedings*                                    14

1   be presented and how you should conduct yourselves during

2   the trial.

3          To begin with, you're here to administer justice

4   in this case.  To administer justice according to the law

5   and the evidence.  You are to perform this task with

6   complete fairness and impartiality and without bias,

7   prejudice, or sympathy either for or against the Government

8   or the defendants.

9          This case, of course, is important to the

10  defendants who are charged with committing certain crimes

11  and who have the constitutional right to receive a fair

12  trial.  The case also is important to the Government since

13  enforcement of the criminal laws is important.

14         The case is based on an indictment.  During jury

15  selection, I briefly summarized the charges in the

16  indictment to you.  I instruct you now that an indictment is

17  simply the document by which a criminal action is commenced.

18  It is merely an accusation, a charge, it is not evidence of

19  the defendant's guilt.

20         Because the defendants have pleaded not guilty,

21  the Government has the burden of proving each of the

22  essential elements of the crime charged in the indictment

23  beyond a reasonable doubt.  The elements.

24         The purpose of the trial is to determine whether

25  the Government meets its burden.  And obviously, I'll have

*Proceedings*                                                    15

1   more instructions for you at the close of the case about

2   what these elements are.

3            The defendants are not required to prove their

4   innocence.  On the contrary, both defendants are presumed to

5   be innocent of the accusations contained in the indictment.

6            As you've already heard, the indictment contains

7   three counts.  I will briefly define each of those crimes

8   and their elements for you, sorry, I will comprehensively

9   define each of those crimes and their elements for you in my

10  instructions after the presentation of the evidence.

11           But for now, in the most general terms, Count One

12  charges both defendants with conspiring, conspiring, to

13  engage in the extortionate collection of credit.  Count Two

14  charges both defendants with engaging, engaging, in the

15  extortionate collection of credit.

16           Count Three charges defendant Celso, and only

17  defendant Celso, with obstruction of justice.

18           Let me now give you a preview of the stages

19  through which this case may proceed.  The trial will proceed

20  through six potential stages, roughly speaking, in the

21  following order:

22           First, the parties have the opportunity to make

23  opening statements.  The Government will make such a

24  statement and the defendants may do so.  The defendants are

25  not, however, obliged to make opening statements.  Indeed,

*Proceedings*                                                         16

1   neither defendant has the obligation to do anything in the

2   course of this trial.  What is said in these opening

3   statements is not evidence.  Rather, the attorneys will be

4   attempting to give you an introduction or an overview of the

5   evidence which they expect, they expect, will be produced in

6   the course of the trial.  That's the first phase of opening

7   statements.

8           Second, after the opening statements, the

9   Government will introduce evidence to support the charges

10  contained in the indictment.  This may come, this evidence

11  may come in the form of testimony from witnesses.  It may

12  also be physical items or documents that are offered in

13  evidence.  And indeed, some of you may have noticed that

14  there are binders under your seats right now.  We put those

15  there to start in an effort to maintain efficiency, but

16  please do not open or look at the binders until instructed

17  to do so.

18          After each witness testifies on direct

19  examination, they will be cross-examined if the defendants

20  choose to.  So the Government lawyer will do a direct

21  examination, the defense lawyer may do a cross-examination

22  asking questions of that government witness.  After that,

23  there might be some redirect examination which is an

24  opportunity for the Government to follow up on certain

25  points that may have been covered on cross.  And then,

*Proceedings*                                                17

1    perhaps the defense may do some recross-examination

2    following up on just the points that were covered in the

3    redirect.  But the scope of each examination is limited to

4    what was covered in the prior examination.  And so, each

5    successive examination should get shorter and smaller.

6             Generally speaking, there are two kinds of

7    evidence:  Direct evidence and circumstantial evidence.

8             Direct evidence is direct proof of a fact such as

9    the testimony of an eyewitness.  Circumstantial evidence is

10   proof of facts from which you may infer or conclude that

11   other facts exist.  To give a classic example, suppose that

12   when you came into the -- the classic example of

13   circumstantial evidence.  Suppose that when you came into

14   the courthouse today, the sun was shining and it was a nice

15   day.  But this courtroom has no windows and, therefore, you

16   cannot look outside.  Then later, as you were sitting here,

17   a person walked in with a dripping wet umbrella, and soon

18   after somebody else walked in with a dripping wet raincoat.

19            Now, on our assumed facts, you cannot look outside

20   of the courtroom and see for yourself whether or not it is

21   raining.  You have no direct evidence of that fact.  But on

22   a combination of facts about the umbrella and the raincoat

23   it would be reasonable perhaps for you to infer that it had

24   begun to rain.  That's an example of circumstantial

25   evidence.

*Proceedings*                                                          18

1          I will give you further instructions on these

2     types of evidence as well as other matters at the end of the

3     case, but please keep in mind that you may consider both

4     kinds of evidence.  The law does not require you to draw any

5     distinction between direct and circumstantial evidence,

6     generally speaking.

7               During the course of the trial, exhibits will be

8     received into evidence.  They will have exhibit numbers.

9     You will be able to review those exhibits in the jury room

10    during your deliberations at the end of the case if you need

11    them.  I will also give a copy of my instructions, my final

12    instructions, at the end of this case so that you will have

13    those during your deliberations as well.

14              If an item is received in evidence, the attorneys

15    may choose to have you look at it right here in court right

16    after it is received.  Whether they do this or not, however,

17    you will have ample opportunity to examine any exhibits you

18    wish to see in the jury room assuming those exhibits are

19    actually admitted at trial.

20              You may also hear that the lawyers have agreed or

21    stipulated as we say to certain facts or to certain

22    testimony.  If there is such a stipulation introduced, you

23    should accept those facts as true if the stipulation is

24    about facts and you should accept the testimony in the

25    stipulation as what a witness would have said if the

*Proceedings*                                    19

1   stipulation is about a witness's testimony.  But you still,

2   even in the event of a stipulation, you still must then

3   decide the weight, the weight, to give those stipulated

4   facts or that stipulated testimony.

5            At other times, it may happen that I instruct you

6   that an item of evidence is being offered for a limited

7   purpose only.  You must follow that instruction.  If I

8   strike an answer that a witness gives, or if I instruct you

9   to disregard an answer, then you should disregard that

10  testimony; that answer.  It is not evidence and it should

11  not be considered by you as evidence.

12           Anything you may see here or hear outside of this

13  courtroom is not evidence and must be disregarded because

14  your verdict must be based solely on evidence that is

15  introduced and presented here in this courtroom.

16           The third phase of trial or potential phase.

17           When the Government has concluded putting in its

18  evidence, the defendants may, may present evidence, but they

19  are not required to do so.  The burden at I've indicated is

20  always on the Government to prove every element of an

21  offense charged beyond a reasonable doubt and the law never

22  imposes on a defendant in a criminal case the burden of

23  calling any witnesses or introducing any evidence.

24           Fourth phase:  If one or both defendants puts on

25  any evidence, the Government may then wish or may not wish

*Proceedings*                                                    20

1   to put on further evidence before you to rebut what the

2   defense has set forth.

3          Fifth:  Once all of the evidence has been

4   presented, each party will have the opportunity to present

5   closing arguments or summations, to you.

6          As with the opening statements today, what is said

7   in closing arguments or summation is not evidence.  Each

8   party will be presenting to you its view of what the

9   evidence has shown and suggesting to you the inferences or

10  conclusions that you should draw from that evidence.  You

11  may find their arguments sound and persuasive or you may

12  not.  Because the Government has the burden of proof in this

13  case, it has the right to argue first followed by both

14  defendants after which the Government may give a rebuttal

15  summation.

16         Sixth:  After you've heard closing arguments, I

17  will then instruct you on the applicable law.  You will then

18  retire to deliberate and consider your verdict.  Your

19  verdict in this case must be unanimous.  You will have a

20  tremendously important task as jurors.  Your task is to

21  determine the facts.  Our constitution gives a defendant the

22  right to have you, who are members of the community, find

23  those facts.

24         (Continued on the next page.)

25

*Proceedings*                                                     21

1    (Continuing.)

2           THE COURT:  As the judges of the facts, you must

3    determine which of the witnesses you believe, what portion of

4    their testimony you accept, and what weight you may attach to

5    it.

6           You, not the Court or me, are the sole, the sole

7    judges of the facts.  I will be doing my best to preside

8    impartially and not to express any opinion concerning the

9    facts.  If at any time I should make any comment with respect

10   to the facts, you should disregard it in your deliberations.

11   It is your judgment as to the facts, not mine, which controls.

12           In the course of this trial, the attorneys may, from

13   time to time, stand and say that they object to a certain

14   question or to certain evidence.  In those cases, the

15   attorneys are asking me to make a ruling of law as to whether

16   the evidence in question is admissible or not in this trial.

17   There are certain rules that apply to the receipt of evidence

18   in trials.  If I sustain an objection, that means that I think

19   the law does not permit the evidence in question to be

20   considered and you are to disregard the question asked.  You

21   are not to speculate about how that question might have been

22   answered.  You simply have no evidence before you on that

23   subject.

24           If, on the other hand, I sustain an objection after

25   the answer has been given, I will strike the answer, meaning

*Proceedings*                                                                22

1    that even though you've heard the answer, you are not to

2    consider it at all in your deliberations.  You are to act as

3    if that answer had never been given.

4           If I overrule an objection, it means that I find no

5    legal reason not to allow the evidence to come before you.

6    You should not, however, attach any special weight to evidence

7    that comes in over objection.  Simply consider it together

8    with all other evidence.

9           No statement, ruling, remark or comment that I may

10   make during this trial is ever intended to indicate any

11   opinion as to how you should decide the case or to influence

12   you in any way in your determination of the facts.

13          At times I may ask a question of witnesses.  I do so

14   simply to bring out matters which I think should be brought

15   out and not in any way to indicate an opinion about the facts

16   or the weight you should give to the testimony of that

17   witness.

18          If at any point your recollection of the evidence

19   differs from what the lawyers have told you about the

20   evidence, it is your recollection that controls -- your

21   recollection that controls.

22          One very important thing to note is that you must

23   not be influenced by anything you may have seen or heard

24   outside of this courtroom.  You must not be influenced by

25   anything you may have seen or heard outside of this courtroom.

*Proceedings*                                                          23

1   This case must be decided by jurors who base their decisions

2   solely on the witnesses' testimony and the other evidence

3   introduced at trial.  This means that from today -- actually

4   yesterday, or even before -- until the end of trial, the true

5   end of this trial, you must not conduct any independent

6   research about this case, the matters in this case, or the

7   individuals involved in this case.  You should not consult any

8   law books, dictionaries, or reference materials, and you

9   should not search the internet or use any other tools to

10  obtain information about this case or to help you in your

11  decision as jurors.  Do not -- do not try to visit any of the

12  places mentioned during this trial whether they are physical

13  places or locations on the internet.

14          You should also not Google the lawyers, the parties,

15  or, going forward, even me.  Don't blog or tweet about the

16  case -- or X about the case, I suppose we would say now.  Do

17  not blog or tweet about your experience as a juror, none of

18  that during the trial.  It would be a violation of your oath

19  as jurors and it is very important, very important that your

20  decision be made solely on the basis of the evidence presented

21  in this case and that you not seek information from any

22  source, any source outside the confines of this courtroom.

23  Every once in a while you read a newspaper article about how a

24  whole trial had to be re-done because a juror did not follow

25  that instruction and it tainted the entire outcome, so please

*Proceedings*                                                    24

1    take that instruction very seriously.

2              Also, if at any point you recognize somebody who

3    comes into the courtroom, please let Mr. Jackson know about

4    that.  There's nothing necessarily wrong with it.  This is a

5    public courtroom and anybody can come in and watch if they

6    want.  But if it's someone close to you, I will want to know.

7              Let me talk now about conduct during recesses.

8              There are several rules which should govern your

9    conduct during any recess or break that we take in the trial.

10             First, do not discuss the case with anyone else

11   during any recess.  Even as among yourselves you see it is

12   important that each of you keep an open mind, reaching your

13   conclusion only, only during your final deliberations after

14   all of the evidence is in and after you have heard the

15   attorneys summations and my instructions on the law.  Only

16   then will you even begin, even begin to exchange views among

17   yourselves and reach a verdict.

18             Now, the instruction I've just given you is

19   obviously counterintuitive.  It's contrary in some ways to

20   human nature.  Serving on a jury is a unique experience.  It's

21   often an interesting experience.  It's an experience that many

22   people have only once or twice in a lifetime and it's

23   something that you would naturally want to share with friends

24   or family as the trial is going along, but you cannot do that.

25   The problem is that if you begin discussing the case with

1    others, they may begin giving you their opinion of what they

2    think about the case even though they have not been here, even

3    though they haven't heard any of the evidence, and even though

4    they haven't heard the arguments of counsel or my instructions

5    on the law, and it fundamentally could deprive the parties,

6    all the parties, of a verdict that's based on the

7    determination of jurors who have heard the evidence that I've

8    referred to, the instructions I've referred to, and nothing

9    else that I've referred to.

10          The same, the same is true, ladies and gentlemen,

11   even with respect to discussing the case amongst yourselves.

12   That, too, is obviously counterintuitive and contrary to human

13   nature.  After all, the thing that has brought you all here

14   together is this trial.  But what is wrong with beginning your

15   discussion of the case before you retire to deliberate is that

16   if you begin talking about the case even amongst yourselves,

17   even amongst yourselves, you may begin to come to tentative

18   opinions and conclusions that could close your mind to other

19   evidence or could close your mind to the arguments of counsel

20   or to my instructions on the law.  Here, again, when I say do

21   not talk about the case, what I'm telling you is a common

22   sense rule.  When I say do not talk about the case even among

23   yourselves, I am talking about the evidence you hear in this

24   courtroom and whether the defendant is guilty or not guilty.

25          I had a trial where I got a haircut in the middle of

1    it and somebody reported to the Court that jurors were

2    discussing the fact that my having come back one day with a

3    haircut.  That kind of thing is permissible.  But do not

4    discuss the evidence, don't discuss the presentation of the

5    lawyers, don't discuss my rulings, don't discuss my

6    instructions, don't discuss anything that is really tied up

7    with the conduct of this trial even amongst yourselves.

8              Lastly, discussion by others.

9              You should not permit any, any other person to

10   discuss this case with you or in your presence.  And if anyone

11   should approach you in an effort to discuss the case with you,

12   you must report that fact to me immediately through

13   Mr. Jackson, whom you've all met.  And you should tell that

14   person that you cannot discuss the case.  You should not,

15   however -- and by the way, let me give you an example of that.

16             So I once ran into a friend in the lobby of this

17   courthouse and said, Oh, what brings you here, and that person

18   said to me, I was selected for a trial and I'm participating

19   in it.  And this was, you know, maybe in my first month as a

20   judge, and I said to that person, Oh, is it a criminal case or

21   a civil case, and the answer I got was, I'm sorry, the judge

22   has instructed me not to talk about the case with anyone.  I

23   can't answer your question.  That was the correct answer.

24   Even to a question as innocuous as "Is it a criminal case or a

25   civil case," the proper answer is, "I'm sorry, I can't discuss

1    the case with you."

2              If someone attempts to talk about the case with you

3    and you are going to report that fact, of course, to

4    Mr. Jackson, you should not discuss with your fellow jurors

5    either that occurrence or any other fact you may feel

6    necessary to bring to my attention.  Bring it to my attention,

7    but don't discuss it with your fellow jurors.  The reason for

8    that may be obvious.  If something occurs that affects the

9    ability of one juror to serve fairly and impartially and that

10   juror communicates that development to other jurors, then it

11   may be that more than one of you becomes affected, and we want

12   to avoid obviously having that conversation extend from any

13   one juror to any other jurors.

14              Discussions with the parties.

15              Although it is normal for people to talk with those

16   whom we are thrown into day-to-day contact, please do not,

17   while you are serving as jurors in this case, have any

18   conversation with the parties, the attorneys, or any witness

19   in this case, whether it be in the courtroom, in the hallways,

20   in the elevator, outside the courthouse, or anywhere else.  By

21   this I mean not only do not talk about the case, when it comes

22   to all these people and the witnesses, and even me, I mean do

23   not talk at all, even to pass the time of day, even about the

24   weather.  You see, if somebody else sees a juror in

25   conversation with a party, a lawyer, or a witness, that

1    someone might think -- rightly or wrongly -- that something

2    improper was being discussed.  To avoid even the appearance of

3    impropriety then, you must have no conversations.  The

4    lawyers, as officers of the Court, are particularly sensitive

5    to this, so I can tell you that if they pass you in the

6    hallways without even acknowledging your presence, without

7    even a nod, they do not mean to be rude.  They are just

8    following my instructions.  If you and a lawyer or one of the

9    parties is waiting for an elevator at the same time, you

10   should take separate elevators, or someone perhaps can even

11   take the stairs.

12          I expect that you will inform me as soon as you

13   become aware of any juror's violation of these instructions or

14   any party or lawyer or witness's violation of these

15   instructions.  You will inform me, again, through Mr. Jackson.

16   A juror who violates these restrictions jeopardizes the

17   fairness of these proceedings and a mistrial could result

18   which could require the entire process to start over.

19          A word on note-taking.

20          You've all been given a notepad, I believe.  And if

21   you haven't, then we will get note pads for you immediately

22   before opening statements.  These note pads are for the use of

23   each individual juror during the course of trial.  I want to

24   caution you about a couple things in connection with taking

25   notes.  Number one, your notes are not a substitute for the

*Proceedings*                                                    29

1   official court record.  Our court reporters take down

2   everything that witnesses say, every question that lawyers

3   ask, and that testimony will be available to you.  It will be

4   available to you should you want to have your recollection

5   refreshed during your deliberations about what a witness said.

6   Really the only purpose of the notepad is that some people

7   feel they can listen better if they're taking notes.  Or, for

8   example, if they think that an exhibit is particularly

9   interesting and they might want to see that exhibit during

10  deliberations, you can jot down the exhibit number, but don't

11  feel any need to take copious notes on what the witnesses are

12  saying, and certainly do not let note-taking distract you from

13  your primary job, which is listening to the witnesses and

14  evaluating their credibility and the things they say.  Do not

15  let note-taking interfere with your listening to the

16  testimony.  You are not to rely on your notes in place of the

17  official record, and your notes will just be for your own

18  individual use.  You are not -- I instruct you that you are

19  not to share your notes with other jurors.  You must leave

20  your note pads in the jury room at the end of each day and

21  these notebooks will be destroyed if anybody takes notes at

22  the end of the case.

23              A word about alternates.

24              And I'm coming to the end here.

25              Those of you who have been alternate jurors should

1   listen just as carefully and conscientiously as the other

2   jurors.  You may very well be called upon prior to the

3   conclusion of the case to take the place of one of the jurors

4   and then you will have to render a verdict.  You will be in

5   the same position in that case as any other juror, so please

6   pay strict attention at all times.

7            Unless I instruct you otherwise, I expect that we

8   will begin each trial day at 9:30 sharp.  Please be on time

9   and allow yourself enough time to pass through security,

10  meaning be in the building by 9:15, please, at the latest.

11  Recognize that there is often extraordinary traffic on the BQE

12  or the Long Island Expressway and leave yourself a large

13  enough margin, please, for error.

14           When you arrive, please assemble in the jury room.

15  We will typically stop for a 45-minute or sometimes a one-hour

16  lunch around 12:30 p.m.  I would encourage you to get your

17  lunch from the cafeteria so you don't have to go out for

18  lunch, clear security on the way back, but that decision is

19  ultimately up to you, as long as you can meet the timeline

20  that we set.

21           We will also take a short break in the morning and a

22  short break in the afternoon and we, I expect, will end each

23  day somewhere between five o'clock and 5:30.

24           So just to sum up, this trial will begin with

25  opening statements and then with witness testimony.  When the

*Proceedings* 31

 1   testimony is complete, the lawyers will address you in their

 2   closing arguments, I will give you my jury charge or

 3   instructions and then you will deliberate and reach a verdict.

 4            Let's take, at this point, a five- or ten-minute

 5   break, we'll get some note pads if you don't have them, and

 6   then we will begin with the Government's opening statement.

 7   So you all can go relax in the jury room for five or ten

 8   minutes and then we will see you back.

 9            Thank you.

10            (Jury exits.)

11            THE COURT:  You can grab some note pads, please.

12            Thank you.

13            Anybody using the podium?

14            MS. SCHUMAN:  Yes, your Honor.

15            THE COURT:  We will get set up for opening

16   statements here.  I think we are going to kick off at 11:15.

17            How long does the Government expect to go?

18            MS. SCHUMAN:  Approximately ten minutes, your Honor.

19            THE COURT:  So we'll have surely at least one more

20   opening statement and maybe even all the opening statements

21   before lunch.

22            (A recess in the proceedings was taken.)

23            (Jury enters.)

24            THE COURT:  Please be seated, everyone.

25            The Government may proceed when ready.

1   OPENING STATEMENT BY MS. SCHUMAN:

2           MS. SCHUMAN:   Thank you, your Honor.

3           On May 11th, 2017, these defendants, Anthony

4   Romanello and Joseph Celso confronted Shuqeri Selimaj to force

5   him to pay his relative's gambling debt, but when he refused

6   to pay, Romanello punched him in the face while Celso and

7   others swarmed in and surrounded him.   That is why we are here

8   today.

9           Ladies and gentlemen, my name is Rebecca Schuman and

10  I'm an Assistant United States Attorney here in the Eastern

11  District of New York.   With me are my colleagues, Irisa Chen

12  and Dana Rehnquist; FBI Special Agent Joseph Costello; and

13  paralegal specialist, Theodore Rader.   Together we represent

14  the United States.

15          During this trial, you will learn that the

16  defendants used intimidation and force to collect a gambling

17  debt from Shuqeri Selimaj who you will generally hear referred

18  to by his nickname "Bruno" during this case.

19          In early 2017, Bruno's relatives got in over their

20  heads.   They were gambling, lost big, and ended up thousands

21  of dollars in debt.   A few weeks later when they hadn't paid

22  up, the defendants, who were known to the victims in this case

23  to be associated with the Mafia, were called in to collect the

24  debt.   And over the following weeks, Romanello confronted

25  Bruno three times to demand the money.   The first time

1    Romanello confronted Bruno, Romanello told Bruno that his

2    relatives owed him more than $80,000 and that Bruno was now

3    responsible for the debt.  Romanello made clear that the money

4    owed was Romanello's money.  And let's remember, this demand

5    wasn't coming from just anyone.  As the evidence will show,

6    Bruno understood that Romanello was associated with the Mafia,

7    that Romanello was dangerous, and that this was not a friendly

8    request.  This was a demand.  This was a threat.

9            But the debt was not immediately paid.  So Romanello

10   went back to Bruno's Restaurant a second time and again

11   demanded the money from Bruno.  Romanello was furious yelling

12   at Bruno that he had to pay.  Romanello wanted his money.  The

13   situation was escalating and Bruno knew that crossing

14   Romanello could have real consequences.  Violent consequences.

15   And it did.

16           On May 11th, 2017, when the debt still wasn't paid,

17   Romanello, Celso, and two other men went to Bruno's Restaurant

18   a third time to confront Bruno.  Romanello again demanded

19   payment screaming at Bruno that he wanted his money.  This

20   time, however, Bruno said he would pay Romanello only a

21   portion of the amount Romanello was demanding, but Romanello

22   wanted his money.  He wanted all his money and he wanted it

23   now.  So what did Romanello do?  In Bruno's own restaurant in

24   front of staff and customers, Romanello punched Bruno in the

25   face.  Another of his men grabbed Bruno by the collar and

1    pushed him backwards, but Celso and Romanello's son surrounded

2    Bruno moving in towards him.  Stumbling backward and trying to

3    protect himself, his staff and his customers, Bruno pointed

4    out the restaurant's surveillance cameras warning the

5    defendants that anything they did would be caught on camera.

6    And it was only then that the defendants backed down and fled

7    the restaurant.

8            Once the defendants left, Bruno called the police to

9    report that he was assaulted by Romanello.  He filed a

10   complaint describing how Romanello showed up at his restaurant

11   and punched him in the face.  But the very next day Bruno's

12   brother told Bruno about a conversation with Celso who, just

13   like Romanello, these victims understood to be associated with

14   the Mafia and to be the kind of person you did not want to

15   cross.  Celso threatened that if Bruno did not drop the

16   charges against Romanello, things would get even uglier.

17           So Bruno went to the police station to withdraw the

18   complaint scared of what the defendants might do otherwise.

19   Bruno also spoke with his family to figure out how they were

20   going to get together the money to pay off that debt.

21   Everyone agreed that the debt had to be paid and it had to be

22   paid immediately because Bruno already had been attacked at

23   his own restaurant and the family worried that if they didn't

24   pay the debt in full quickly, someone would get hurt even

25   worse.

1         So not only did Bruno withdraw the complaint against

2   Romanello, but he and his family also found a way to pay the

3   entire debt.  And for a period of time, the defendants got

4   away with it.  That is until two years later when a grand

5   jury, a group of people just like yourselves whose job it is

6   to investigate crimes, started looking into the crimes of

7   these defendants.

8         In 2019, Bruno's brother received a subpoena

9   ordering that he appear to testify before the grand jury about

10  the intimidation and violence the defendants used to collect

11  the gambling debt.  Testimony before a grand jury is under

12  oath.  It must be truthful.  But when Celso found out about

13  the subpoena, he told Bruno's brother to lie to the grand jury

14  about Celso's role in collecting the debt to say Celso wasn't

15  involved at all.

16        For these actions, the defendants are charged with

17  collection of credit using extortionate means and conspiring

18  -- which means agreeing with others -- to commit that crime.

19  Celso also is charged with obstructing that grand jury

20  investigation.  We will prove these charges to you beyond a

21  reasonable doubt with several types of evidence.  First you

22  are going to see and hear from the victims who experienced

23  firsthand the events that I just described to you.  You will

24  hear from Bruno's relatives about the gambling debt.  You will

25  hear from Bruno and his brothers about how the defendants used

1    intimidation and violence to collect that debt.  These victims

2    who knew the defendant's reputations will tell you about their

3    fears that following the assault on Bruno something worse

4    would happen to their family if the debt was not paid.  They

5    also will tell you about Celso's efforts to cover it all up.

6    But you will see the assault on Bruno for yourselves.  You

7    will watch the video from Bruno's Restaurant on May 11th when

8    the defendants used force and intimidation to get Romanello

9    his money.  You will see with your own eyes Romanello punch

10   Bruno in the face while Celso and the rest of the pack close

11   in on Bruno surrounding him to cut off any avenue of escape.

12          Finally, you will hear recorded calls from the

13   defendants co-conspirators which were captured on a

14   court-authorized wiretap.  You will hear members of the

15   gambling organization discussing how Bruno's relatives owed

16   thousands of dollars and how if that money wasn't paid, quote,

17   "things would get ugly."

18          (Continued on the following page.)

19

20

21

22

23

24

25

1    (Continuing)

2           MS. SCHUMAN:  You will also hear recorded calls

3    about how it did get ugly, how Romanello punched Bruno in the

4    face and how that assault became a warning to other gamblers

5    who didn't pay their debt.

6           At the end of the trial, after you have seen and

7    heard all of the evidence, we will have a chance to speak with

8    you again and at that time we will ask you to return the only

9    verdict that is consistent with the evidence:  Guilty on all

10   counts.

11          THE COURT:  Mr. McMahon.

12          MR. MCMAHON:  Thank you, Judge.

13          I'm too old fashion to be wearing these microphones.

14          Opening Statement - Mr. McMahon

15          MR. MCMAHON:  Ladies and gentlemen of the jury, good

16   morning.  I represent Anthony Romanello along with my

17   assistant Cassandra Williams.

18          Let me begin by joining Judge Komitee in thanking

19   you for agreeing to serve as jurors in this case.  I'm sure

20   all of you know that if you say a few magic words like I can't

21   be fair or whatever, you get out of serving on a jury.  The

22   fact that you didn't do that, the fact that you are agreeing

23   to serve as a jury is absolutely commendable and we thank you

24   for that.

25          When my client was charged with these crimes last

1   year, he entered a plea of not guilty, which did basically two

2   things:  He says I didn't do these crimes, and number two, I

3   want a trial by a jury of my peers.  That's you guys.

4           The Government, they get to arrest him, but they

5   don't get to decide if he is guilty or not guilty.  You get to

6   decide that.  And I will tell you this now, without any shadow

7   of a doubt, that presentation that you heard in the

8   Government's opening statement is so far from the truth and

9   the reality that you will be shocked at the end of the case,

10  absolutely shocked.

11          Now, what you will hear over the next couple of days

12  -- this is not going to be a long trial -- is that New York

13  City remains a melting pot.  And one of the things that you

14  will also hear in terms of being a melting pot, you're going

15  to have a little bit of ancient history sprinkled in.

16          The Government is talking about an assault that

17  occurred in May of 2017.  My client, on videotape, punched

18  Bruno one time in the face, indisputable.  But he didn't punch

19  Bruno to collect a gambling debt, he punched Bruno because

20  Bruno told him that he was a washed up Italian, he had no

21  balls, he was a nothing.

22          You will actually see on the videotape -- there's no

23  audio on the videotape, but you will see when Bruno is saying

24  this to my client, you will see him flinch, and you will know

25  that Bruno had said something to him absolutely insulting.  So

1    he didn't punch him to collect a gambling debt.  He punched

2    him -- "he" being that 86-year-old guy sitting over there,

3    punched Bruno because Bruno insulted him to his face.

4          Now, when I say that this case shows what a melting

5    pot New York is, on the one side we have an extended Albanian

6    family.  They are -- you will hear from two or three or four

7    of them during the course of the trial.  You will hear that

8    they are, many of them, very heavy gamblers, very significant

9    gamblers.  Two of the brothers are Bruno and Nino.  They own

10   restaurants in Manhattan.

11         Bruno has a nephew who is the son of a third

12   brother.  The nephew's name is Toni, and Toni has a

13   brother-in-law named Eddie.

14         Now, Toni and Eddie were big, big, big gamblers, and

15   they gambled with this organization which was run by an Irish

16   guy in Queens, Michael Regan.  You will hear about his

17   gambling organization, which he inherited from his father,

18   Patty Regan.

19         So in the middle of this group of people, the

20   Albanians on one side, the Irish in Queens on the other side,

21   the gamblers, sits my client, Anthony Romanello.  He is

22   friends -- you will hear from the Albanians that he has been

23   friends of theirs for more than 30 years.  You will hear that

24   he was such a good customer at their restaurants that he was

25   there as often as 1-A week, every week.

1          And on the other side, he knew Regan Senior, Patrick

2     Regan, the gambler, because they are from the same

3     neighborhood in Queens.  And he knew Michael Regan, the son,

4     who was running the gambling operations that he inherited from

5     the father.

6          So he's in the middle of this situation.  He knows

7     the Regans.  He know the Albanians.  So he gets asked.  He

8     didn't put himself into it.  The evidence will show he did not

9     have a dog in the fight.  This was not his money.  He was

10    approached, and because they knew he was friendly with the

11    Regans who are owed money for gambling, and he was friendly

12    with the Albanians, because he spent a lot of money in their

13    restaurants, so that's why he's in this thing.  So he has

14    three visits to the restaurant of Bruno.

15         Bruno, by the way, was taking on the debt of his

16    nephew and his nephew's brother-in-law.  What's interesting is

17    that these two -- Toni and Eddie were betting with Regan's

18    gambling organization.  And Eddie, at one point won $300,000

19    and got paid.  And then a week or so later, he losses $100,000

20    and he doesn't want to pay.  So you can understand why Regan

21    wasn't terribly happy about that.  So he asks Rom, can you --

22    since you know these guys, can you arrange to have this money

23    get paid.

24         Now, the three visits that the Government just told

25    you about, she describes it as, you know, lurking, my client's

1   hiding, going in there threatening them and stuff like that,

2   when he goes in there with four people to have dinner, which

3   he did the first two of the three visits, that's a $1,000 that

4   he drops in the restaurant owner's pocket.  $1,000.  This is a

5   pricey steakhouse.  You go there for dinner, it's a $1,000.

6           One of the things that you will hear from Bruno is

7   that he was sorry about the incident about being punched, but

8   he was also sorry that he would lose a very, very good

9   customer.

10          So you will hear -- the Government is going to play

11  a number of calls for you.  They're spread out over a period

12  of time, over months and months and months.  And I think you

13  may hear something like 27 calls.  And in those 27 calls,

14  there's not a single call with Mr. Romanello because really he

15  has nothing to do with it.  The calls are involved with people

16  in the Regan organization and the Albanians and they're about

17  when are you going to pay the gambling debt.

18          So Mr. Romanello was nowhere to be heard on any of

19  these calls because he's really not involved in this.  So what

20  happens is it culminates in the -- as I say, the first visit,

21  Mr. Romanello goes there, I think Mr. Regan may have gone

22  there on the first visit, they had dinner, and Bruno is told

23  that your nephew and his brother-in-law -- and the nephew, by

24  the way, vouched for the brother-in-law.  That's why he was

25  allowed to gamble with the organization -- they owe this

1   $100,000, can you please have him pay it.

2          And you will hear -- the evidence will show there

3   was no threat.  It was will you please have this guy pay the

4   debt.

5          They knew that Eddie had a lot of money.  His father

6   was a very wealthy construction company owner.  So it wasn't

7   that he didn't have the money to pay, he just wasn't paying.

8   And after winning $300,000 and getting paid by Mr. Regan, you

9   can understand he might be a little unhappy when the guy

10  doesn't pay $100,000.  So be that as it may, the first visit,

11  they bring it to Bruno's attention and he and Toni owes

12  $100,000, please arrange to have it paid.  Nothing happens for

13  a couple of weeks.  They go back, have dinner again, another

14  1,000 dropped in the steakhouse.  Everything is cordial.  You

15  will see it on the videotape.

16         Even on the night of the third visit, May 11th,

17  2013, everything is cordial.  There is a certain degree of

18  impatience now.  This is the third time you said you were

19  going to arrange to have this thing paid a month ago.  And, in

20  fact, one of the things that you'll hear was that Bruno's

21  brother said to Bruno what are you doing?  You told these

22  people 11 weeks ago that this was going to get paid and now it

23  hasn't been paid, and you're wondering why they keep coming

24  back and asking for it to be paid.  So that's Bruno's brother.

25  Nino is telling him.

1        So they go there on the third visit and, finally,

2   Nino says to -- Bruno says to Mr. Romanello well, I'll give

3   you the money that Toni owes my immediate nephew, which was

4   6,000, but I'm not going to give you the 80,000 that Eddie,

5   the brother-in-law of Toni owes.  That's the first time he had

6   ever said this.  And bearing in mind that Eddie was only

7   allowed to bet because Toni had vouched for him to bet with

8   the organization, and it was always understood that when they

9   talked to Bruno on the first and the second time that he was

10  going to take care of the entire debt from Toni and Eddie.

11       So you will see on the night of May 11th, 2017 --

12  and bear in mind, May 11th, 2017 -- we are what?  November

13  29th, 2023.  Six and a half years ago.  We are dealing with

14  the trial about a one-punch incident which fits the

15  description of the facts that I've just told you, six and a

16  half years ago.

17       Now, people who have viewed the videotape, they make

18  it seem like my client was Rocky -- Rocky Marciano or

19  something like that.  People who have reviewed the videotape

20  -- and you will see it for yourself -- describe the punch that

21  my client punches like a girl.  This wasn't some vicious

22  beating or anything like that.  This is a guy flinching.  He

23  can't believe that he's being insulted, and he punches him one

24  time and he leaves.

25       So, ladies and gentlemen, the evidence is not going

Opening Statement - Mr. Marrone                    44

1  to be -- you know, they want you to -- he's Italian.  They're

2  going to talk about mafia, mafia, mafia, you got to convict

3  him, mafia, mafia, mafia.  This has nothing to do with the

4  mafia.  This has to do with the debt owed to an Irish bookie

5  in Queens by an Albanian and somebody who was friends with

6  both sides of the equation who's asked to help out and try to

7  get it paid.

8           My client never, ever threatened anyone to pay the

9  debt ever.  And the evidence at the end of the case will

10 confirm that fact.  And when it does, I'm confident that you

11 will find him not guilty.

12          Thank you.

13          THE COURT:  All right.  While you are walking up

14 there, I just want to have one quick conversation with my law

15 clerk.

16          Opening Statement - Mr. Marrone

17          MR. MARRONE:  This is quite a drama, ladies and

18 gentlemen, and my client has nothing do with the drama, that I

19 can assure you.

20          May it please the Court, ladies and gentlemen of the

21 jury, Counsel.  Good morning.  Good afternoon.  My name is

22 Gerard Marrone and I'm an attorney.  I have the pleasure of

23 representing Joseph Celso, who is seated there at the defense

24 table.  Like my co-counsel said, Mr. Celso was also arrested,

25 accused of these crimes but pled not guilty and stated that he

1    is not guilty of these charges and he wants a trial.

2          So my argument is with you folks; we look to you for

3    justice.

4          Now, Mr. Celso is a regular guy.  He is a father.

5    He's a son.  He's a husband.  He's a working guy.  And I want

6    to just remind you folks of a few key issues.  Because Mr.

7    Celso pleaded not guilty, that as he sits there this morning,

8    this afternoon, he has a presumption of innocence.  It's the

9    Government that has to prove his guilt beyond a reasonable

10   doubt.  That's a very high burden for the Government.  We

11   don't even have to say anything.  I don't even have to make an

12   opening statement.  I don't even have to cross-examine

13   witnesses.  It's the Government itself that has to prove the

14   case against Mr. Celso beyond a reasonable doubt.

15         I'm going to keep this short because we haven't

16   heard any evidence.  And everything I say, everything the

17   Government has said so far is only argument.  It's not

18   evidence at all.  And I'd ask that you folks keep a very, very

19   open mind and listen and observe, just like in life and don't

20   rush to judgment.  The Government sounds -- that case sounds

21   wow, it's amazing, but it's just not the way it happened.

22         My client, Mr. Celso, is even further removed from

23   this Irish Michael Regan gambling organization.  Let me make a

24   few promises to you.  Maybe I will go out on a limb as a

25   criminal defense attorney.  But you will absolutely not hear

1  my client on any recorded wiretaps.  You will not hear him

2  mentioned on any recorded 27 wiretaps.  The Government, when

3  -- use a lot of resources, a lot of time and money to

4  investigate the Irish gambling organization.  It's got nothing

5  to do with my client.  I promise you that.  And the evidence

6  will show that.  The lack of evidence will also show that.

7          You'll never hear my client yell, be violent,

8  threaten, intimidate.  It's just not there.  It's the lack of

9  that evidence.  It does not exist, ladies and gentlemen.  You

10 will never even hear any witness testify that Mr. Celso

11 threatened or intimidated.  I could assure you that.

12         I submit to you will hear from a few key people that

13 Mr. McMahon had mentioned earlier before, an individual by the

14 name of Bruno, who's the owner of the steakhouse, right.  He

15 doesn't know my client.  He will testify that he does not know

16 my client.  My client was at his restaurant one time.  It's

17 the night of that fight incident.  My client was merely

18 present.  I will get back to that in a second.

19         You're going to hear from a young man named Toni.

20 Toni was the young man that was gambling with the Irish

21 organization.  Toni will never testify that he gambled with

22 Mr. Celso.  It never happened.  He doesn't even know Mr.

23 Celso.  He's never met him before in his life.

24         You will hear about a young man named Eddie.  Eddie

25 was betting not tens of thousands, hundreds of thousands with

1    this Irish organization.  He doesn't know my client.  He has

2    never met my client before in his life.

3            The only connection that my client has to this

4    situation is he is merely present when this fight occurs and

5    he happens to know Bruno's brother Nino.  They know each other

6    for 20 years because he is a customer also at Nino's

7    restaurant in the city.  I told you it's quite a drama.  It's

8    a soap opera, but my client is not involved in the drama of

9    it.

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; 11:48 a.m.)

2          MR. MARRONE:  Now, you're going to see a video.  We

3    all love videos, right of the everyone knows everything is on

4    video today whether we're if the street, whether we're in a

5    restaurant, whether we're in court everything is videotaped.

6    You probably won't even be able to see my client in the video

7    unless I point him out to you because he's not even on the

8    camera.  My client, when this incident happens, is at the bar

9    talking to the hostess about trying to get their credit card

10   account.

11          Ladies and gentlemen, you'll see Mr. Celso has his

12   hands in his pocket.  He's not even on camera when the two

13   individuals are talking or arguing or whatever the case you

14   want to call it.  He is not involved.  He is further removed

15   from the situation than even his co-defendant is.  And then

16   when something happens, there's a punch as Mr. McMahon said.

17   Naturally, my client walks over to see what's going on.  It's

18   natural to walk over when something is going on, we're

19   curious.  His hands are in his pocket.  He doesn't menace

20   anyone, he doesn't touch anyone.  He certainly does not touch

21   anyone.  You'll see another individual push Bruno.  It's not

22   my client.  My client is there, he's merely present.

23   Mr. Celso was not present for the prior meetings.  Mr. Celso

24   went to the restaurant one time trying to get a steak dinner

25   and was merely present when this fight happened.

1    And, ladies and gentlemen, those are the facts of

2  the case.  You're going to see, I submit to you, and that's

3  why I ask you to listen really carefully.  You're going to

4  hear so many inconsistencies from these witnesses.  Dare I

5  call them lies because they are covering up.  They're the

6  Albanian family, the boys that are gambling.  They're

7  committing crimes, constantly committing crimes, consistently

8  betting, taking in hundreds of thousands of dollars.

9    They got this whole little gambling thing going on.

10  That's not cool, that's not the right thing to do, right?

11  But that's got nothing to do with my client.  He's not part

12  of the Irish gambling ring.  And you'll hear zero evidence

13  that is he was merely present at the fight.  He is guilty,

14  I'll tell you, of the other brother Nino for 20 years.

15    So, again, I ask you to keep a very open mind.  Use

16  your common sense, use your street smarts, and decipher

17  through all this evidence and look for the truth.  Look for

18  justice.  I ask you to look for justice for my client.

19    I'm happy that we were able to talk because we

20  weren't able to conversant or anything prior to that.  And I

21  thank you, I really thank you, for your time, your effort,

22  your attention, and your service.  My client thanks you.

23    We will talk again, you and I, in a couple of days

24  when everything will come together.  When you have the

25  benefit of hearing all of the evidence or the lack of the

1   evidence as far as Mr. Celso is concerned.  And I will tie up

2   all those issues together, all of that information together

3   for you, in what's called my closing argument.  And I can

4   assure you, the only verdict you will come to for Mr. Celso

5   is not guilty.  And, again, you'll never hear Mr. Celso

6   threaten, never hear him be violent.  You will not hear that

7   out of any witnesses that take that stand.  That I can

8   promise you because that never happened.

9                So keep an open mind, give my client a fair trial

10   that he's asked of you, and we'll talk again in a few days

11   and the evidence will show that Mr. Celso is not guilty.

12   Thank you.

13                THE COURT:  Does the Government have a witness?

14                MS. RHENQUIST:  Yes, your Honor.  The Government

15   calls Shuqeri Selimaj.

16                (Witness takes the witness stand.)

17                COURTROOM DEPUTY:  Raise your right hand.

18   **SHUQERI SELIMAJ**, called by the Government, having been first

19   duly sworn, was examined and testified as follows:

20                THE WITNESS:  I do.

21                COURTROOM DEPUTY:  State and spell your name for

22   the record.

23                THE WITNESS:  S-h-u-q-e-r-i S-e-l-i-m-a-j.

24                           ///

25                           ///

1   DIRECT EXAMINATION

2   BY MS. RHENQUIST:

3   Q    Good afternoon, Mr. Selimaj.  By what name are you

4   commonly known?

5   A    Bruno.

6        MS. RHENQUIST:  Mr. Jackson, can we please have

7   access to the Elmo, please, for the witness only.

8        COURTROOM DEPUTY:  Yes.

9   Q    Mr. Selimaj, do you see an image appearing on the screen

10  in front of you?

11  A    Yeah, I see it.

12  Q    Do you recognize the viewed in this image?

13  A    Yes, I do.

14  Q    This is marked Government Exhibit 12?

15  A    Yes.

16  Q    Who do you recognize it do be?

17  A    That's me with more hair.

18  Q    Is that a fair and accurate depiction of you with more

19  hair?

20  A    Yes.

21       MS. RHENQUIST:  Your Honor, at this time, the

22  Government moves to admit and publish Government Exhibit 12.

23       MR. MCMAHON:  No objection.

24       MR. MARRONE:  No objection, your Honor.

25       THE COURT:  Received.

1          (Government's Exhibit 12 was marked in evidence.)

2          THE COURT:  And you may publish.

3          MS. RHENQUIST:  And, your Honor, if we could

4    publish the headshot board.

5          THE COURT:  Yes.

6    Q    And you mentioned that you commonly go by the name

7    Bruno?

8    A    Yes.

9    Q    Your full name is Shuqeri Selimaj?

10   A    That's correct.

11   Q    Are these placards that say Shuqeri Selimaj and Bruno

12   marked as Government's Exhibits 12-A and 12-B?

13   A    Yes, they are.

14         MS. RHENQUIST:  Your Honor, at this time, the

15   Government moves to admit Government's Exhibits 12-A and

16   12-B.

17         MR. MCMAHON:  No objection.

18         MR. MARRONE:  No objection.

19         MS. RHENQUIST:  May I publish?

20         THE COURT:  You may.  They're admitted.

21         (Government's Exhibits 12-A and 12-B were marked in

22   evidence.)

23   Q    What do you do for a living, Mr. Selimaj?

24   A    I owned a restaurant.

25   Q    How many restaurants?

*S. Selimaj - Direct/Ms. Rhenquist*                    53

1    A    I used to have two, now I have only one.

2    Q    So what are the names of the two restaurants that you

3    used to own?

4    A    The one I own is Club A Steakhouse and I used to own

5    Lincoln Square Steakhouse.

6    Q    Focusing first on Club A Steakhouse.  Do you still own

7    Club A Steakhouse?

8    A    Yes, I do.

9    Q    How long have you owned Club A Steakhouse?

10   A    Over 45 years.

11   Q    Was it previously known by any other names?

12   A    For 30 years, it used to be call Bruno.

13   Q    Where is Club A Steakhouse?

14   A    It's 240 East 58th between Second and Third in

15   Manhattan.

16   Q    What is the name of the second restaurant you mentioned?

17   A    Lincoln Square Steakhouse.

18   Q    Is Lincoln Square Steakhouse still open?

19   A    No, it is closed.

20   Q    When were you involved in the operations of Lincoln

21   Square Steakhouse?

22   A    From 2014 to 2018.

23   Q    Where was the Lincoln Square Steakhouse located?

24   A    It was 208 West 70th Street between Amsterdam and West

25   End Avenue.

*S. Selimaj - Direct/Ms. Rhenquist*                    54

1   Q    I want to focus on Bruno's restaurant for a minute.  How

2   long has Bruno's restaurant been open again?

3   A    I opened 1978.

4   Q    And from 1978 until today, what type of clientele did

5   you have at Bruno's restaurant?

6   A    I had mixed clientele.

7   Q    What do you mean by mixed clientele?

8   A    Business people, tourists, neighbors, Mafia people.

9   Q    You said Mafia people?

10  A    Yes.

11  Q    What do you mean by Mafia people?

12  A    They used to frequent my restaurant.

13  Q    How frequently would they go?

14  A    I used to have this room upstairs, piano room.  They

15  used to come up there.  It was only about nine tables.  It

16  was a small club.  They used to come once a week, once a

17  month.  Once every two months.

18  Q    Over time, did you become familiar with some those Mafia

19  people you described?

20  A    Yes, I did.

21  Q    Do you learn about their reputations?

22  A    Yes, I did.

23  Q    Did you learn some of their names?

24  A    Very few, some of them.

25  Q    Did you learn if some of them had previously been

1   arrested?

2   A    Yes, I did.

3   Q    So switching topics momentarily, I want to talk a little

4   bit about your family structure.

5        Where are you from?

6   A    I am from Albania.

7   Q    Do you have any siblings?

8   A    We are six brothers and four sisters.

9   Q    Do they all live in the United States?

10  A    Yes, they all live here.

11  Q    And where do you fall in the birth order among all of

12  your siblings?

13  A    I have an older sister and I am the oldest boy.

14  Q    Does one of your brothers go by the name Nino?

15  A    Yes, he does.

16  Q    What's his full name?

17  A    Shemsi Selimaj.

18  Q    And is that spelled, just for the Court reporter,

19  S-h-e-m-s-i?

20  A    Correct.

21  Q    And then same spelling as your last name?

22  A    Yes.

23  Q    Where does Nino live?

24  A    He lives in New Jersey.

25            MS. RHENQUIST:  Mr. Jackson, could we have the Elmo

1   just for the witness, please.

2   Q    Mr. Selimaj, do you recognize the individual in

3   Government Exhibit 13?

4   A    Yes, I do.

5   Q    Who do you recognize it to be?

6   A    It's my brother Nino.

7   Q    Is it a fair and accurate depiction of Nino?

8   A    Yes, it is.

9   Q    And while we have it, is Government Exhibit 13-B a

10  placard that says Nino?

11  A    Yes, it is.

12  Q    And is Government Exhibit 13-A a placard that says

13  Shemsi Selimaj?

14  A    That's correct.

15  Q    And is that Nino's full name?

16  A    Yes, it is.

17       MS. RHENQUIST:  Your Honor, at this time, the

18  Government moves to admit Government Exhibits 13, 13-A, and

19  13-B.

20       MR. MCMAHON:  No objection.

21       MR. MARRONE:  No objection, your Honor.

22       THE COURT:  Received.

23       (Government's Exhibits 13, 13-A, and 13-B were

24  marked in evidence.)

25       MS. RHENQUIST:  May we publish, your Honor?

1           THE COURT:  You may.

2    Q    What does Nino do for a living?

3    A    He owns a restaurant.

4    Q    Where is the restaurant located?

5    A    It's on 72nd Street and First Avenue.

6    Q    Also in Manhattan?

7    A    In Manhattan.

8    Q    How long has Nino been in the restaurant business?

9    A    Over 30 years.

10   Q    Do you also have a brother Besim?

11   A    Yes, we do.

12   Q    What does Besim do for a living?

13   A    He is a bus driver.

14   Q    Does he live in New York, too?

15   A    Yes, he does.

16   Q    Does Besim have any children?

17   A    He has four children.

18   Q    Any sons?

19   A    He has three sons, one daughter.

20   Q    Does he have a son named Fiton?

21   A    Yes, he does.

22   Q    Does Fiton go by any nicknames?

23   A    He goes by the name Toni.

24   Q    Toni?

25   A    Yes.

1   Q     And showing the witness only also on the Elmo, do you

2   recognize the individual in Government Exhibit 11?

3   A     Yes, I do.

4   Q     Who do you recognize it to be?

5   A     This is my nephew Fiton.

6   Q     Is that a fair and accurate depiction of your nephew

7   Fiton?

8   A     Yes, it is.

9   Q     And showing you what's been marked as

10  Government Exhibit 11-A.

11        Is this a placard that says Fiton Selimaj?

12  A     Yes, it is.

13  Q     Is that Fiton's full name?

14  A     Yes, it is.

15  Q     And finally, showing you what's been marked as

16  Government Exhibit 11-B.

17        Is this a placard that says Tony?

18  A     Yes, it does.

19  Q     And is this your nephew's nickname?

20  A     Yes, it is.

21        MS. RHENQUIST:  Your Honor, at this time, the

22  Government moves to admit Government Exhibits 11, 11-A, and

23  11-B.

24             MR. MCMAHON:  No objection.

25             MR. MARRONE:  No objection.

1          THE COURT:  Received and you may publish.

2          (Government's Exhibits 11, 11-A, and 11-B were

3    marked in evidence.)

4    Q    Mr. Selimaj, did there come a time that you learned that

5    your nephew Tony had incurred a debt?

6    A    Yes.

7    Q    How did you first learn this information?

8    A    One of the gentlemen came to my restaurant, Lincoln

9    Square Steakhouse, and he told me that my nephew owes him

10   money; that he's a friend of Rom and Tough Tony.

11   Q    I want to break that down.  You said that a man came to

12   your restaurant?

13   A    Yes.

14   Q    What restaurant?

15   A    Lincoln Square Steakhouse.

16   Q    And that's the one that's no longer open?

17   A    Correct.

18   Q    Do you know the man's name?

19   A    I know it now but before I didn't.

20   Q    Do you remember what the man looks like?

21   A    Yes, I do.

22   Q    I'm showing the witness only what's been marked for

23   identification as Government Exhibit 5.

24        Do you recognize the individual in Government Exhibit 5?

25   A    Yes, I do.

1   Q    Who do you recognize it to be?

2   A    He's the first one who came at my restaurant Lincoln

3   Square.

4   Q    The man who we were just talking about?

5   A    Yes.

6   Q    Is it a fair and accurate depiction of the man who

7   visited you at Lincoln Square Steakhouse and advised you of

8   your nephew's debt?

9   A    Correct.

10        MS. RHENQUIST:  Your Honor, at this time, the

11   Government moves to admit Government Exhibit 5.

12        MR. MCMAHON:  No objection.

13        MR. MARRONE:  No objection.

14        THE COURT:  It's admitted.

15        MS. RHENQUIST:  May we publish?

16        THE COURT:  Yes.

17        (Government's Exhibit 5 was marked in evidence.)

18   Q    So you said this man came to your restaurant and told

19   you about your nephew?

20   A    Yes.

21   Q    How did he describe your nephew to you?

22   A    He told me that my nephew owes him $86,000.  And I said

23   which nephew?  He told me Toni.  I said, I don't have a Toni

24   nephew.  And he said his father rides the bus, or he told me

25   the father rides a bus.  I knew my brother Besim rides the

1    bus so I figured.

2    Q    So he told you what his dad did and then you were able

3    to figure out --

4    A    Yes.

5    Q    -- he was talking about --

6    A    Exactly.

7    Q    -- Fiton?

8    A    Fiton, yes.

9    Q    And did he say how much money he owed him?

10   A    Yes.  He mentioned about $86,000.

11   Q    Did you learn why he owed him $86,000?

12   A    He told me that he was gambling with him.

13   Q    That Tony was gambling with this individual in

14   Government Exhibit 5?

15   A    Yes.

16   Q    I believe you also mentioned -- actually, approximately

17   when was this, if you remember?

18   A    This was some time in March of 2017.

19   Q    Okay.  And you said during this meeting that the

20   individual in Government Exhibit 5 also mentioned someone

21   named Rom?

22   A    Yes.

23   Q    And someone named Tough Tony?

24   A    Yes.

25             MR. MCMAHON:  Objection.

1            THE COURT:  What's the objection, in a word.

2            MR. MCMAHON:  We had previously, I thought

3    discussed this.

4            THE COURT:  Come to the sidebar.

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar* 63

1          (Sidebar held outside the presence of the jury.)

2          THE COURT:  Remind me.

3          MR. MCMAHON:  I had raised an objection to the use

4    of the nickname Tough Tony and I think your Honor had said

5    the Government should not use it.

6          MS. RHENQUIST:  We mentioned, specifically, that

7    the name would be used at the trial because when we were

8    going through the list of names and places, you asked what

9    Tough Tony would be elicited at trial and I said yes and

10   that's how the witness knows him.

11         THE COURT:  I don't remember excluding it.  I don't

12   know on what basis, I mean, the word "tough," I suppose that

13   is sufficient content but this is a name by which the fact

14   witness refers to.  The foundation is now laid to that

15   effect.  I will admit it.

16         MR. MCMAHON:  Judge, I don't know that the witness

17   knows Tough Tony.  I think he's making it up out of whole

18   cloth.

19         THE COURT:  That will be for cross-examination.

20         MR. MCMAHON:  Second, your Honor, the Government's

21   opening statement was Mafia, Mafia, Mafia and I think that

22   certainly, in my view, is violating the spirit of the Court's

23   ruling that this is not supposed to be a Mafia case, so I'd

24   like my objection noted.

25         THE COURT:  I don't think I've ruled that this is

*Sidebar*                                                              64

1    not supposed to be a Mafia case.  I observed at one point

2    this was not a RICO indictment but this is a conspiracy case

3    and the conspiracy is the conspiracy comprised of the members

4    that it's comprised of who know each other in the way that

5    they know each other, and I'm not going to exclude that

6    evidence broadly to the extent there is an adequate

7    foundation laid.

8            MS. RHENQUIST:  Your Honor, in the opening, the

9    Government was very careful to use the word Mafia only in the

10   sense of that is how the victims understood the defendants

11   and I think it was used three times.  I think Mr. McMahon

12   used it far more times than the Government didn't, you know,

13   talk about anyone's heritage either.

14           THE COURT:  I made my ruling.  You can continue.

15   Thank you.

16               (Sidebar discussion concludes.)

17               (Continued on the next page.)

18

19

20

21

22

23

24

25

1              (In open court.)

2              THE COURT:  The objection is overruled.

3              Ms. Rhenquist, you may continue.

4     EXAMINATION BY

5     MS. RHENQUIST:

6     (Continuing.)

7     Q    So you mentioned when the individual in

8     Government Exhibit 5 came to your restaurant to ask about the

9     debt, he mentioned the name Rom?

10    A    Yes.

11    Q    And he also mentioned the name Tough Tony?

12    A    Correct.

13    Q    Who did you understand Rom and Tough Tony to be?

14    A    I understood they're Mafia from Corona, Queens.

15    Q    How long -- and I want to break that up, so let's focus

16    on Tough Tony.

17         How long, if by 2017, had you known Tough Tony?

18    A    Well I met him a long time ago.  I will say 1972.

19    Q    How did you meet him?

20    A    I was working the restaurant La Maganette on 50th Street

21    and Third Avenue and he was a customer there.

22    Q    Was Tough Tony also a customer at your restaurants?

23    A    Yes, he was.

24    Q    And during the time Tough Tony was a customer at your

25    restaurant what, if anything, did you learn about him?

*S. Selimaj - Direct/Ms. Rhenquist*                    66

1  A    I learned that he's a boss of the Corona group, Mafia

2  guys.

3  Q    Is that Corona, Queens?

4            MR. MCMAHON:  Objection.

5  A    Queens yes.

6            THE COURT:  Overruled.

7  Q    And did you have any conversations with Tough Tony about

8  the Mafia?

9  A    Yes.

10  Q    What conversation is that?

11  A    Well, several times Tony told me that if he knew how

12  much money I can make in restaurant business he would never

13  go in Mafia business.

14  Q    Okay.  And you also mentioned that the individual in

15  Government Exhibit 5 said the name Rom to you?

16  A    Yes.

17  Q    And who do you know Rom to be?

18  A    Rom was associate with the Tough Tony.

19  Q    He was an associate with Tough Tony?

20  A    Yes.

21  Q    And how do you know that?

22  A    They used to come together in the restaurant, hang

23  around.

24  Q    Was Rom in Tough Tony's crew?

25            MR. MCMAHON:  Objection, leading.

1   A    Yes.

2          THE COURT:  And no foundation.  Can you rephrase

3   the question?

4   Q    For how long had Rom been coming to your restaurant?

5   A    For about 30 years.

6   Q    And would Rom come to the restaurant with other

7   individuals?

8   A    Yes, he would.

9   Q    Who are some of the individuals you saw Rom interact

10  with?

11  A    He used to come with Larry Glitz and I forgot all the

12  other guys.

13  Q    And would you ever see him at the restaurant with

14  Tough Tony?

15  A    Yes.

16  Q    And did you observe him on multiple occasions?

17  A    Sometimes once a month, sometimes every two months.

18  Q    And what was your understanding of Rom and Tough Tony's

19  relationship?

20  A    My understanding was that Rom worked for Tony, for

21  Tough Tony.

22  Q    In relation to what?

23  A    The Mafia business.

24  Q    Did either Rom or Tough Tony know any your family

25  members?

1  A     They know my brother Nino and probably know some of my

2  brothers because they work in the restaurant as waiters.  But

3  they know Nino very well.

4  Q     Focusing on Rom.  Do you know that individual's full

5  name?

6  A     Well, in that time, I didn't know but now I know.

7  Q     So let's just focus on what you knew at that time.

8        Even though you don't know his full name, do you know

9  what he looks like?

10  A     Yes, I do.

11  Q     Showing you, for the witness only, what's been marked

12  for identification as Government Exhibit 1.  Do you recognize

13  the individual in Government Exhibit 1, Mr. Selimaj?

14  A     Yes, I do.

15  Q     What do you recognize it to be?

16  A     This is Rom.

17  Q     Is it a fair and accurate depiction of Rom?

18  A     Yes, it is.

19  Q     Showing you also what's been marked as

20  Government Exhibit 1-B, is this a placard that says Rom?

21  A     Yes.

22        MS. RHENQUIST:  Your Honor, at this time, the

23  Government moves to admit Government Exhibit 1 and

24  Government Exhibit 1-B.

25        MR. MCMAHON:  No objection.

1          MR. MARRONE:  No objection, your Honor.

2          THE COURT:  Admitted and you may published.

3          MS. RHENQUIST:  Thank you.

4          (Government's Exhibits 1 and 1-B were marked in

5    evidence.)

6    Q    So you testified that the individual in

7    Government Exhibit 5 mentioned the name Rom and Tough Tony to

8    you?

9    A    Yes.

10   Q    Was this in the same conversation when you were talking

11   about your nephew Tony's debts?

12   A    Yes, the first time he came.

13   Q    What did you interpret that to mean?

14          MR. MCMAHON:  Objection.

15          THE COURT:  Can you rephrase the question?  Can you

16   ask the prior question, please.

17          MS. RHENQUIST:  Sure.

18   Q    You mentioned the person in Government Exhibit 5

19   mentioned the name Rom and Tough Tony to you?

20   A    Yes.

21   Q    What did you interpret that to mean?

22   A    I interpreted that he's going to use muscles against me.

23          MR. MCMAHON:  Objection, move to strike.

24          THE COURT:  Sustained.

25          The jury should disregard that answer, please.

1   Q    What did you say to the individual in

2   Government Exhibit 5 after he told you that your nephew owed

3   him the gambling money?

4   A    I told him that I will call my nephew and speak with him

5   and see how to pay him back.

6   Q    Did the individual in Government Exhibit 5 say anything

7   else to you?

8   A    No.

9   Q    After this individual visited your restaurant, what, if

10  anything, did you do?

11  A    I called my nephew Toni and I told him that he came over

12  looking for the money.

13  Q    You told him that this individual in

14  Government Exhibit 5 at quarter restaurant?

15  A    Yes.

16  Q    Did you say anything else to Toni?

17  A    I told him that he's claiming that you owe him $86,000.

18  Q    And after your conversation with Toni, what did you

19  expect to happen in relation to paying back that $86,000?

20  A    I was expecting that Toni, that he'll pay the money.

21  Q    After the first visit in March of 2017 from the

22  individual in Government Exhibit 5, did anything else happen

23  in relation to the gambling debt?

24  A    Yes.

25  Q    What happened?

S. Selimaj - Direct/Ms. Rhenquist                    71

1   A     Couple weeks later, Rom came with the gentleman there

2   and with two other guys by the restaurant.

3   Q     Which restaurant?

4   A     Lincoln Square Steakhouse.

5   Q     And when you say Rom, are you referring to the person --

6   A     Yes.

7   Q     -- in Government Exhibit 1?

8   A     Yes.

9   Q     Sitting here today, do you remember who the other two

10  people were that came to the restaurant that day?

11  A     I just remember Rom and the gentleman over there.

12  Q     And by the gentleman over there, you're referring to the

13  individual in Government Exhibit 5?

14  A     Yes.

15  Q     What happened when Rom and these other individuals came

16  to your restaurant that day?

17  A     Rom asked me to go in the private room to talk.

18  Q     Did you go to a private room?

19  A     Yes, I did.

20  Q     And what happened while you were in the private room?

21  A     Rom start to yell and I need my $86,000, I need it now.

22  And I was telling him to say, I spoke with my nephew Toni,

23  I'll speak again with him, and we'll see if we can resolve

24  this issue.

25  Q     So I just want to break that down.

1     So Rom first said that he needs his $86,000?

2  A    Yes.

3  Q    And what $86,000 was this?

4  A    That my nephew gambled with them, with the Mafia over

5  there.

6  Q    And you mentioned that Rom was raising his voice during

7  this conversation?

8  A    Yes.

9  Q    In addition to Rom saying that he needs his $86,000, did

10  he say anything else to you?

11  A    No.

12  Q    Did he mention any other individuals to you during this

13  conversation?

14  A    No.

15  Q    Was anything said about Tough Tony?

16         MR. MCMAHON:  Objection, leading.

17         THE COURT:  Overruled.  You may answer.

18         Was anything said about Tough Tony?

19         THE WITNESS:  What was the question again?

20  Q    During the first time that Rom came to your restaurant

21  and was asking you about this debt, did he mention

22  Tough Tony?

23  A    Oh, yes.  Rom told me that Tony said hello, he's going

24  to come over to visit you.

25  Q    And what did that mean?

1  A    It meant that he's going to use Tony to, like,

2  intimidate me or...

3          MR. MCMAHON:  Objection, move to strike.

4          THE COURT:  Overruled.

5  Q    Did anything else happen during this first meeting with

6  you and Rom?

7  A    No.

8  Q    Did you have an understanding at this time about what

9  the $86,000 -- if all of the $86,000 was owed by your nephew?

10 A    Yes, I understood that was gambling money.

11 Q    And did you respond to any of the things Rom said during

12 this conversation?

13 A    I told Rom I'm going to speak with my nephew again, see

14 if he can come up with the money and we left it like that.

15 Q    Did anything else happen during this meeting?

16 A    Rom and the gentleman over there, Exhibit 5, it was the

17 gentleman that sit down, had the dinner, and they left.

18 Q    What, if anything, did you do after Rom visited your

19 restaurant for the first time?

20 A    I called my nephew again and I told him that Rom came

21 over and he's looking for the $86,000.  And he said let me

22 talk with his brother-in-law because, apparently, they were

23 gambling together and...

24 Q    And when you say you called your nephew, did you call

25 your nephew Toni?

*S. Selimaj - Direct/Ms. Rhenquist*                          74

1  A   Fiton.

2  Q   Was it at this point that two people were gambling?

3  A   Yes.

4  Q   Why did you call Toni after Rom visited your restaurant?

5  A   I was afraid that Toni, my nephew, is going to get hurt

6  from them.

7  Q   Why?

8  A   Well, because they have a reputation to, to...

9        MR. MCMAHON:  Objection, move to strike.

10       THE COURT:  Overruled.

11 Q   You can answer the question.

12 A   What was the question again.

13 Q   Why were you afraid that Toni would get hurt?

14 A   I was afraid because nobody jokes with Mafia.  There was

15 no joke.

16 Q   After you talked with Toni and told him about this

17 meeting with Rom, did you think the debt was going to be

18 paid?

19 A   Toni told me, my nephew, he said that he owes only

20 $6,000 and that his brother-in-law owes $80,000.

21 Q   And what did you think was going to happen in relation

22 to the debt?

23 A   I was hoping that they were going to pay the debts

24 because I know that if they don't pay the debts, they get

25 killed.

*Proceedings*                                                    75

1          MR. MCMAHON:  Objection.  What's his basis of
2     knowledge here?
3          THE COURT:  We're not going to have speaking
4     objections, we've been clear about that.
5          MR. MCMAHON:  Objection.
6          THE COURT:  Let's excuse the jury for -- and given
7     that we're so close to what would have been the lunch break
8     anyway, we're going to excuse the jury and let you all begin
9     your lunch break while I speak with the lawyers.
10          Thank you, ladies and gentlemen, we'll see you back
11     at, let's call it, 1:30.
12          (Jury exits courtroom at 12:20 p.m.)
13          THE COURT:  Let's excuse the witness as well.
14          (Witness leaves the witness stand.)
15          THE COURT:  Mr. McMahon, in case I wasn't clear
16     enough in the lead-up.  If you want to be heard on the merits
17     of an objection, ask for a sidebar.  Don't start
18     pontificating in front of the jury, please.
19          What is the basis for the objection?
20          MR. MCMAHON:  The basis is this guy is not an
21     expert.  He's not even Italian, he's Albanian.  What is he
22     doing opining that this meant he was going to get killed.
23     Where does that come from?
24          THE COURT:  So questions about what you understood
25     a witness's statement to mean are relatively common in all

*Proceedings*                                                76

1    kinds of cases when the witness was there and the jury was

2    not and there is a foundation for this of sorts in the

3    reputation evidence I admitted.

4           At the same time, it is the case, I think as we've

5    discussed, that what matters here is the defendants' actions

6    and their intent and the effect that those actions would have

7    on the reasonable recipient rather than this witness in

8    particular.

9           I do think this is the kind of thing, Mr. McMahon,

10   that you could easily have foreseen coming up at this trial

11   and framed by a motion in limine.  I take what Mr. McMahon is

12   saying now is that he is seeking to exclude all of this

13   witness's subjective interpretations of the things that were

14   communicated to him.  Somebody that doesn't actually say,

15   "you're going to be killed," that he shouldn't be testifying

16   I understood I was going to be killed.

17          This is a very fine, almost metaphysical, line

18   we're drawing here.  The case law in both the Second Circuit

19   and elsewhere that I think I've cited in my motion in limine

20   talks explicitly about the fact that a witness who knows of

21   his own reputation and of -- and that his reputation precedes

22   him with the person to whom he's speaking can communicate

23   certain things in more brief and high-level terms secure in

24   the knowledge that the message will get across.  The deeper

25   message will get across because of those facts.  And it's not

*Proceedings*                                                          77

1   obvious to me, under those circumstances, that there's any

2   unfair prejudice, unfair prejudice, associated with this

3   witness's interpretation of what was being communicated to

4   him.

5            But we're going to take the lunch break now.  We're

6   going to reconvene at, let's call it, 1:35.  And, Mr. McMahon

7   and Mr. Marrone, you'll bring whatever case to my attention

8   you want me to read before we bring the jury back on this

9   subject.  You find the case, we'll print it for you.

10           MR. MCMAHON:  Judge, I appreciate that your Honor

11  wants me to have a motion in limine at every conceivable

12  subject.  I have told you --

13           THE COURT:  Every major and obviously foreseeable

14  subject.

15           MR. MCMAHON:  We have previously discussed Bruno

16  giving his interpretation of what this means.  I have

17  never -- it is inconceivable to me that you would allow a

18  witness who is Albanian to testify that he understood if his

19  nephew didn't pay the gambling debt that would mean he was

20  going to get killed by the Mafia.  That's inconceivable to me

21  that you think that that's reputation evidence and is

22  admissible at this trial.

23           THE COURT:  First of all, let's speak to each other

24  in normal tones of voice.  And second of all, let's argue by

25  reference to legal authority.  If you're telling me that, in

*Proceedings*                                                      78

1    your view, evidence of this type about what a listener

2    understood in light of the actions that were being taken and

3    his understanding of the reputations of the people who took

4    them show me a case.  This is not the first time this issue

5    has come up.

6             We're going to break for lunch now and I will see

7    you all at or around 1:30.  Thank you.

8             (Luncheon recess taken; 12:26 p.m.)

9             (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          79

AFTERNOON SESSION

1

2              (In open court; jury not present.)

3              THE COURT:  Please be seated, everyone.

4              We have two quick things to cover before we bring

5    the jury back, assuming we are on the record, is that we filed

6    the order on the motions in limine under seal because it

7    refers to aspects of witnesses' disciplinary histories and so

8    forth.  But that is a preliminary sealing.  We need I think

9    the Government to tell us in short order what parts of that

10   order, if any, you believe should be redacted and we will

11   otherwise unseal that.

12             MS. REHNQUIST:  We will do that, your Honor.

13             THE COURT:  Thank you.

14             And then two is that this question about the

15   witness' testimony that he believed someone would be killed if

16   this debt was not paid.

17             Mr. McMahon, do you have anything more you want to

18   add?

19             MR. MCMAHON:  No, Judge.  I think it's pretty much

20   basic hornbook law.

21             THE COURT:  What's the hornbook law?

22             MR. MCMAHON:  That it is not admissible; it's

23   hearsay, and there is no exception that applies to it.

24             THE COURT:  So it's not hearsay.

25             MR. MCMAHON:  His belief -- it's got to be -- either

1   it's made up out of whole cloth -- he's got space antennae up

2   here -- or somebody told him.

3            THE COURT:  Right.

4            MR. MCMAHON:  That's hearsay.

5            THE COURT:  Statements offered for their state of

6   mind -- he's talking about what he understood.  It's not

7   hearsay.

8            MR. MCMAHON:  Well, Judge, every hearsay exception

9   could be swallowed by is what he understood.  That's not what

10  it's about.

11           THE COURT:  The hearsay objection is overruled.

12           MR. MCMAHON:  It is also prejudicial, 403.

13           THE COURT:  Well, that's what I thought we were

14  going to be talking about, is the 403 question.

15           MS. REHNQUIST:  Your Honor, the Government found a

16  case during the break which we provided a copy to defense

17  counsel and your courtroom deputy.

18           THE COURT:  The *Wooten* case.

19           MS. REHNQUIST:  The *Wooten* case.  It is from the

20  Sixth Circuit's but it references almost every other circuit,

21  including the Second.  It is on page 5 of the Westlaw

22  printout, the bottom right.

23           THE COURT:  Yes.

24           MS. REHNQUIST:  And it basically stands for the

25  proposition that even in a case where the elements are an

Proceedings                                                        81

1    objective reasonable person standard, the victim's perceptions

2    and state of mind are relevant, which is I think the crux of

3    the issue here.

4             THE COURT:  I think we have questions both about

5    relevance and the question of substantial prejudice.

6             How would you describe the relevance?  How does this

7    opinion describe the relevance?

8             MS. REHNQUIST:  Well, the relevance is that a

9    victim's state of mind, even when the Government doesn't need

10   to prove actual fear of this victim and the elements of the

11   crime the Government need only prove the fear of a reasonable

12   person, that the victim's perceptions and state of mind are

13   irrelevant.

14            THE COURT:  Yes, and they cite the Seventh Circuit

15   case of *United States versus Smith*, Seventh Circuit, 1997, for

16   that purpose.

17            The Seventh Circuit concluded that the teller's

18   testimony that she, in fact, feared bodily harm to herself or

19   someone else in the bank if she did not comply with Smith's

20   demands can be considered in determining whether Smith's

21   actions would have produced the fear of bodily harm in a

22   reasonable person.

23            That does map very squarely on to the relevance

24   question here, at least.

25            *United States versus Walker*, this case goes on to

1   cite "Noted in the context of a forcible assault of a

2   probation officer, that although the proper standard for

3   determining whether the requisite degree of force was

4   displayed is an objective one; i.e., whether the defendant's

5   behavior would reasonably have inspired fear in a reasonable

6   person, the victim's subjective state of mind is not

7   irrelevant to determining whether the amount of force

8   threatened or displayed was sufficient to make fear

9   reasonable.

10          Third -- so that was the *Walker* case in the

11  Second Circuit -- Second Circuit, 1987.

12          Then *United States versus Cunningham*, admittedly,

13  the intimidation inquiry, under the statute at issue there,

14  which is 18, U.S. Code, Section 2113(a), is objective, not

15  subjective -- I take it that's the bank robbery statute --

16  focusing on whether an ordinary person in the teller's

17  position reasonably could infer a threat of bodily harm from

18  the defendant's acts.

19          That said, asking the teller about her state of

20  mind; i.e., whether she was afraid, was at least minimally

21  probative of whether a reasonable person in her position would

22  also be afraid.  That was *United States versus Cunningham*,

23  Third Circuit 2004.

24          And *United States versus Muhammad*, a Ninth Circuit

25  case from '03, we, the Ninth Circuit, have consistently upheld

Proceedings                                           83

1    the admission of teller testimony concerning their subjective

2    reaction to a defendant's conduct as circumstantial evidence.

3    That, when combined with other evidence, like a demand note,

4    could allow a jury to infer objective intimidation.

5           But see the *Jennings* case -- I don't see what

6    circuit this is -- 439 F.3d at 611, which concluded that an

7    examination into the subjective reaction of one specific bank

8    teller is inappropriate because it risks creating a windfall

9    for defendants who fortuitously selected to victimize a bank

10   teller with an unusually thick skin.

11          So, you know, I think it's clear that the testimony

12   is relevant.  I think the hard -- and I think it is clear that

13   it comes in as an indication of state of mind over hearsay

14   objection.

15          I think the hard question is the 403 question of

16   when a witness says I thought someone would be killed.  Is

17   that a level of -- you know, a potential inferential leap to a

18   level that is so shocking to the jury that it should be

19   stricken.

20          We have three options here:  One is to admit the

21   testimony, full stop; two is exclude the testimony, full stop;

22   three is admit it with a limiting instruction.

23          And I'm interested in the defense view of whether a

24   limiting instruction is something they desire.  But maybe the

25   Government can speak to the balance of probative versus

1    prejudicial specifically.

2         MS. REHNQUIST:  Your Honor, I believe that this is

3    the victim's state of mind.  He was being threatened by

4    intimidation and force, and the defense has an opportunity to

5    cross-examine him as to whether or not that was a reasonable

6    state of mind for him to have.

7         THE COURT:  Right.

8         I think the extent to which the testimony is

9    probative is maybe linked to the extent to which it was

10   reasonable in light of whatever this witness had actually seen

11   and heard, including firsthand, and including by reputation.

12        If his subjective interpretation is crazy because he

13   took such a long inferential leap that it just made no sense

14   to conclude that, then the evidence is not particularly

15   prejudicial because you can bring out on cross-examination the

16   length of that inferential leap and that will obviously --

17   that will potentially result in this witness's testimony doing

18   more harm to the Government's case than good, let alone

19   unfairly prejudicing it.

20        To the extent his interpretation is an objectively

21   reasonable one in light of everything he heard and saw,

22   including by reputation, then that buttresses the probative

23   value that we just heard about in all of these circuit cases

24   cited in the *Wooten* decision because it is indeed relevant to

25   and probative of the way a reasonable person standing in that

Proceedings                                    85

1   witness's shoes would have understood the testimony.  So I'm

2   struggling to -- I'm trying to stress test what I am saying

3   now, but I'm struggling to come out in a place where I see why

4   this testimony is substantially more prejudicial than

5   probative.

6            MR. MARRONE:  Judge, if I may.

7            THE COURT:  Yes, please.

8            MR. MARRONE:  Just my two cents, Judge, on behalf of

9   Mr. Celso.  I would have certainly join in Mr. McMahon's

10  objection.

11           It really is -- it's more along the line of a

12  violation of Your Honor's decision in our motion in limine.

13  If you look at the prior questioning, it's about the

14  defendant's, Mr. Romanello, in this case, reputation, and then

15  the Government is leading the witness down this path where he

16  is this mafia guy, associated with the mafia, and the mafia

17  kills people.  So it is that two plus two equals four and

18  that's the problem.  That's the violation, Judge.  So that's

19  certainly a 403 issue for me.  It's a 403 issue for Mr. Celso

20  because he's sitting here as well.  And.

21           I would object to the fact that if this witness is

22  afraid of a co-defendant killing him, then he is certainly

23  afraid of my client killing him.

24           THE COURT:  Let me look back at the testimony for a

25  moment.

Proceedings                                      86

1          MR. MARRONE:  And I think your Honor instructed the

2    Government to be very careful as to what the witness said and

3    I think the Government led him down a bad path.

4          THE COURT:  So I think I know the context you're

5    referring back to.  And what I was saying was to the extent

6    we're going to have reputation evidence come in; i.e., hearsay

7    evidence on reputation, the Government would need to be very

8    careful with its witnesses to make sure that the witness was

9    going to testify to what he or she actually heard about a

10   defendant's reputation rather than what inferential leaps that

11   witness may have made about that reputational statement.  And

12   I think the Government has done that, or, at the very least,

13   you're not complaining that the Government violated the

14   literal instructions on that score here.

15          Let me just look back at the testimony.  Hold on one

16   second.

17          MR. MARRONE:  Judge, also, as I'm sitting here, I'm

18   thinking about it and it's just how the Government just got

19   that evidence in through the back door.  It's Detective

20   Carillo testimony, Judge, elicited from a layperson, and

21   that's really the reality of what it is, and it is highly

22   prejudicial.  The Government was admonished not to do that.

23   It's not fair.  It hurts my client.  I don't see how my client

24   could even get a fair trial after that.

25          And nowhere in Bruno's Grand Jury testimony, in his

Proceedings                            87

1    302s has he ever said that.  So where does that come from?  It

2    came out the sky.

3              THE COURT:  It's not in the 302s?

4              MR. MARRONE:  I've never seen it in any 302s that I

5    read or his Grand Jury testimony.

6              THE COURT:  Can you respond by responding to that

7    last point?  I actually was thinking about that at lunch.

8              MS. REHNQUIST:  There are notes in the 302s in

9    response to when I asked what does mafia mean to you?  What do

10   you interpret that to mean?  And he responded that my family

11   will get hurt or killed.

12             MR. MARRONE:  He didn't say that.

13             THE COURT:  Do you dispute that characterization of

14   the 302s or are you saying it doesn't line up with the

15   testimony we heard in court?

16             MR. MARRONE:  I don't think that's the accurate

17   version of the 302, I think -- Bruno says --

18             THE COURT:  Can I see the 302.

19             MR. MARRONE:  -- they'll get hurt, but never killed.

20   And I think, Judge, the reality of a gambling debt, that's not

21   realistic.

22             THE COURT:  Well, that's the question.

23             MS. REHNQUIST:  Your Honor, I think there is also a

24   difference.

25             THE COURT:  What do you want me -- assume that we

Proceedings                                            88

1   are in the middle ground of the testimony is not going to be

2   stricken but I will give the limiting instruction, what do the

3   defense want the limiting to say, if anything?

4          MR. MCMAHON:  I would like the limiting instruction

5   to say this witness has no basis for making such a statement,

6   do with it what you want.  Because he has no basis.  What's

7   his basis for saying that?

8          THE COURT:  His basis is -- the question was what

9   did you understand -- let me go back to the precise question.

10         MS. REHNQUIST:  Your Honor, I think there is a

11  difference here between the reputation evidence and the state

12  of mind of the victim.

13         THE COURT:  So the transcript, as it stands now, has

14  him saying I know that if they don't pay the debts they're

15  going to get called.  Someone is going to call the debt.

16         MR. MARRONE:  We will take that.

17         THE COURT:  I think the defense lawyers are telling

18  me that's not what they heard, that they heard if they don't

19  pay the debts, they're going to get kill.

20         The full answer -- if I substitute the word killed

21  for called, the full answer I was hoping that they were going

22  to pay the debts -- sorry.  So let me start back.  The

23  question that elicited this answer was:  And what did you

24  think was going to happen in relation to the debt?  And then

25  the witness begins -- and maybe this answer was nonresponsive.

Proceedings                                                89

1    The witness answers the question about what he thought was

2    going to happen, he said, I was hoping that they were going to

3    pay the debts because I know that if they don't pay the debts,

4    they're going to get killed.

5             Does that solve the problem if we just strike the --

6    was the testimony nonresponsive to your question?

7             MS. REHNQUIST:  I don't believe so.  I mean, he said

8    if we weren't going to pay the debts --

9             THE COURT:  What do you think was going to happen?

10   He says I was hoping that they were going to pay the debts.  I

11   guess he makes a if then statement, like if they do pay the

12   debts, that's great; if they don't pay the debts, they're

13   going to get killed.  So, yes, maybe that is responsive.

14            MR. MCMAHON:  The basis of his knowledge, Judge, is

15   the TV?

16            MS. REHNQUIST:  It's not about his knowledge.  This

17   is separate from the reputation issue.  This is about the

18   witness' interpretation and state of mind of what those things

19   meant to him, what was his emotional response to hearing those

20   words.  Your emotional response doesn't need to be based in

21   something.  It's your visceral reaction, which I clearly --

22            MR. MCMAHON:  His state of mind is not relevant.

23            THE COURT:  So his state of mind, we just heard from

24   a bunch of circuits --

25            MR. MCMAHON:  Those are individual bank tellers

Proceedings                                        90

1   confronted by a robber.

2          This is a guy saying he heard that if something

3   doesn't pay a debt they're going to get killed.  That's a

4   little bit different, like night and day.

5          THE COURT:  The logic is the same.

6          MR. MCMAHON:  No, it's not the same logic, Judge.

7          THE COURT:  What's your logic?

8          MR. MCMAHON:  The logic is --

9          THE COURT:  Let me tell you my logic and then you'll

10  tell me --

11         MR. MCMAHON:  The bank teller gets a note and -- and

12  should he -- he or she, from that note, be in fear or not,

13  that's different because it's a personal one-on-one encounter

14  with the bank teller and the robber.

15         This is Bruno saying if these guys don't pay the

16  gambling debt, I know they're going to get killed.  There's no

17  one on one.  He is just an expert making this up.  What

18  gambling debtor can the Government cite that has been killed

19  by the mafia in the last 50 years?

20         MR. MARRONE:  Judge, just --

21         THE COURT:  Let me tell you what I think is the

22  logical relationship between the *Wooten* cases that I just

23  cited and this case.

24         In both cases you've got a statute that asks

25  whether -- or a guideline or both -- that asks whether the

Proceedings                                          91

1   conduct of the defendant would instill fear of violence in the

2   reasonable objective listener.  What all of those -- you know,

3   what one circuit court case after another said even when the

4   focus is on the defendant's objective conduct, we accept

5   evidence about the subjective interpretation of the victim

6   because that is relevant to the objective analysis.  So that's

7   a pretty clear logical map I think on the situation, it's a

8   legal dynamic in which we find ourselves here.

9           MR. MCMAHON:  If Bruno happens to think that the

10  mafia kills people that are left-handed, because he thinks it,

11  that makes it admissible?

12          THE COURT:  I didn't see anything in the bank

13  robbery cases that I was citing that said that the victims,

14  before they can testify, that they were worried for their

15  safety, have to undertake a randomized control trial on how

16  many bank robberies actually resulted in physical harm to the

17  teller.

18          MR. MCMAHON:  So, Judge, the fact that this

19  gentleman has no basis for making that statement is of no

20  moment?

21          THE COURT:  Nobody's inquiring in the bank robbery

22  cases as to the basis -- what's the difference in basis?

23          MR. MCMAHON:  Because -- to the teller.

24          THE COURT:  Or passing a note.

25          MR. MCMAHON:  Or passing a note.

Proceedings                                    92

1          THE COURT:  Sometimes the note says give me all your

2     money or else.

3          MR. MCMAHON:  We don't have that, here.  Bruno is

4     talking about hypothetically the mafia kills people who don't

5     pay gambling debts.

6          THE COURT:  No.  Hold on a second.

7          What does he say about the actual conduct here that

8     he is interpreting?

9          MR. MCMAHON:  Nothing.  He is not interpreting

10    conduct.

11         THE COURT:  Ms. Rehnquist, do you have access to the

12    realtime?

13         MS. REHNQUIST:  I don't, unfortunately, your Honor.

14         THE COURT:  Why?  Budget reasons?

15         I will look at it.  Rom told me that Toni said hello

16    and he's going to come over to visit you.  What did that mean?

17    It meant that he's going to use Tony to like intimidate me

18    or -- objection.  Overruled.

19         Did anything else happen in that meeting?  Did you

20    have an understanding about what -- about whether all of the

21    86,000 was owed by your nephew?

22         Yeah.  There's a pretty weak link, I suppose,

23    between his takeaway, that his nephew was going to be killed

24    and any objective conduct on Mr. Romanello's part.

25         MS. REHNQUIST:  Well, I think --

Proceedings                                    93

1        THE COURT:  I'm trying to -- I'm not even sure I

2   follow the question of what was it that made you -- what was

3   it that made you draw this conclusion.

4        MR. MCMAHON:  Actually, Judge, if you read his Grand

5   Jury testimony, the Government led him to that conclusion and

6   they're just following that path here at trial.

7        THE COURT:  Rom asked me to go into the private room

8   to talk.

9        Did you go in?

10        Yes, I did.

11        What happened?

12        Rom started to yell, and I need my $86,000.  I need

13   it now.  And I was telling him to say I spoke with my nephew

14   Toni.  I will speak with him again, see if we can resolve this

15   issue.

16        And then Ms. Rehnquist says, so, I just want to

17   break that down.  Rom first said he needs his $86,000.  Yes,

18   what $86,000 was that.  That my nephew gambled with them.

19        I mean, I think the evidence is more relevant,

20   obviously, to the extent it is closely linked to some relevant

21   action or statement by the defendants, and the link is not

22   emerging all that clearly to me here as I go through this

23   again.

24        MS. REHNQUIST:  Well, the link is that it wasn't

25   just anyone who went to the restaurant to demand the money and

Proceedings                          94

1   raise the voice, and the reference to Tough Tony, who this

2   witness previously identified as the head of a mafia crew who

3   Rom worked with.

4             THE COURT:  It's relevant to the listener's state of

5   mind if it helps move the story forward in terms of explaining

6   what he does next, laying the groundwork for the third

7   meeting.

8             I will give a limiting instruction.

9             I think, Mr. McMahon, you're preferred limiting

10  instruction is for me to say that this witness has no idea

11  what he's talking about and that's unlike any limiting

12  instruction I've ever heard before.

13            MR. MCMAHON:  I will clean it up into legalese, if

14  your Honor can --

15            THE COURT:  Yeah.  I think we can say something like

16  he testified about his state of mind, this may be relevant for

17  context, it may be relevant to who did what next, but it is

18  not admitted for its truth, and you should not take that as

19  evidence that his subjective belief was any indication of what

20  would -- or would not have happened, or something to that

21  effect.

22            MR. MCMAHON:  Yes, that would be fine, your Honor.

23            THE COURT:  So why don't -- let me write this down.

24            MS. REHNQUIST:  I think it may be more proper to

25  phrase it in like it's up to you, the jury, to determine

1    whether or not that state of mind was reasonable.

2           THE COURT:  Whether an objective listener would have

3    understood the defendant's conduct the same way or not, which

4    is an element here.

5           MR. MCMAHON:  Well, what conduct of the defendant

6    are we interpreting?

7           THE COURT:  Screaming, taking somebody into a

8    private room, saying I need my money now.

9           MR. MCMAHON:  Okay.

10          MS. REHNQUIST:  And referencing Tough Tony.

11          THE COURT:  And referencing Tough Tony.

12          So he testify to his understanding, or his thinking,

13   let's say, because that maps more closely to what he said.  He

14   testified about his thinking....

15          This witness is Mr. Selimaj?

16          MS. REHNQUIST:  Yes, your Honor.

17          THE COURT:  The problem with what you said, Ms.

18   Rehnquist, is that once again it's tied to the state of mind

19   of the victim, not the defendant, and the elements about are

20   about the state of mind of the defendant.  So the thing that

21   the jury needs to consider at the end of the day is what Mr.

22   Romanello intended.  And what the cases we read say is that

23   how the victim took it is relevant to the jury's consideration

24   of what the -- and so ultimately the question of what a

25   reasonable person -- ultimately the question of what a

1   defendant would reasonably expect a person in the witness'

2   place to understand or not understand is for you to decide.

3          MS. REHNQUIST:  I don't think -- sorry.

4          THE COURT:  Go ahead.

5          MS. REHNQUIST:  I actually -- the limiting

6   instruction is about -- it's not about the elements.  I think

7   what defense counsel is saying is that the witness'

8   interpretation is unreasonable.  So the witness' state of mind

9   is unreasonable.

10          It's up to the jury to evaluate each witnesses

11  testimony.  So it's not about the elements we need to prove at

12  the end of trial.  It's about evaluating whether or not when

13  Mr. Selimaj says he's believed that, whether that is a

14  reasonable thing for him to believe given the facts that they

15  were produced.

16          THE COURT:  The limiting instruction is called for

17  when testimony comes in for one purpose but not another

18  purpose.  And we're telling the jury to consider it for

19  purpose A, not for purpose B.

20          So what I have here is as follows:  The witness,

21  from whom you are hearing, testified about his thinking

22  following his encounter with Mr. Romanello.

23          Is it following or during?

24          MS. REHNQUIST:  Both.

25          THE COURT:  Okay.  During his encounter -- let's say

Proceedings                                                97

1  after.

2            The witness from whom you're hearing testify about

3  his thinking after his encounter with Mr. Romanello.  That

4  testimony has been admitted to show the witness' state of mind

5  and to provide context for who did what next.  It has not been

6  admitted for its truth and you should not consider it for that

7  purpose.  Ultimately, the question of what a defendant would

8  reasonably expect a person in the witness' place to understand

9  or not understand is for the jury.

10           MS. REHNQUIST:  I think --

11           THE COURT:  Mr. McMahon?

12           MR. MCMAHON:  Your Honor, on a scale of ten, I give

13  it a one, but it is better than nothing.

14           THE COURT:  Is there anything specific you would

15  change?

16           MR. MCMAHON:  It should not be given; it should be

17  stricken.  It's so clearly highly prejudicial.  It's so

18  clearly without any -- the witness has no basis.  He didn't

19  hear that.  He just made it up at the prompting of the

20  Government and your Honor is looking for a way to keep it in

21  and finesse it.  There is no good way to do it.  It doesn't

22  belong in the case.  It should be stricken.

23           THE COURT:  All right.  I'm going to give this

24  limiting instruction.

25           MS. REHNQUIST:  Your Honor --

1          THE COURT:  Yes.

2          MS. REHNQUIST:  -- I just -- I agree with the first

3    part of the instruction because the basis here is that the

4    victim's perception or state of mind is not admissible for its

5    truth.

6          But the second part where it discusses the elements,

7    I just worry that's a little bit confusing because the jury

8    hasn't heard the elements of the crime yet.  But I think if we

9    ended the instruction that it's not admissible for its truth,

10   that what the jury knows how they can consider that

11   information and how not to consider that information.

12         THE COURT:  So you would just delete the last

13   sentence?

14         MS. REHNQUIST:  Yes.

15         THE COURT:  Which I was putting in only at your

16   request of what they should be considering this for.  That's

17   fine.  Okay.

18         MS. REHNQUIST:  Your Honor, I would note for the

19   record that I do expect that similar statements will be made

20   by our witnesses, asking them what they interpret things to

21   have meant.

22         THE COURT:  There has to be a close -- in the bank

23   robbery cases, the teller gets a note, hypothetically, that

24   says give me all the money or else.  And there is a close

25   logical link between that conduct and the question about what

Proceedings                                            99

1   the witness thinks because the witness is asked what did you

2   understand or else to mean.  It's not obvious what the or else

3   is here.

4            I mean, I understand he's screaming and demanding

5   money and has gone into a back room for that purpose.  But

6   it's not like there's a highly ambiguous phrase in that

7   context that the witness is being asked to explain their

8   interpretation of.  So, I do think you want to be very careful

9   going forward to make sure that if anything like this comes

10  out further, it comes out in response to specific and

11  legitimate questions about conduct that is legitimately

12  subject to multiple interpretations.

13           You know, here, the "or else" is I suppose implicit

14  if somebody is screaming at you better get my money.

15           MR. MCMAHON:  That you're going to kill him?  I

16  don't think so, Judge.

17           THE COURT:  Well, that's something.  There is a

18  logical question that follows or else what?

19           MS. REHNQUIST:  This is something we're not

20  eliciting from this witness, but this witness knows other

21  people who gambled with the mafia and were beaten with bats.

22  He knows -- he has experience with this.

23           THE COURT:  I mean, it's not a secret to people who

24  work in this city, in this line of work that the loansharking

25  business has at times involved violent methods of collection

Proceedings                                           100

1    and, in a sense, that is what this trial is all about.

2             All right.  Let's bring the jury in.  I'm going to

3    give this limiting instruction, and then we're going to bring

4    in Mr. Selimaj, if I am pronouncing that correctly, and

5    resume.

6             How do you pronounce his name?

7             MS. REHNQUIST:  The sort of Americanized

8    pronunciation is Mr. Selimaj.  Selima would be the

9    non-Americanized version, but both are acceptable.

10            THE COURT:  So, I'm sorry, Mr. McMahon, given the

11   limiting instruction that I have framed, would you rather I

12   give it or don't give it at all?

13            MR. MCMAHON:  I'd rather that you give it than not

14   give it at all.

15            THE COURT:  Okay.

16            Mr. McMahon, just for what it is worth in the

17   record, my question about the randomized control trials in

18   bank robbery cases, the answer is there's actually very little

19   physical harm that emerges from bank robberies, because, as we

20   know, in this business, bank tellers are trained to always

21   give over the money and the FBI and NYPD are trained not to

22   respond to bank robberies in progress because of the risk to

23   civilians.  So the actual risk of injury, I think, empirically

24   speaking, is exceedingly low and nevertheless we have this

25   raft of cases in which victim's subjective expectation that

Proceedings                                        101

1   they would be hurt if they didn't give over the money is

2   admitted.  So I actually think that this maps, even your

3   version of the facts where the empirical evidence of --

4            MR. MCMAHON:  The decision in those --

5            THE COURT:  -- violence --

6            MR. MCMAHON:  -- is force being used.  They were

7   sentencing decisions, is there force there, and then as part

8   of that equation, they're looking at --

9            THE COURT:  Were they all sentencing decisions?  I

10  don't think so.

11           MR. MCMAHON:  Several of them were.  They are

12  looking at what do the tellers think in terms of when they got

13  the note.

14           THE COURT:  Yes.  That's the limiting factor on ...

15  the *Smith* case from the Seventh Circuit was about jury

16  instructions.  So guilt or innocence rather than at

17  sentencing.

18           The *Walker* case from the Second Circuit is not clear

19  from this.

20           (The jury enters the courtroom.)

21           THE COURT:  Please be seated, ladies and gentlemen.

22           Ladies and gentlemen of the jury, welcome back from

23  the lunch break.

24           Just a few things, some housekeeping and then a

25  legal instruction.

1          So, first of all, when you come in, you should

2     always feel free to sit as soon as you get to your seats.  We

3     are standing out of respect for the jury and the jury system.

4     So we will remain standing until you're seated, but you don't

5     have to wait for me.

6          Secondly, that was a longer lunch break than we

7     generally hope for.  Sometimes these things are unavoidable.

8     But rest assure that we try to surface legal issues that we

9     are going to have to discuss outside of the jury's presence.

10    We try as hard as possible to surface those issues in advance

11    of trial and after the trial day is over to minimize the

12    burden on your time.

13         Lastly, a legal instruction.  Before the lunch

14    break, immediately before the lunch break, you will remember

15    that the witness, who is currently on the witness stand, Mr.

16    Selimaj, I think is the way you pronounce that, testified

17    about his own thinking, his own thinking after the encounter

18    he described with Mr. Romanello.  That testimony about his own

19    thought process was admitted to show the witness' state of

20    mind and to provide context for who did what next.  His

21    testimony was not admitted for its truth and you should not

22    consider it for that purpose.

23         All right.  Does the Government want to bring the

24    witness back?

25         MS. REHNQUIST:  Yes, your Honor.

1        THE COURT:  Thank you.

2        MS. REHNQUIST:  May I resume the podium?

3        THE COURT:  Yes.

4        MS. REHNQUIST:  May I resume, your Honor?

5        THE COURT:  You may, please proceed.

6        MS. REHNQUIST:  Just for the record and the witness,

7   you're still under oath.

8   DIRECT EXAMINATION

9   BY MS. REHNQUIST:  (Continuing)

10  Q    Mr. Selimaj, before the break, we were talking about the

11  first time Rom visited your restaurant.

12        Do you remember that?

13  A    Yes, I do.

14  Q    Do you see Rom in this courtroom today?

15  A    Yes, I do.

16  Q    Could you please identify him by an article of clothing

17  that he's wearing?

18  A    He has a gray hair, glasses, and a sweater is, I think

19  it's blue.

20        MS. REHNQUIST:  Your Honor, let the record reflect

21  that the witness has identified the defendant.

22        MR. MCMAHON:  So stipulated, your Honor.

23        THE COURT:  Yes, the record shall so reflect.

24  Q    After that first visit from Rom, did there come a time

25  that you saw Rom again?

1   A    Yes, I did.

2   Q    When was that?

3   A    It is a couple weeks later.

4   Q    A couple weeks after the first visit?

5   A    Yes.

6   Q    Where did you see him?

7   A    At Lincoln Square Steakhouse.

8   Q    Who was Rom with that day?

9   A    The second time Rom came with the gentleman, Exhibit 5,

10  and Luan Bexheti and a fourth person, I don't know.

11  Q    You said the name Luan Bexheti?

12  A    Yes.

13  Q    Who is Luan Bexheti?

14  A    He's Albanian kid.  I know him like 25, 30 years.

15          MS. REHNQUIST:  Mr. Jackson, may I please have the

16  ELMO for the witness only.

17  Q    Mr. Selimaj, do you see Government Exhibit 3 in front of

18  you?

19  A    Yes, I do.

20  Q    Do you recognize the individual in Government Exhibit 3?

21  A    Yes, I do.

22  Q    Who do you recognize it to be?

23  A    This is Luan Bexheti.

24  Q    Is this a fair and accurate depiction of Luan Bexheti?

25  A    Yes, it is.

1          MS. REHNQUIST:  And also showing just the witness

2   only Government Exhibit 3-A.

3   Q    Is this a placard that says Luan Bexheti?

4   A    Yes, correct.

5          MS. REHNQUIST:  Your Honor, at this time the

6   Government moves to admit Government Exhibit 3 and

7   Government Exhibit 3-A.

8          MR. MCMAHON:  No objection.

9          MR. MARRONE:  No objection, your Honor.

10          THE COURT:  Received and you may publish.

11          (Government's Exhibit 3-A received in evidence.)

12          (Exhibit published.)

13   BY MS. REHNQUIST:

14   Q    Why was Luan Bexheti there during the second meeting?

15   A    He was there with the Exhibit 5, trying to collect the

16   money that my nephew owes.

17   Q    Is this the gambling money?

18   A    Gambling money.

19   Q    And what was Luan Bexheti's relationship to the gambling

20   money?

21   A    I don't know if he work for them or was ....

22          THE COURT:  If you know.

23   Q    What happened when Rom and these other men arrived at

24   your restaurant?

25   A    As usual Rom asked me to go in a private room, we went

1    over, we talk, and he was asking again for $86,000.

2    Q    What was the tone of the conversation?

3    A    He was getting higher than the first time, like screaming

4    that I need my $86,000, I don't want to hear.  I need my

5    money.

6    Q    And who was saying these things?

7    A    He was saying to me.

8    Q    Who was saying them?

9    A    Rom.

10   Q    Was anyone else in the private room with you and Rom at

11   this time?

12   A    No.  No.

13   Q    What, if anything, did you say to Rom after he was asking

14   for his $86,000?

15   A    So I told Rom that time, I spoke with my nephew, Toni,

16   Fitoni, and he said he want only $6,000 and other $80,000,

17   Fitoni's brother-in-law owe, and I say I don't care, I want

18   all my money.  I don't care who owns it.  I want all my money.

19   Q    Did anything else happen during that conversation?

20   A    Well, no, he was getting just like mad.  Nothing else.

21   Q    What, if anything, did you do after Rom, the individual

22   in Government Exhibit 5, and Luan Bexheti came to your

23   restaurant that day?

24   A    Well, they had the dinner and they left.  And I called my

25   nephew again and I told him that Rom came with the number

1  Exhibit 5 and asking for money.

2  Q    Okay.  And why did you reach out to Tony?

3  A    I didn't want Toni again to get hurt from them.

4  Q    Did there come a time after this second visit by Rom that

5  you saw Rom again?

6  A    Yes, I did.

7  Q    Approximately when was that in relation to the Second

8  visit?

9  A    It was about a couple weeks later.

10  Q    And where did you see Rom next?

11  A    At Lincoln Square Steakhouse.

12  Q    The same location?

13  A    Same location.

14  Q    And this is the restaurant you were owning at the time?

15  A    Yes.

16  Q    Prior to each of the times that Rom showed up at your

17  restaurant, did you know that he was coming?

18  A    No, I didn't.

19  Q    Did he ever reach out to you beforehand?

20  A    No, he didn't.

21  Q    Have you ever spoken with Rom on the phone?

22  A    No, I didn't.

23  Q    At this point, in 2017, did you consider Rom a friend?

24  A    I knew him as a customer, not a friend.

25  Q    For this third visit, who, if anyone, did Rom come to

1   your restaurant with?

2   A    He came with the Exhibit 5.  He came with his son, and he

3   came with another gentleman.

4   Q    All right.  How do you know he came with his son?

5   A    He introduced me that night to his son.

6   Q    So it was Rom and three other people?

7   A    Yes.

8   Q    Okay.  Can you describe for the jury what happened during

9   the third time Rom came to your restaurant?

10  A    Well, when he came third time to my restaurant, again, we

11  went to private room.  Rom asked to go to private room, and

12  one of the gentleman with him ask him should we come with you.

13  He said no, and me and Rom went over there.  And --

14  Q    Let me pause you for a second.

15       When you say you and Rom went over there, where --

16  A    In the private room.

17  Q    Mr. Selimaj, if you would just slow down a little bit and

18  just wait until I finished my question.

19  A    Okay.

20  Q    It's for the Court reporter.

21       So did you and Rom go to a private room.

22  A    Yes, we room.

23  Q    What happened -- was anyone else with you?

24  A    No.

25  Q    What happened when you were in the private room?

Shuqeri Selimaj - direct - Rehnquist          109

1   A    Rom was getting mad.  He was still screaming, yelling:  I

2   want all my money, I want $86,000, and I don't want to hear.

3   And I told him Rom, my nephew tells me he owes you $6,000.

4   I'm willing to pay for my nephew $6,000, but I'm not willing

5   to pay $80,000 for my nephew's brother-in-law.  He say, I

6   don't care, I want all my money.  And he was raising the

7   voice.

8   Q    Why did you tell Rom that you would pay the $6,000 that

9   your nephew owed?

10  A    I just didn't want my nephew to get hurt, to get broken

11  leg or to be killed.

12  Q    How, if at all --

13        MR. MARRONE:  Objection.

14        MR. MCMAHON:  Same objection.

15        THE COURT:  Your objection is noted.  But overruled,

16  you may continue.

17  Q    How, if at all, did Rom react when you told him that you

18  would pay him the $6,000 but not the $86,000?

19  A    He just didn't want to take the answer.  He say I want

20  all my money and he was raising his voice, screaming.

21  Q    Did you eventually leave the private room?

22  A    Yes, we did.

23  Q    Where did you go?

24  A    We went towards the bar, where he had his friends waiting

25  for him.

Shuqeri Selimaj - direct - Rehnquist          110

1   Q     The three individuals?

2   A     The three individuals, yes.

3   Q     What happened, if anything, when you arrived at the bar

4   area?

5   A     So, me and Rom, we arrived at the bar area and we're

6   still talking and, you know, I was telling him I'm willing to

7   pay 6,000 for my nephew but I'm not paying 80,000 for his

8   brother-in-law.  And the gentleman, Exhibit 5, he came closer

9   to us, me and Rom, and he start to talk, that they want all

10  the money, that I don't care, Toni got to pay all the money,

11  we don't care about his brother-in-law.

12  Q     So at this time, you're standing with Rom and the

13  individual in Government Exhibit 5?

14  A     Yes.

15  Q     And what did you say, if anything, to Rom and this

16  individual?

17  A     I just told him I'm willing to pay $6,000, but I'm not

18  willing to pay $86,000, and Rom keep yelling, screaming at the

19  bar.  There was a customer at the bar.  There was my workers,

20  15 workers around there watching show.

21        And then Rom keep saying I would like to punch you,

22  I'd like to punch you.  And, you know, he keep going I like to

23  punch you.

24        I say you have no guts to punch me.  I told him

25  that.

1  Q     Then what happened?

2  A     Few seconds later he just punched me.

3  Q     Where did he punch you?

4  A     He punched me in my face.

5  Q     After Rom punched you in your face, what, if anything,

6  happened?

7  A     The gentleman, Exhibit 5, he pushed me with his hands

8  like this.

9          MS. REHNQUIST:  For the record, the witness is

10  holding his two hands in front of his chest and moving them

11  forward.

12          THE WITNESS:  Yes.

13  Q     After the individuals in Government Exhibit 5 pushed you,

14  what happened?

15  A     Well, the two gentlemen, they surround me one on the left

16  and one on the right.

17  Q     Which two gentlemen?

18  A     The gentlemen sitting at the bar, Rom son or the

19  gentleman that I ignore.

20          (Continued on next page.)

21

22

23

24

25

1  EXAMINATION BY

2  MS. RHENQUIST:

3  (Continuing.)

4  Q    So those two surround you?

5  A    Yeah, four of them.  I was, like, in the middle

6  surrounded by four of them.

7  Q    And then what happened?

8  A    And I was lucky enough to say, gentlemen, you are on the

9  video camera.

10 Q    What video camera are you referring to?

11 A    Camera in the restaurant.

12 Q    After you mentioned the video camera to them, what

13 happened?

14 A    Rom just say let's get out of here.

15 Q    And what happened next?

16 A    And then they left.

17 Q    And after all of this happened, what was your reaction?

18 A    I was really mad.  I could not believe that Rom knew me

19 for 30 years and he was going come over, beat me in front of

20 my work, in front of customers in the restaurant, and I was

21 very mad.

22 Q    You were mad?

23 A    Yes.

24 Q    You mentioned the video cameras.  Were there

25 surveillance videos?

*S. Selimaj - Direct/Ms. Rhenquist*                    113

1    A    That's surveillance camera, yes.

2    Q    And do you know if the incident that you just discussed

3    where Rom punched you was captured on that video

4    surveillance?

5    A    Yes, it is.

6    Q    Have you watched that video?

7    A    Yes, I did.

8              MS. RHENQUIST:  Your Honor, at this time, the

9    Government would like to read in a stipulation into the

10   record.

11             THE COURT:  Please.  Just tell us how the

12   stipulation is identified if there is a number, an exhibit

13   sticker on it.

14             MS. RHENQUIST:  The stipulation is identified as

15   Government Exhibit S-2.  And if we could put it on the Elmo

16   so the jury can follow along.

17             THE COURT:  Yes, it's been published now.  Let us

18   know if you need us to dim the lights at all.  This is a

19   stipulation so we're going to publish it, right?

20             COURTROOM DEPUTY:  Dim the lights?

21             THE COURT:  A bit.

22             MS. RHENQUIST:  So Government Exhibit Stipulation

23   S-2.

24             It is hereby stipulated and agreed by and between

25   the United States of America and defendants Joseph Celso and

1    Anthony Romanello, through their attorneys, that:

2              On or about May 11, 2017, Lincoln Square steakhouse

3    was located at 208 West 70th Street in New York, New York.

4    The steakhouse.

5              Government's Exhibits 311 through 323 are true and

6    accurate copies of video surveillance footage recovered from

7    surveillance cameras located inside the steakhouse on May 11,

8    2017.

9              The timestamps that appear on Government

10   Exhibits 311 through 323, are accurate as to the date and

11   time of the events depicted.

12             Government Exhibits 311 through 323 are admissible

13   in evidence.

14             This stipulation, marked as Government Exhibit S-2

15   is admissible in evidence.

16             Signed and dated by the parties on November 14,

17   2023.

18   EXAMINATION BY

19   MS. RHENQUIST:

20   (Continuing.)

21   Q    Mr. Selimaj, in addition to reviewing the surveillance

22   video from Lincoln Square Steakhouse, did you also look at

23   some still images that were taken from those videos?

24   A    What was the question?

25   Q    Did you review the video from Lincoln Square Steakhouse?

1    A    Yes, I did.

2    Q    Did you also review some still images of that video

3    surveillance?

4    A    Yes, I did.

5    Q    Were those still images and clips true and accurate

6    still images and clips from the video surveillance footage?

7    A    Yes, they are.

8    Q    Showing the witness only what's been marked as

9    Government Exhibit 353.

10        Do you recognize this exhibit?

11   A    Yes, I do.

12   Q    How do you recognize it?

13   A    I signed it, initial it, on November 27, 2023.

14   Q    And does this hard drive contain the still images and

15   video clips that we just discussed from the Lincoln Square

16   Steakhouse video surveillance footage?

17   A    Yes, it is.

18   Q    And are these true and accurate copies of those still

19   images and video clips?

20   A    Yes, they are.

21        MS. RHENQUIST:  Your Honor, at this time, the

22   Government moves to admit Government Exhibit 353 and its

23   contents which contains Government Exhibits 313-A, 313-B,

24   316-A, 319-A, and 323-A.

25        MR. MCMAHON:  No objection.

*S. Selimaj - Direct/Ms. Rhenquist*          116

1          MR. MARRONE:  No objection, your Honor.

2          THE COURT:  They are admitted.

3          (Government's Exhibits 353, 313-A, 313-B, 316-A,

4    319-A, and 323-A were marked in evidence.)

5          MS. RHENQUIST:  Your Honor, in relation to the

6    stipulation S-2 the Government formally moves the stipulation

7    which is marked as Government Exhibit S-2 and the Government

8    exhibits referenced therein which are Government's

9    Exhibits 311 through 323.

10          MR. MCMAHON:  No objection.

11          MR. MARRONE:  No objection, your Honor.

12          THE COURT:  They are admit as well.

13          (Government's Exhibits S-2 and 311 through 323 were

14   marked in evidence.)

15   EXAMINATION BY

16   MS. RHENQUIST:

17   (Continuing.)

18   Q    I want to focus on the surveillance cameras for a

19   minute.

20          Were there multiple cameras at the restaurant?

21   A    Yes, there were.

22   Q    And where, generally speaking, where were the cameras

23   located?

24   A    Outside the door in a hallway, over the bar, and some

25   dining room areas, in the kitchen.

1  Q    And were there timestamps on the video cameras?

2  A    Yes.

3  Q    And were those approximately accurate?

4  A    Yes, they are.

5  Q    If we could publish what's in evidence as

6  Government Exhibit 313-A.

7           MS. RHENQUIST:  And, Mr. Jackson, this is on the

8  computers, please.

9  Q    Mr. Selimaj, do you recognize the area of the restaurant

10  that depicted in Government Exhibit 313-A?

11  A    Yes, I do.

12  Q    What area of the restaurant is this?

13  A    This is bar area of the steakhouse.

14  Q    And I want to focus your attention on the top right-hand

15  corner of Government Exhibit 313-A.

16      Do you see a date and timestamp there?

17  A    Yes, I do.  2017, May 11th, 5:58.

18  Q    Is that am or p.m.?

19  A    P.m.

20           MS. RHENQUIST:  And, Mr. Rader, if we could just

21  zoom in on the center of the exhibit.

22  Q    Mr. Selimaj, do you recognize anyone in the center of

23  exhibit, Government Exhibit 313-A?

24  A    Yes, I do.

25  Q    If you could tell me person by person who you recognize

1  by circling the individual on the screen.  It's a touch

2  screen, so...

3  A    So touch screen I just --

4         MS. RHENQUIST:  One second.

5  Q    313-A.  So, first, why don't you circle the individual

6  and then explain to the jury who it is, who you recognize?

7  A    (Circling).

8  Q    For the record, the witness has circled an individual

9  wearing a suit and he's used the blue circle in the

10 top-middle of the screen.

11        Who do you recognize that to be, Mr. Selimaj?

12 A    That's myself.

13 Q    And I'm going to clear the screen.

14        Do you recognize anyone else in

15 Government Exhibit 313-A?

16 A    (Circling).

17 Q    Mr. Selimaj has now placed a second circle, which is on

18 the right-hand side of the individual he just identified as

19 himself.

20        Mr. Selimaj, who do you recognize that second individual

21 to be?

22 A    That's Rom.

23 Q    Okay.  We're going to clear the screen.

24        Do you recognize anyone else in this exhibit,

25 Mr. Selimaj?

1   A     (Circling).

2   Q     For the record, the witness has circled the individual

3   in between the two individuals previously identified as

4   Mr. Selimaj and Rom.

5         Mr. Selimaj, who do you recognize this individual to be?

6   A     That's Exhibit 5.

7   Q     The individual in Government Exhibit 5?

8   A     Yes.

9   Q     Do you recognize anyone else in this exhibit,

10  Mr. Selimaj.

11  A     (Circling).

12  Q     For the record, the witness has circled the individual

13  at the bottom of the screen who is wearing a white shirt with

14  his back to the bar.

15        Mr. Selimaj, who do you recognize this individual to be?

16  A     That's Rom's son.

17  Q     Rom's son?

18  A     Yes.

19  Q     And clearing the screen, do you recognize anyone else in

20  Government Exhibit 313-A?

21  A     (Circling).

22  Q     For the record, the witness has placed a blue circle to

23  an individual on the left-hand side of this group of men

24  wearing what appears to be a dark-colored shirt.

25        Mr. Selimaj, who do you recognize this individual to be?

*S. Selimaj - Direct/Ms. Rhenquist*                    120

1   A    That's the gentleman that came with Rom and the fourth

2   person.

3   Q    I'm going to clear the screen.

4        Are all the individuals that Rom came into your

5   restaurant that day located here on Government Exhibit 313-A?

6   A    Yes, they are.

7             MS. RHENQUIST:  Mr. Rader, if we could take that

8   down and publish what's in evidence as

9   Government Exhibit 316-A.

10  Q    Mr. Selimaj, what part of the restaurant is featured

11  here in Government Exhibit 316-A?

12  A    This is the hallway going to the private room.

13  Q    And could you please circle on the exhibit where the

14  private room is located?

15  A    (Circling).

16  Q    For the record, the witness has placed a circle on the

17  top-center and slightly left of center on

18  Government Exhibit 316-A and I'm just going to clear the

19  screen.

20       Mr. Selimaj, what is the date and time featured on

21  Government Exhibit 316-A?

22  A    2017, 5/11, 5:56:09 p.m.

23  Q    Just to orient the jury, is this the date of visit three

24  that we just discussed?

25  A    Correct.

*S. Selimaj - Direct/Ms. Rhenquist*                    121

1   Q    Do you recognize any individuals in

2   Government Exhibit 316-A?

3   A    Yeah, this is Rom.

4   Q    Could you please circle on the screen which individual

5   is Rom?

6   A    (Circling).

7   Q    For the record, the individual has circled the

8   individual who appears to be wearing a light-colored jacket.

9        And do you recognize anyone else in

10  Government Exhibit 316-A?

11  A    I see just Rom here.

12       MS. RHENQUIST:  Mr. Rader, could we just blow up

13  the center of the exhibit?

14  Q    Mr. Selimaj, do you see anyone standing in front of Rom?

15  A    (Circling).  Yes, I do.

16  Q    And, for the record, the witness has circled the

17  individual standing in front of Rom.

18       Do you recognize that individual?

19  A    Yes, I do.

20  Q    And who is that?

21  A    That's myself.

22       MS. RHENQUIST:  Mr. Rader, if we could please

23  publish what's in evidence as Government's Exhibit 319-A.

24  Q    Mr. Selimaj, what part of Lincoln Square Steakhouse is

25  featured in Government Exhibit 319-A?

1   A    This is area in front of the bathroom, in front of the

2   private rooms, where the four private rooms and bar area.  In

3   front of bar area.

4   Q    Do you see the entrance to Lincoln Square Steakhouse in

5   this exhibit?

6   A    Yes, I do.

7   Q    Could you please circle the entrance to the steakhouse?

8   A    (Circling).

9   Q    For the record, the witness has placed a circle on the

10  top-center of the screen.

11       You mentioned there was also a bathroom area?

12  A    Yes.

13  Q    Where is that area in the exhibit?

14  A    (Circling).

15  Q    For the record the witness, has placed a circle in left

16  of the center on the exhibit.

17       Mr. Selimaj, do you recognize any individuals in

18  Government Exhibit 319-A?

19  A    Yes, I do.

20  Q    Who do you recognize?

21  A    (Circling).  This is Rom's son.

22  Q    For the record, the witness has circled the individual

23  on the left-hand side of the exhibit.

24       And you mentioned that's --

25  A    Rom's son.

*S. Selimaj - Direct/Ms. Rhenquist*                    123

1    Q      -- Rom's son.

2           And do you recognize anyone else in this exhibit?

3    A      Yes, I do.

4    Q      Could you please circle that individual?

5    A      (Circling).

6    Q      For the record, the witness has circled the individual

7    on the right-hand side.

8           Mr. Selimaj, who do you recognize that individual to be?

9    A      That's the fourth gentleman that came with Rom.

10   Q      Now, if we could please publish

11   Government Exhibit 323-A.

12          Mr. Selimaj, what part of Lincoln Square Steakhouse is

13   featured in Government Exhibit 323-A?

14   A      This is in front of the bar area coming from the private

15   room.

16   Q      And is the -- where is the bar area in this exhibit?

17   A      It's this area here.

18   Q      On the left-hand side?

19   A      Left side.

20   Q      For the record, the witness has placed a circle on the

21   left-hand side of the exhibit.

22          Where, in relation to this exhibit, is the exit from

23   Lincoln Square Steakhouse?

24   A      (Marking with an X).

25   Q      For the record, the witness has placed an X just at the

*S. Selimaj - Direct/Ms. Rhenquist*                    124

1    bottom of the exhibit which is not captured on the camera.

2        Mr. Selimaj, do you recognize anyone in

3    Government Exhibit 323-A?

4    A    Yes, I do.

5    Q    And for the record, the individual has placed a circle

6    around the sole individual in Government Exhibit 323-A.

7        Who do you recognize that person to be?

8    A    That's Rom.

9            MS. RHENQUIST:  Your Honor, at this time, we would

10   like to play a video.

11           Are the lights dim enough?  Is this the right

12   setting?

13           COURTROOM DEPUTY:  Do you want it more dim.

14           THE COURT:  You can go one or two clicks from here,

15   please.

16           (A brief pause in the proceedings was held.)

17           MS. RHENQUIST:  Mr. Rader, if you could please

18   publish what's in evidence as Government Exhibit 313-B.  And

19   before we start playing, if we could just pull the video up.

20   Q    First, if we could just focus on the top right-hand

21   corner of the screen.  If we could zoom in on the top

22   right-hand corner if we can.

23       Mr. Selimaj, do you see the date and time in the top

24   right-hand corner of the screen?

25   A    Yes, I do.  It's still 2017, 5/11, 5:53:16 p.m.

1          MS. RHENQUIST:   Mr. Rader, could you pull up

2    Government Exhibit 313-B.

3    Q     And focusing on Government Exhibit 313-B, could you just

4    read the date and time, again, for the jury?

5    A     2:0:17 is, May 11th, 5:58:17 p.m.

6    Q     And we could focus, Mr. Selimaj, on the three

7    individuals in the center of the exhibit.  Do you recognize

8    those individuals?

9    A     Yes, I do.

10   Q     And who do you recognize them to be?

11   A     This is Rom's son.

12   Q     For the record, the witness has placed a circle around

13   the individual wearing what appears to be a light-colored

14   shirt with his back to the bar.

15         And do you recognize anyone else?

16   A     Yes, I do.

17   Q     And could you please put a circle on that person?

18   A     (Circling).

19   Q     For the record, the witness has placed a circle around

20   the person standing immediately in front of the individual

21   that was just identified as Rom's son.

22         And who do you recognize that person to be?

23   A     This Exhibit 5.

24   Q     The individual from Government Exhibit 5?

25   A     Yes.

1  Q     And clear the screen.

2        Do you recognize anyone else in this video, Mr. Selimaj?

3  A     (Circling).

4  Q     For the record, the witness has placed a circle around

5  the individual standing immediately in front of the

6  individual Mr. Selimaj just identified as the person from

7  Government Exhibit 5.

8        Mr. Selimaj, who do you recognize that to be?

9  A     That's the fourth gentleman that came with Rom.

10       MS. RHENQUIST:  So, Mr. Rader, if we could please

11 play a portion of this through zero seconds and pause eight

12 seconds into the video.

13       Mr. Selimaj, I'm going to play eight seconds of the

14 video, pause it, and then ask some additional questions?

15       (Video file played in open court.)

16       (Video file concludes.)

17 Q     Mr. Selimaj, did you see the two people enter the video

18 from the left-hand side of the screen?

19 A     Yes, I did.

20 Q     Do you recognize those individuals?

21 A     Yes, I do.

22 Q     Who do you recognize them to be?

23 A     (Circling).

24 Q     Mr. Selimaj, placed a circle of the individual in the

25 top-left corner of the screen who is walking in front wearing

1    what appears to be a dark-colored jacket.

2        Mr. Selimaj, who do you recognize that to be?

3    A    That's Rom.

4    Q    And then do you recognize anyone else?

5    A    (Circling.)

6    Q    Mr. Selimaj put a circle around the individual who is

7    standing on the left-hand side of the individual who was just

8    identified as Rom.

9        Mr. Selimaj, who do you recognize that to be?

10   A    That's myself.

11   Q    And before we continue playing the video, Mr. Selimaj,

12   do you know where you and Rom are coming from at this point?

13   A    We came from private room.

14   Q    So you were in the private room?

15   A    Yes.

16   Q    And now you're entering the bar?

17   A    Yes.

18   Q    If we could please play the next five seconds of the

19   video.  So starting at eight seconds in and playing through

20   13 seconds in.

21              (Video file played in open court.)

22              (Video file concludes.)

23   Q    Mr. Selimaj, can you please explain to the jury where

24   you and Rom went?

25   A    We went to the private room and we had discussion.  Rom

1    was yelling and screaming that he wants $86,000 which I

2    offered to pay 6,000 for my nephew, but 80,000 I was not

3    willing to pay far his brother-in-law which...

4    Q    And just focusing, Mr. Selimaj, on the video, did you

5    and Mr. Romanello meet up with anyone in this portion of the

6    video at second 13?

7    A    Yes.

8    Q    And who is that?

9    A    This is Exhibit 5.

10   Q    Okay.  And so, at this point, you're standing with

11   Mr. Romanello and the individual from Government Exhibit 5?

12   A    Yes.

13   Q    Could we please play from 13 seconds and pause at

14   48 seconds.

15            (Video file played in open court.)

16            (Video file concludes.)

17   Q    Mr. Selimaj, what's taking place in the video from

18   13 seconds to 48 seconds?

19   A    Okay.  When we came from the private room, Exhibit 5

20   came over to talk with me and I explained to him exactly what

21   I explained to Rom.  I'm willing to pay $6,000 for my nephew

22   but not 80,000.  And he was raising voice, too, we want all

23   the money and we want $86,000.  So both him and Rom they want

24   all the money at once.

25   Q    And you were talking to Rom and the individual from

*S. Selimaj - Direct/Ms. Rhenquist*                    129

1    Government Exhibit 5?

2    A    Yes, correct.

3    Q    Now, Mr. Selimaj, I want you to focus now on where you

4    are standing.

5            MS. RHENQUIST:  And Mr. Rader if we could play the

6    next portion of the video at half speed from second 48 until

7    second 55.

8            (Video file played in open court.)

9            (Video file concludes.)

10   Q    And, again, Mr. Selimaj, if you could please focus on

11   the area where you're standing?

12   A    What's the question again?

13   Q    While you're watching the video, if you could focus on

14   the area where you're standing and then I'll ask you some

15   questions about that after we watch the next seven seconds.

16           (Video file played in open court.)

17           (Video file concludes.)

18   Q    Mr. Selimaj, what just happened in this portion of the

19   video?

20   A    Rom just punched me in my face.

21   Q    After Rom punched you, what happened?

22   A    The gentleman, Exhibit 5, he pushed me with his hands in

23   the back.

24   Q    And the other two individuals that came with Rom, what

25   did they do?

*S. Selimaj - Direct/Ms. Rhenquist*          130

1   A    They surround me, all around, like, four sides.  I was,

2   like, in the middle.  One is over there, one is here, one is

3   here, one is behind.

4          MS. RHENQUIST:  Mr. Rader, if we could now rewind

5   to 48 seconds and play at normal speed from 48 seconds to

6   one minute and three seconds.

7          (Video file played in open court.)

8          (Video file concludes.)

9   Q    Mr. Selimaj, what is happening in this section of the

10  video?

11  A    After Rom punched me, I told him that, guys, you are

12  under surveillance camera.  And Rom says, let's get out of

13  here.  He use the words:  Let's get out of here.

14  Q    And where do you go at that time?

15  A    I went on the left towards the main dining room.

16  Q    So you went in the opposite direction?

17  A    Yes.

18          MS. RHENQUIST:  And then if we could continue

19  playing from minute 1:03 to minute 1:33.

20          (Video file played in open court.)

21          (Video file concludes.)

22  Q    Mr. Selimaj, could you please explain to the jury what

23  happened in that section of video?

24  A    So they left and then I went towards the exit to see if

25  they left or they're coming back.

S. Selimaj - Direct/Ms. Rhenquist                131

1   Q    Did they come back to the restaurant?

2   A    No, they didn't.

3   Q    What were your emotions at this time?

4          MR. MCMAHON:  Objection.

5          THE COURT:  Sustained.

6   Q    How, if at all, did Rom punching you in the face

7   influence whether or not you thought the money should be paid

8   back?

9   A    I was afraid.  I said, if you can punch me in the middle

10  of the day in my restaurant, what are they going to do at

11  night where nobody watches.

12  Q    After Mr. Romanello and the other individuals left the

13  restaurant, what did you do next?

14  A    After they left, I called the police.

15  Q    And why did you call the police?

16  A    Because Rom punched me.

17  Q    And after you spoke with the police, what did you do?

18  A    The police came to the restaurant and they said we

19  cannot file this, we're going to go to the police station.

20  So the police car took me to police station.

21  Q    What happened?

22  A    And I filed complaint.

23  Q    When you arrived at the police station, you filed a

24  complaint?

25  A    Yes.

*S. Selimaj - Direct/Ms. Rhenquist*                    132

1  Q    And what was the complaint?

2  A    It was a complaint that Rom hit me in my face with the

3  three other gentleman that were at the restaurant.

4  Q    In addition to talking with the police that night, did

5  you speak with anyone else?

6  A    Yeah, I calmed my brother Nino.

7  Q    Why did you call Nino?

8  A    Because we're six brothers, but me and Nino are eldest,

9  oldest, brothers.  So he knew Rom and I was so emotional how

10 Rom can hit me in my restaurant.  And he went to my brother's

11 restaurant so many times.  And Nino told me and said call the

12 police and I said I already did.

13 Q    In addition to speaking with Nino and the police, did

14 you speak with Toni?

15 A    Yes.

16 Q    And what did you say to Toni?

17 A    I don't remember exactly but I told him what happened

18 and that Rom hit me.

19 Q    Did you say anything to him about the debt?

20 A    I don't remember.

21 Q    Why did you call Toni?

22 A    To be careful not to be because he could be hurt.

23 Q    The police report that you filed, what happened in

24 relation to that police report?

25 A    After me and Nino spoke, and Nino telling me that we

1  should withdraw the complaint.  It's going to be bad, it's

2  going to be ugly, that I should drop complaint.

3  Q    What did you interpret that to mean?

4           MR. MCMAHON:  Objection.

5           THE COURT:  Sorry, you have to pause when there is

6  an objection.

7           Are we talking about what he interpreted Nino's

8  statement to mean?

9           MS. RHENQUIST:  Yes, your Honor.

10           THE COURT:  His brother.

11           MS. RHENQUIST:  Yes.

12           THE COURT:  Sustained.

13  Q    After Nino told you that it was going to get bad or get

14  ugly, what did you do?

15  A    Next day, Nino came to my restaurant, Lincoln Square,

16  and from there me and Nino went to the police station on

17  Upper West Side and I withdraw the complaint.

18  Q    Did you have to file paperwork when you went to the

19  police station to report the incident?

20  A    Yes, I did.

21           MS. RHENQUIST:  Showing just the witness what's

22  been marked for identification as Government Exhibit 500 and

23  501.

24  Q    Mr. Selimaj, do you see the two documents on the screen

25  there?

1   A    Yes, I do.

2   Q    Do you recognize these documents?

3   A    Yes, I do.

4   Q    What do you recognize them to be?

5   A    These documents when I went to withdraw complaint.

6   Q    These are the documents that when you went to the police

7   department?

8   A    It withdraw complaint.

9   Q    And are these true and accurate copies of the documents

10  that you filed with the New York City Police Department to

11  withdraw the complaint?

12  A    Yes, they are.

13          MS. RHENQUIST:  Your Honor, at this time, the

14  Government moves to admit Government Exhibit 501 and 500.

15          MR. MCMAHON:  No objection.

16          THE COURT:  Hold on.

17          MR. MARRONE:  I'm sorry, Judge.

18          THE COURT:  We're waiting on one more lawyer.

19          MR. MARRONE:  If I could have a very brief voir

20  dire.

21          THE COURT:  Come to the sidebar.

22          (Continued on the next page.)

23

24

25

*Sidebar*                                                    135

1          (Sidebar held outside the presence of the jury.)

2          THE COURT:  We're going to take a ten-minute break

3    right now.  The jury is excused and we will talk while you

4    all relax in the jury room for a bit.

5          (Jury exits courtroom at 3:08 p.m.)

6          MS. SCHUMAN:  Your Honor, may we excuse the

7    witness?

8          THE COURT:  As long as we're all at the sidebar,

9    we'll talk at the sidebar.

10          MR. MARRONE:  I just want to ask the time.  There's

11    a timestamp on top of that complaint.  If you look at the

12    exhibit, it's very small.

13          THE COURT:  Okay.

14          MR. MARRONE:  And I wanted to just inquire what

15    time the complaint was withdrawn.

16          THE COURT:  What time the complaint was withdrawn.

17          MR. MARRONE:  Withdrawn.

18          THE COURT:  Does that go to admissibility?

19          MR. MARRONE:  It goes to when he -- to his state of

20    mind when he withdrew the complaint.

21          THE COURT:  You can ask him on cross.  Voir dire

22    questions, just so everybody knows, should really be limited

23    to questions that go to the admissibility or inadmissibility

24    of a documents, not how the jury should interpret the

25    documents.

1      MR. MARRONE:  Sounds good.

2      (Sidebar discussion concludes.)

3      (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                      137

1   (Continuing.)

2              (In open court; jury not present.)

3              THE COURT:  Please be seated.  We can bring in the

4   jury and the Government can please retrieve the witness.

5              MS. REHNQUIST:  Your Honor, just very briefly, I am

6   gating a little bit worried about timing only because I

7   thought we would be putting on multiple witnesses today and I

8   think we might not even get through one witness.

9              Is there any way maybe tomorrow morning we can start

10  at 9:00 or sit a half day on Friday or something?

11             THE COURT:  Let me look at Friday.  Hold on.

12             MR. MCMAHON:  Judge --

13             THE COURT:  Let's take this up at 5:00 so we don't

14  waste the jury's time.

15             MS. REHNQUIST:  If we are going to start at 9:00, i

16  just wanted to address that, but if Friday is an option, then

17  I'm happy to do so at 5:00.

18             THE COURT:  I have to figure out what time my flight

19  is on Friday, but we'll take that up at the end of the day.

20             MR. MCMAHON:  I'm checking out of my hotel tomorrow

21  morning, Judge.

22             THE COURT:  I'm sorry?

23             MR. MCMAHON:  I'm checking out of my hotel tomorrow

24  morning, so I don't need a 9:00 call.

25             THE COURT:  I don't understand what one thing has to

1   do with the other.

2           THE COURTROOM DEPUTY:  Can the jury come in, Judge?

3           THE COURT:  Yes, please.

4           Let's get the witness.

5           MS. REHNQUIST:  Should I resume the podium?

6           THE COURT:  Yes.

7           (Witness resumes the stand.)

8           (Jury enters.)

9           THE COURT:  Please be seated, everyone.

10          I will remind the witness that you remain under

11  oath.

12          And, Ms. Rehnquist, you may continue.

13          MS. REHNQUIST:  Thank you, your Honor.

14  BY MS. REHNQUIST:

15  Q    Mr. Selimaj, before we broke, you were explaining that

16  you withdrew the complaint that you had filed against

17  Mr. Romanello?

18  A    Yes, I did.

19  Q    Why did you do that?

20  A    I spoke with my brother Nino for a couple long time,

21  maybe a few hours.  Don't remember exactly.  And he was keep

22  saying it's going to be very bad.  It's going to be very ugly.

23  It's going to be very bad.  It's going to be very ugly.  Maybe

24  you should withdraw the complaint.

25  Q    And after that conversation, you decided to withdraw the

1  complaint?

2  A     Yeah.  Nino came to my restaurant, Lincoln Square.  From

3  there we went to the police station, both of us, and I

4  withdraw the complaint.

5          MS. REHNQUIST:  If we can turn back to Government's

6  Exhibits 500 and 501, which are in evidence.

7          Mr. Jackson, if we could please publish those to the

8  jury?

9          THE COURTROOM DEPUTY:  Is that a video?

10          MS. REHNQUIST:  No.

11          Thank you.

12          (Exhibit published.)

13          MS. REHNQUIST:  Your Honor, I actually don't believe

14  that -- we were be pending an objection to Government's

15  Exhibits 500 and 501 coming into evidence.

16          THE COURT:  I think there was a request for voir

17  dire which was denied.

18          Is there any objection?

19          MR. MARRONE:  No.  I consent, Judge.

20          THE COURT:  Okay.  It's admitted and you may

21  publish.

22          MS. REHNQUIST:  Thank you, your Honor.

23          (Government's Exhibits 500 and 501 received in

24  evidence.)

25          (Exhibit published.)

1          MS. REHNQUIST:  Mr. Jackson, if we can go to the

2     computers, please.

3          Thank you.

4     Q    I want to focus first on Government's Exhibit 501.

5          MS. REHNQUIST:  Mr. Rader, if we can zoom in on the

6     top half of Government's Exhibit 501.

7     Q    Mr. Selimaj, is this the complaint dismissal form that

8     you filled out?

9     A    Yes, it is.

10    Q    The handwriting on this report, whose handwriting is

11    that?

12    A    It's mine.

13    Q    Looking at the top portion of the report, I'm going to

14    read it and I just want you to tell me if I've read it

15    correctly.

16          I, Shuqeri Selimaj --

17    A    I don't have that here.

18    Q    Do you see -- I'm going to tap the screen --

19          THE COURTROOM DEPUTY:  It's right here.

20          THE WITNESS:  I see it.

21    Q    Mr. Selimaj, do you see where the blue line is?

22    A    Yes.

23    Q    I'm going to read this and if you can tell me if I'm

24    reading it correctly.

25    A    Yes.

1    Q    I, Shuqeri Selimaj, New York, New York, the complainant

2    in complaint report number 2017-020-1819 and/or Domestic

3    Incident Report numbers NA do hereby request that the

4    complaint I filed against Anthony Romanello unknown on 5/11/17

5    be dropped.

6              Did I read that correctly?

7    A    Yes.

8              MS. REHNQUIST:  And if we could now, Mr. Rader,

9    please zoom in on the second half of the document.

10   Q    Mr. Selimaj, again, I'm going to read this portion.  I

11   just want you to let me know if I'm reading it correctly.

12             I make this request of my own free will and without

13   threat of physical or serious injury or death by the

14   perpetrator listed on the complaint report, nor his family or

15   friends.

16             I do not want the New York City Police Department to

17   take any further actions in connection with the above-listed

18   complaints.

19             And then there's a printed name "Shuqeri Selimaj"

20   with a date 5/12/17, and then officer's signature, P.O. Matos

21   with a date May 13th, '17.

22             Did I read that correctly?

23   A    Yes.

24   Q    And, Mr. Selimaj, is that your signature on this

25   document?

1  A    Yes, it is.

2          MS. REHNQUIST:  Now, Mr. Rader, if we can look at

3  Government's Exhibit 500.

4  Q    Mr. Selimaj, Government's Exhibit 500, which is on the

5  left-hand side of the screen, did you also file Government's

6  Exhibit 500 with the New York City Police Department?

7  A    Yes.

8  Q    And, again, I'm just going to read for the jury at the

9  top, 5/12/17.

10          My name is Shuqeri Selimaj.  I was thinking over the

11  24 hours and will like to drop the charges.  He had few

12  drinks.  I know him for last 30 years.

13          MS. REHNQUIST:  And, Mr. Rader, if we can just go to

14  the bottom half of Government's Exhibit 500, please.

15  Q    So was misunderstanding between me and him.  I think he

16  didn't meant to do that.  Shuqeri Selimaj with a signature and

17  a date of May 12, 2017.

18          Mr. Selimaj, is that your signature on Government's

19  Exhibit 500?

20  A    Yes, it is.

21  Q    Did you write the statements contained in Government's

22  Exhibit 500?

23  A    Yes, I did.

24  Q    The two documents that we just looked at, Government's

25  Exhibit 500 and 501, was what was written in those documents

1   accurate?

2   A     Nothing -- nothing accurate.

3   Q     Nothing in those documents was accurate?

4   A     No.

5   Q     So what you wrote in Government's Exhibit 500 that you

6   were thinking over the 24 hours and that it was a

7   misunderstanding and he didn't mean to do that, who was the

8   "he" you were referring to?

9   A     Rom.

10  Q     What's written in Government's Exhibit 500 you said was

11  not accurate?

12  A     It was not true.  Accurate -- writing it accurate, but

13  it's not true.

14  Q     So the content is not true?

15  A     Content is not true.

16  Q     And why did you tell the NYPD something untruthful in

17  this Government's Exhibit 500?

18  A     As I say before, I was afraid that this Mafia guy they

19  gonna hurt me or my brothers or my nephew or my niece.

20  Q     After you we drew the police report -- and just to

21  clarify for the jury, is the date on this May 12th, 2017?

22  A     I think I withdrew it on 13, but I don't know why it's on

23  12.

24  Q     Looking at Government's Exhibit 500 on the left-hand side

25  of the screen, what's the date written there?

1    A    5/12/17.

2    Q    And is that your handwriting?

3    A    Yes.

4    Q    And the day that Rom came to your restaurant and punched

5    you from the video, what date was that?

6    A    It was May 11th.

7    Q    The day before?

8    A    Day before.

9    Q    After you withdrew the police report, were you involved

10   at all in the debt moving forward?

11   A    What's the question again?

12   Q    After you withdrew the police report, what, if any,

13   involvement did you have in paying the debt?

14   A    Oh.  I gave to my brother Nino $6,000 to pay for my

15   nephew Toni.

16   Q    And why did you give the money to Nino?

17   A    Because Nino know these guys.

18   Q    Was anyone else involved?

19   A    I don't remember.

20   Q    Who did you believe the money was ultimately going to be

21   given to?

22   A    I believe it was going to Rom.

23   Q    Do you know if the debt was ultimately paid?

24   A    Yes.

25   Q    By whom?

1    A    By Nino.  I gave 6,000 and Toni's brother-in-law, his

2    father wire money to Nino's account, and Nino slowly cashed

3    the checks and he paid whoever he had to pay.

4    Q    Why did you pay $6,000?

5    A    Again, I didn't want my Toni nephew to get hurt.

6    Q    When was the last time you saw Rom?

7    A    May 11, 2017.

8              MS. REHNQUIST:  No further questions, your Honor.

9              THE COURT:  Cross-examination?

10             MR. MCMAHON:  Yes.

11   CROSS-EXAMINATION

12   BY MR. MCMAHON:

13   Q    Good afternoon, Mr. Selimaj.

14   A    Good afternoon.

15   Q    By the way, I requested to interview you before trial and

16   you refused; is that right?

17   A    I didn't know anything about that.  I heard from my

18   lawyer.  I didn't hear --

19             MS. REHNQUIST:  Objection.

20             THE COURT:  Did you receive a request from Mr. --

21             THE WITNESS:  No, I didn't.

22             THE COURT:  -- McMahon?

23   Q    Through your lawyer.

24   A    No, I didn't.  Nothing from my lawyer.  Not from you.

25   Q    Your lawyer is Stanley Cohen?

1   A    Yes.

2   Q    Stanley Cohen didn't tell you that I called him?

3   A    Yes.

4            MS. REHNQUIST:  Objection.

5            THE COURT:  Sustained.

6   Q    Now, this punch occurred on May 11th, 2017, at about

7   6:00 p.m.; is that correct?

8   A    Yes.

9   Q    A couple of hours later, did you call Rom and did you

10  tell him, Hey, Rom, you fucking pussy.  You motherfucking.

11  You cocksucking motherfucker.  Come over here if you have

12  fucking balls.  You have no balls, you motherfucker.

13           Did you call Rom a few hours after the punch and say

14  --

15  A    I don't remember.  I don't remember.

16  Q    You don't remember.

17  A    No.

18  Q    Did you also call Rom and tell him to go fuck his mother.

19  He's a pussy, cocksucker, motherfucker?

20  A    I don't remember.

21  Q    Is that the kind of language that you would use?

22  A    Usually I don't use that kind of language.

23  Q    Okay.  And would you like to hear a recording of these

24  calls?

25           MS. REHNQUIST:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MR. MCMAHON:  Excuse me, Judge, I have to get my

3     glasses.

4          (Pause.)

5     Q    Did you also call him and tell him to come over here and

6     get your ass here.  Fucking balls.  You go fuck yourself, you

7     motherfucking scumbag.

8          Did you call him after the punch that night and tell

9     him that, leave that message?

10    A    Well, you have to understand, in Albanian culture -- I'm

11    Albanian.  I was very upset.  Nobody put ever a fist in my

12    face, and that showed me in front of my workers, in front of

13    my customers, and I was really mad.  I thought the building

14    was coming on my shoulder, so I don't remember.

15    Q    Well, you don't remember or you were just very upset?

16    Which is it?

17    A    I don't remember saying that, but I was very upset.

18    Q    Okay.  Well, does it sound like something that you said

19    that night and --

20    A    I don't remember, sir.

21    Q    And did you also leave a message that night and say, Why

22    don't you suck my dick, you motherfucker.  This is Bruno.

23    Come suck my dick you piece of shit.

24          Did you also leave that message for him an hour

25    later?

1  A    I don't remember, sir.

2  Q    Now, one of the things that you were angry about being

3  punched at your place was that this was bad for your

4  reputation; is that right?

5  A    Reputation, my family.

6  Q    And your reputation as an Albanian tough guy?

7  A    Absolutely not.

8  Q    Do you fashion yourself as an Albanian tough guy?

9  A    No, I do not, sir.

10 Q    Okay.  So when you said that this was bad for your

11 reputation, what did you mean?

12 A    I said Albanian in general reputation.  Not my own.

13 Albanian in general.

14 Q    So the fact that you got punched by Mr. Romanello

15 affected all Albanians?

16 A    No, sir, I didn't say that.

17 Q    Well, tell me what you mean when you said it affected

18 your reputation and that's why you were upset.

19 A    It was not reputation.  I was shocked that I knew Rom for

20 30 years and he -- to hit my in my restaurant after I knew him

21 for 30 years, that's why I was shocked.

22 Q    Now, you remember on the videotape that you just saw, the

23 incident, you told the jury, I don't know, three, four, five,

24 ten times, about how Rom was screaming in the back room and

25 yelling on all three visits; is that right?

1   A    Yes.

2   Q    Okay.  And in the video where you are in the bar with

3   him, there's only one person waiving his arms around and that

4   was you; is that correct?

5   A    That's correct.

6   Q    And you were the one that was screaming?

7   A    You know why?

8   Q    Why?

9   A    Because I offer to pay $6,000 to Rom and to other

10  gentlemen there, number 5.  They refused to take $6,000.  They

11  want to collect $86,000.  That's why I said I didn't have

12  $86,000 in my pocket to give it to them.

13  Q    Now, you know that the 6,000 Toni was a debt that your

14  nephew ran up; is that right?

15  A    Yes.

16  Q    And the $80,000 was from his brother-in-law; is that

17  right?

18  A    That's what I heard.

19  Q    Okay.  So it's not like he's a stranger to you.  He's

20  your nephew's brother-in-law; is that right?

21  A    I don't know him.  If I see him in the street, I wouldn't

22  recognize him.

23  Q    So you were willing to pay $6,000, but not the 80; is

24  that right?

25  A    That's correct.

1  Q    By the way, did you know a gentleman by the name of

2  Mr. Rushi?

3  A    Mr. Who?

4  Q    Rushi.  Sam Rushi.

5  A    Sam?

6  Q    The guy that gave you $250,000.

7  A    Sam?  Can you spell his last name?

8  Q    I believe it's R-U-S-H-I.

9        When you opened up Club A Steakhouse, did you get

10  $250,000 from somebody?

11  A    Oh, yes.  That's Sam Rushi.

12  Q    Rushi, Rushi.

13  A    No.  Rushi.

14  Q    I'm just a poor Irish guy.  What can I tell you.

15  A    Yeah.

16  Q    Did you get $250,000 from him?

17  A    Yes.

18  Q    Was it in cash?

19  A    It was a check.

20        MS. REHNQUIST:  Objection.  Relevance.

21        THE COURT:  Is this relevant?

22        MR. MCMAHON:  Yes, Judge.  He's pleading poverty,

23  Judge.

24        THE COURT:  Who is?

25        MS. REHNQUIST:  Your Honor, can we have this

 1  discussion at sidebar?

 2          MR. MCMAHON:  As to why he didn't want to pay

 3  Eddie's portion of the gambling debt.

 4          THE COURT:  Sustained.

 5  Q    Now, Mr. Selimaj, how tall are you, sir?

 6  A    Six-one.

 7  Q    And how much do you weigh?

 8  A    220.

 9  Q    And how old are you?

10  A    I'm 71.

11  Q    Now, you are aware, sir, that Mr. Romanello is 86?

12  A    Yes.

13  Q    And that he's five-foot ten inches tall?

14  A    I don't know how tall.

15  Q    He's shorter than you.

16  A    Yes.

17  Q    And he's lighter than you; is that right?

18  A    He's what?

19  Q    Lighter.  He doesn't weigh as much as you weigh.

20  A    I don't know that.

21  Q    Now, this incident happened in 2017; is that right?

22  A    Correct.

23  Q    And you said that you viewed the videotape which you saw,

24  a portion of it here in court, you viewed that videotape

25  before; is that right?

1    A    Yes, sir.

2    Q    Tell the jury where you viewed that videotape.

3    A    Well, the first time I saw that video was at the district

4    attorney in Queens.  I was subpoenaed to testify and the first

5    time I saw that video it was about -- I don't -- I don't

6    exactly, but maybe four years ago I saw there.

7    Q    And was that the Queens District Attorney's Office?

8    A    It was in Queens.  I don't know exactly, in Queens.

9    Q    You knew they had arrested the Regan gambling people --

10            MS. REHNQUIST:  Objection.

11            THE COURT:  Sustained.

12   Q    Did you know that there was an arrest of the gambling

13   people?

14            MS. REHNQUIST:  Objection.

15   A    No, I didn't.

16            THE COURT:  Don't answer the question when there's

17   an objection.  You have to wait to hear me rule on the

18   objection.

19            Come to the sidebar quickly and we'll sort this out.

20            (Sidebar.)

21            (Continued on next page.)

22

23

24

25

*Sidebar*                                                                         153

1          (sidebar conference held on the record out of the

2     hearing of the jury.)

3               THE COURT:  What's the relevance?

4               MR. MCMAHON:  The relevance is it's the first time

5     that he viewed the videotape, which they brought out on

6     direct, so I'm allowed to inquire the circumstances under

7     which --

8               THE COURT:  You have the circumstances.  The state

9     of the Queens District Attorney's Office's investigation of

10    anything is surely not relevant, and if you are going that

11    way, don't.  You got the answer on where he first viewed the

12    videotape.

13              What's next?

14              MR. MCMAHON:  I wanted to ask about the Queens

15    prosecution.  I think it's relevant.

16              THE COURT:  The objection to that is sustained on

17    relevance grounds.  What is the relevance of the Queens

18    prosecution, that the Queens DA did not opt to prosecute these

19    people?

20              MR. MCMAHON:  No.  The relevance is that this

21    gentleman is trying to say that he withdrew the complaint

22    because he was in fear, and I just don't -- I think I'm

23    allowed to challenge the parameters of that; whether he was in

24    fear, what he knew about the surrounding circumstances.

25              THE COURT:  Surrounding circumstances months or

*Sidebar*                                                                                       154

1    years after he withdrew the complaint?

2            MR. MCMAHON:  We are here six and a half years

3    later.  If it's relevant for this Court, it's certainly

4    relevant for me to inquire four years ago and two years ago.

5            THE COURT:  I will hear a question about his state

6    of mind, but anything about what the Queens DA did or did not

7    do is surely off limits.

8            MR. MCMAHON:  All right.

9            THE COURT:  Thank you.

10           (Sidebar conference ends.)

11           (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2    BY MR. MCMAHON:

3    Q    You testified in the Queens grand jury and that's where

4    you saw the video?

5    A    Yes.

6    Q    Did you know that there was an indictment?

7    A    No.

8    Q    This gentleman that you talked about as number 5, you

9    don't know his name?

10   A    I learned the name later on.

11   Q    Mr. Regan?

12   A    Mike Regan.

13   Q    Yeah, the Irish bookie.

14   A    I don't know.  Mike Regan.

15   Q    I assume you talked to your nephew about who he bet with.

16   A    I didn't ask.

17   Q    You didn't ask?

18   A    I didn't ask who my nephew bet with.

19   Q    Okay.  Well, you know Luan Bexheti, don't you?

20   A    Yes, I do.

21   Q    And Luan Bexheti was sort of like a manager for Regan in

22   his gambling operation?

23   A    I don't know that, sir.

24   Q    Did Bexheti apologize to you for doing gambling and

25   involving your employees?

1   A     No, he didn't.

2   Q     He didn't?

3   A     He didn't.

4   Q     Does Bexheti know Toni?

5   A     Which Toni?

6   Q     Toni, your -- Besim's son?

7   A     Yes, he knows Toni.

8   Q     And you, as you are sitting here today, you didn't know

9   that Toni ran up that $6,000 debt by working with Bexheti for

10  Regan; you didn't know that?

11  A     I know Toni told me that they owe $6,000 to the bookie,

12  the bookmaker, whoever they are.

13  Q     Okay.  And Mr. Bexheti -- did you say that he apologized

14  to you for not -- for involving an employee of yours?

15  A     No.

16  Q     He didn't.

17        Do you know Mr. Bexheti?

18  A     Yes, I do.

19  Q     How do you know him?

20  A     I used to lend him my dining room restaurant, the Bruno

21  restaurant 25 years ago to perform his -- he's an artist -- to

22  perform, like, movie, to do, like -- for Albanian cause.

23  Q     So you knew he wanted to be an actor?

24  A     It wasn't only him, it was other actors.  They were

25  trying to educate our Albanian kids in America, culture --

1   Albanian culture, how to see the history, the poems.

2   Q    And did you know that he had gone to acting school with

3   Mr. Regan?

4   A    No, I don't, sir.

5   Q    Now, the transaction that you did with Mr. Rushi, Sal

6   Rushi --

7              MS. REHNQUIST:  Objection.

8              THE COURT:  Let's hear the question first.

9              Sorry, what's the objection?  Misstates the

10  testimony.

11             MS. REHNQUIST:  You sustained questioning on this

12  line of questioning.  You sustained my objection to the

13  questioning on this line of questioning.

14             THE COURT:  Let's hear the question.

15  Q    Was that a handshake deal?

16  A    Yes.

17             MS. REHNQUIST:  Objection.

18             THE COURT:  Oh, yes.  Sustained.  Sorry, this is

19  reminding me of the basis I articulated for the admission.

20  Q    He already answered "yes."  Do you want to have that

21  stricken?

22             THE COURT:  We will strike the answer.  The

23  objection was sustained.

24  Q    So that was a $250,000 handshake --

25             MS. REHNQUIST:  Objection.

1          THE COURT:  Sustained.

2   Q    Now --

3          THE COURT:  Unless there's a different basis for

4   relevance that you want to bring to my attention at the

5   sidebar, but the one previously articulated is overruled.

6   Q    Now, on direct examination, you were asked where you

7   thought the money from the gambling debt being repaid, where

8   it was going, and I believe you answered you thought it was

9   going to Rom; is that right?

10  A    I don't remember.

11  Q    It was only five minutes ago.

12  A    Well, yeah.

13  Q    Well, do you remember or you don't remember?

14  A    I believe it was going to Rom.

15  Q    Okay.  But you believe but you are not sure?

16  A    I'm not sure.

17  Q    Okay.

18         In fact, the guy who had the gambling office was

19  Regan and Bexheti worked for him; is that right?

20  A    Well --

21         MS. REHNQUIST:  Objection.  Asked and answered.

22         THE COURT:  Overruled.

23  Q    You can answer.

24  A    My brother will know better where money went.

25  Q    Okay, okay.

1          But in terms of the money for the gambling debt

2    going to Rom, you are just -- you are not sure of that?

3    A    My brother will know better who took the money.

4    Q    Okay.

5          Do you remember testifying in the grand jury in

6    Queens that your nephew bet the money with Luan?

7    A    I don't remember, sir.

8          MR. MCMAHON:  May I approach the witness, your

9    Honor?

10         THE COURT:  No, unless there's a reason to.

11         MR. MCMAHON:  I want to show him his grand jury

12   testimony.

13         THE COURT:  Why?

14         MR. MCMAHON:  To refresh his recollection on what he

15   said in the grand jury under oath in Queens.

16         THE COURT:  Okay.  There's a standard rubric, as I'm

17   sure you are aware, for laying a foundation for the refreshing

18   of recollection and we haven't heard it yet.

19         MR. MCMAHON:  Okay.

20   Q    Did you testify in the Queens grand jury on October 9th,

21   2019?  Did you?

22   A    I testified, yes.

23         MR. MCMAHON:  Judge, I think that's a sufficient

24   foundation.

25         THE COURT:  Absent an objection, you can approach.

1          MS. REHNQUIST:  Your Honor, could we just have a

2    brief sidebar?

3          THE COURT:  Yes.

4          (Sidebar.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (sidebar conference held on the record out of the

2    hearing of the jury.)

3               MR. MCMAHON:  He said that he doesn't --

4               THE COURT:  He doesn't remember.

5               MR. MCMAHON:  -- who his nephew bet with.

6               THE COURT:  Right.

7               MR. MCMAHON:  His testimony under oath said he bet

8    with Bexheti.

9               THE COURT:  Okay.  So what's going to happen next?

10              MR. MCMAHON:  I want to show it to him.  He said he

11   didn't remember, so presumably this will refresh his

12   recollection and he will then say, oh, yes, I now remember.

13              THE COURT:  What's the next question after --

14              MR. MCMAHON:  Do you now remember that your nephew

15   bet with Bexheti.

16              THE COURT:  I think the next question is, has this

17   refreshed your recollection.

18              MR. MCMAHON:  Yes.

19              THE COURT:  If the answer is yes, because witnesses

20   are always tempted to say, oh, if I see this on the paper,

21   then, yes, I said that.  That's not how refresh your

22   recollection, as we all know, works.  And so you should

23   establish first that his recollection has actually been

24   refreshed.

25              MS. REHNQUIST:  I just want to clarify for the

*Sidebar*                                                                          162

1  record, this is his federal grand jury testimony.

2          THE COURT:  We may have set the wrong foundation.

3          MS. REHNQUIST:  Yes, we laid the wrong foundation.

4          THE COURT:  We will fix that, too.

5          (Sidebar conference ends.)

6          (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           MR. MCMAHON:  May I continue, Judge?

3           THE COURT:  Yes, please.

4    BY MR. MCMAHON:

5    Q    Mr. Selimaj, the grand jury in October of 2019 was a

6    federal grand jury, not a state grand jury.

7           Do you remember testifying in the federal grand

8    jury?

9    A    I just testify over there.  I don't know in Queens.

10   Q    You don't remember testifying in Brooklyn here?

11   A    I remember testifying -- I don't understand question.

12          What is the question?

13   Q    Okay.  Well, what I really want to know is whether or not

14   you were aware that Toni, your nephew, was betting with Luan

15   Bexheti.  That's the question I'm interested in.

16   A    I didn't know who he is betting with.

17   Q    And do you remember testifying under oath -- well, let me

18   show you the document first and see if it refreshes your

19   recollection.  Take a look at the bottom part of the document.

20   Read it to yourself.

21   A    Yes, it's four years ago, five years ago.  I forgot.  I

22   didn't remember.

23   Q    Now, how many times did Mr. Romanello come into your

24   restaurant?

25   A    Which restaurant?

1  Q    Hah?

2  A    Which restaurant?

3  Q    Bruno's Restaurant.

4  A    He used to come quite often.

5  Q    Once a week?

6  A    Once a week, once a month, every -- once in two months.

7  Q    Now, how much money -- and if he came, he usually came

8  with other people?

9  A    Yes.

10  Q    Now, a table of four at Bruno's restaurant, what would

11  the average bill be for a table of four?

12  A    Well, all depends what they drink, what they eat.

13  Q    It could be a thousand dollars.

14  A    For four people, no.

15  Q    750?

16  A    I think -- I don't remember correctly, but at that time

17  it was maybe $75 per person.

18  Q    Was it a price-fixed place?

19  A    No, no.  It was a la carte, but the prices were lower.

20  Q    But you did describe Mr. Romanello as a very good

21  customer.

22  A    Yes.

23  Q    And you would be sad to lose him as a customer.

24  A    I will be sad to lose any customer.

25  Q    And I think he even went to Nino's restaurants even more

1    often than he went to your restaurants; is that correct?

2    A    I don't know.  I don't know that.

3    Q    You don't get along with Nino, by the way?

4    A    We do.  We're brothers.

5    Q    So that means you fight sometimes.

6    A    Well, I fight sometime with my son, sometime with my

7    wife, sometime with my brother.  We're six brothers, so, you

8    know.

9    Q    Does Nino think that you are a bully?

10   A    He can think whatever he wants.

11   Q    Has he ever told you that, that he thinks you are a

12   bully?

13              MS. REHNQUIST:  Objection.

14              THE COURT:  Sustained.

15   Q    Now, after the incident when Mr. Romanello punched you at

16   the -- was that Lincoln Square?

17   A    Yes.

18   Q    Did you call Bexheti and curse him out?

19   A    I called.

20   Q    Did you curse him out?

21   A    Probably I did.

22   Q    Okay.

23              When you went to the -- after you were punched -- by

24   the way, the punch by Mr. Romanello, it didn't knock you down?

25   A    No, he didn't.

1   Q     It didn't even knock you back, did it?

2   A     No.

3   Q     And would it be fair to say that Mr. Romanello punches

4   like a girl?

5   A     It's not matter of punch like girl.  Romanello and the

6   other guy, they push me.  You saw on the video, they pushed

7   me.  I was lucky, if they came in a private room, four of

8   them, what they would do with me, because if they did in front

9   of customer, in front of my worker, if we were in a private

10  room, what Romanello would do with this three other guy with

11  me.

12  Q     Well, you had just been in a private room with Rom --

13  A     Only with Rom, but --

14  Q     Let me get my question out.

15  A     Yeah.

16  Q     You had just been in a private room with Rom --

17  A     Yes.

18  Q     -- for the third time.

19  A     Yeah, but only with Rom.

20  Q     And he didn't do anything to you.

21  A     Not in the private room, but with three guys.

22  Q     But you knew when you came in and met him that he was

23  with three people.

24  A     Yes.

25  Q     Okay.  So you went to a private room with him, nothing

1    happens, he's not happy that your you're only paying the six,

2    you go back to the bar, and then you try to embarrass him --

3            MS. REHNQUIST:  Objection.

4            THE COURT:  This is a compound question.  Can we

5    take it piece by piece?

6            MR. MCMAHON:  Okay.

7    Q    You go back to the bar after the private room.  Yes?

8    A    Yes.

9    Q    With Rom.  Yes?

10   A    Yes.

11   Q    And you have more discussion about the debt.

12   A    Yes.

13   Q    And that's when you're flailing your arms around; is that

14   right?

15   A    As I said before --

16   Q    Yes or no.

17   A    As I said before, I say --

18   Q    Yes or no.

19   A    Repeat the question again.

20   Q    In the video that you just saw when you went back to the

21   bar and you're having a conversation with Rom about the debt,

22   are you flailing your arms about it?

23   A    Yes, sir.

24   Q    Were you trying to embarrass Rom by telling him in front

25   of his friends that you weren't going to pay anything other

1    than 6,000?

2    A    He embarrass me in front of my workers.

3    Q    So you were going to embarrass him back.

4    A    No, I was not embarrassing.  I say, I not going to pay

5    $80,000 for a kid I don't know.  I will pay 6,000 for my

6    nephew.

7    Q    And so really the reason why the payment was -- it was

8    just too much money.  If it was a lesser amount you would have

9    paid it?

10   A    Not -- I wouldn't pay it because he's not related to me.

11   Q    Did you know that Toni guaranteed the gambler, Regan --

12   when Eddie, his brother-in-law, opened up the account, Toni,

13   your nephew, had to guarantee Eddie.

14   A    I don't know, sir.

15   Q    You didn't know that?

16   A    No.

17   Q    Now, why are you paying Toni's bill?

18   A    I didn't want the Mafia guy to break Toni's legs.

19   Q    You didn't care if he broke Eddie's legs?

20   A    Whose?

21   Q    Eddie's?

22   A    Who is Eddie?

23   Q    Toni's brother-in-law.

24   A    I care for him, but I'm not responsible for him.  I'm

25   responsible for my own blood.

1   Q     All right.

2         Now, how long was Toni betting with Bexheti and

3   Regan?

4   A     That's the first time I heard in beginning of March.

5   Q     And this incident happened on May 11th; is that right?

6   A     Yes.

7   Q     Now, Nino -- and you had a conversation about paying off

8   this gambling debt; is that right?  You had several

9   conversations, did you not?

10  A     I -- we had the conversation to pay Toni's -- I paid

11  $6,000 for Toni.

12  Q     Did Nino tell you to just go ahead and pay the whole

13  debt?

14  A     No.

15  Q     Never told you that?

16  A     No.

17  Q     And so you agreed with Nino back in March that you would

18  pay Toni's debt?

19  A     Yes.

20  Q     But you didn't pay it?

21  A     I paid Toni's debt 6,000.

22  Q     You paid that, what, in May?

23  A     What?

24  Q     May?

25  A     Yes.

1  Q     All right.  After the punch.

2  A     Yes.

3  Q     But if you agreed with Nino in March that you were going

4  to pay the gambling debt --

5  A     Nino was not involved in March.  Nino was involved only

6  after Rom punched me.  Nino was never involved before Rom

7  punched me.

8  Q     By the way, when you were punched and you went to the

9  police station, did they take a picture of your face?

10 A     I don't remember.

11        MR. MCMAHON:  May I approach the witness, your

12 Honor?  This is 3500 SBS6 page 3.

13        MS. REHNQUIST:  Objection.

14        THE COURT:  Hold on one second.

15        You could approach.

16 Q     Look at this portion right here.  This is the first

17 paragraph.  Read it to yourself.

18        THE COURT:  Read it to yourself and wait for a

19 question, please.

20 Q     Does that refresh your recollection about the police

21 taking a picture of you when you went to file a complaint?

22 A     I don't remember.

23 Q     You don't remember if they took a picture?

24 A     I don't remember if they take a picture.

25 Q     And this doesn't refresh your recollection?

1  A    No.

2  Q    Now, you would agree, sir, that when you went to the

3  police they told you that there was absolutely no mark on your

4  face, no bruise, no redness, no nothing?

5  A    Yes.

6  Q    Now, you had a conversation with Nino in which you told

7  him about what you called a slap.

8        Do you remember that conversation?

9  A    Yes.

10        (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. MCMAHON:   (Continuing)

3   Q     And Nino told you that would not be good for business?

4               THE COURT:  Hold on.  There is an objection.

5               What is the nature of the objection?

6               MS. REHNQUIST:  Hearsay.

7               MR. MCMAHON:  Not offered for its truth, your Honor,

8   just that it was said.

9               THE COURT:  So the question is did Nino tell you

10  that speaking to the police would not be good for business?

11  You can answer that question.

12  A     What's the question?

13  Q     After you talked to Nino about the slap, did Nino tell

14  you that that would not be good for business?

15  A     No, he didn't.

16  Q     And you didn't tell that to the prison August 19, 2019?

17  A     What's August 19th?

18  Q     When you were interviewed.  I mean, you were first

19  interviewed by the police, you went there on May 11th, 2017.

20  And then I believe you looked at a video in Queens D.A.'s

21  office; right?

22  A     Right.

23  Q     And then the feds reached out to you what, 2019?

24  A     I don't remember when exactly.

25  Q     And you testified in a federal Grand Jury, 2019?  Yes?

1   A    Yes.

2   Q    You were interviewed by a number of agents of the FBI and

3   police officers in 2019, 2020?

4   A    Yes.

5   Q    Okay.  Now, before your testimony here today, have you

6   met with the prosecutors in this case?

7   A    Yes, I did.

8   Q    How many times did you meet with them?

9   A    Four or five time.

10  Q    Four or five?

11  A    Yeah.

12  Q    And where?  In their office?

13  A    Yes.

14  Q    A couple of hours each visit?

15  A    I don't remember how long we stay.

16  Q    And did they go over all of the questions in their office

17  that you were asked on direct examination?  So it was the same

18  questions that you were asked today, they went over those

19  questions in their office; is that right?

20  A    Yes.  Yes.

21  Q    Now, I think you talked about three visits by Mr.

22  Romanello about the debt.  The third one was May 11th, 2017,

23  and there were two earlier visits; is that right?

24  A    Yes.

25  Q    And on the two earlier visits, Mr. Romanello and his

1   friends stayed for dinner; is that correct?

2   A     Yes.

3   Q     So they had conversation with you, he did, Rom, and then

4   he and his friends stayed for dinner; is that right?

5   A     Yes.

6   Q     And they paid the check, I assume?

7   A     Yes.

8   Q     Okay.  The first time that Mr. Romanello at the first

9   visit and Mr. Romanello said that the nephews, nephew owed

10  $86,000, did you check that with Mr. Bexheti?

11  A     No, I didn't.

12        MR. MCMAHON:  May I approach, your Honor,

13  3500-SBS-6, page 2.

14        MS. REHNQUIST:  Objection.

15        THE COURT:  Sustained.

16  BY MR. MARRONE:

17  Q     So it's your testimony today that you did not call Mr.

18  Bexheti when Mr. Romanello first told you about the gambling

19  debt?

20  A     I don't remember that call.

21        MR. MCMAHON:  Now, I would ask to approach and

22  refresh his recollection with the document.

23        THE COURT:  You can approach now.

24  A     Four years ago.

25  Q     Huh?

1    A    Four years ago.

2    Q    You don't remember?

3    A    Yeah.

4    Q    But you could remember some of the things that Rom told

5    you in the private room, but you can't remember what you told

6    the police?

7    A    Yes, I remember what Rom told me in the private room.

8    Q    This is your friend of 30 years?

9    A    It was a customer.  He was never friend.

10   Q    How many other customers have you had for 30 years?

11   A    For 45 years I have 1 thousand people a week, 50,000

12   customer a year.

13   Q    How many come back once a week?

14   A    I didn't say come over to once a week, once a month,

15   every two months.

16   Q    Now, the second time that Rom came back and was asking

17   about the money, Luan was with him; is that correct?

18   A    The second time, yes, sir.

19   Q    Yeah.  And you said that you had spoken to your nephew

20   and he assured you that the gambling debt was going to be

21   paid; is that right?

22   A    He told me he is going to speak with his brother-in-law,

23   that they going to work.

24   Q    So that's when you told him that, that was both parts of

25   it, the 6,000 from Toni and the brother-in-law's 80,000,

1   that's what you just said?

2   A    But that was not my responsibility for Toni's

3   brother-in-law.

4   Q    Okay.  But at this second visit, you told Rom that you

5   were told by Toni?

6   A    I told --

7   Q    Let me get my question out.  Let me get my question out.

8           You told Rom at the second visit that you had spoken

9   to your nephew Toni and he had told you that the money would

10  be paid all 86,000?

11  A    I don't remember that.

12  Q    And after that second visit, Rom and Luan Bexheti and the

13  others, they had dinner again?

14  A    Yes.

15  Q    Now -- and, so, I think you had said that he was

16  screaming and yelling at you in the back room and then they

17  went out and sat down in the dining room and had dinner?

18  A    When I told him that I'm willing to pay for Toni $6,000,

19  not his brother-in-law $80,000, that's when he was screaming

20  and yelling.

21  Q    After the screaming and yelling in the private room, they

22  go back to the dining room --

23  A    Yeah.

24  Q    -- and sit down --

25  A    Because I told him, I speak one more time with my nephew

1   and see what they can come up with.

2   Q    Okay.  Now, on the third visit, did you tell Mr.

3   Romanello that he didn't have the balls to punch you.

4   A    After so many time he say I would like to punch you, I

5   would like to punch you.  I told him you have no guts to punch

6   me.

7   Q    You actually said you have no balls?

8   A    No, I said no guts.

9   Q    You didn't say balls?

10  A    Guts.

11  Q    How about on those phone calls where --

12  A    I don't remember.

13  Q    Where you accused him of having no balls?

14  A    There was no phone over there.  It was in front of the

15  bar.  I told him you have no guts to punch me.

16  Q    Were you pointing your finger?  Was this at the same time

17  you were flailing your arms?

18  A    I was pointing my finger when I told both of them,

19  gentleman number five and Rom, I'm not going to pay 86,000, I

20  pay only 6,000; 80,000, they cannot collect from me.

21  Q    And did you tell Mr. Romanello that he was a washed up

22  old Italian?

23  A    A what.

24  Q    A washed up old Italian?

25  A    I never -- I don't remember that saying.

1  Q    Did you remember seeing on the videotape where, right

2  after you were waving your arms around, he flinched back on

3  the video?  Did you see that on the videotape?

4  A    Who flinched?

5  Q    Rom.

6  A    I didn't recall.

7  Q    And did --

8       MR. MCMAHON:  Would it be possible to pull that up?

9       MS. REHNQUIST:  Government Exhibit 313?

10      MR. MCMAHON:  Yes.

11      Your Honor, with the able assistance of the

12 United States Government.

13      THE COURT:  We are going to play the video.

14      MS. REHNQUIST:  Government Exhibit 313-B?

15      MR. MCMAHON:  Yes.  Can you advance to just before

16 the punch.

17      MS. REHNQUIST:  48 seconds.

18      (Video playing.)

19 Q    And this is you back in the bar with Mr. Romanello; is

20 that correct?

21 A    Yes.

22 Q    And the gentleman facing you with his back to the camera

23 is number five; is that right?

24 A    That's correct.

25 Q    Mr. Romanello's son is at the bar sipping on a drink; is

1   that right?

2   A    Yes.

3   Q    And the other fellow, the fourth person is off to the

4   left?

5   A    Yes.

6   Q    Okay.

7            MR. MCMAHON:  You can play now.

8            (Video playing.)

9            MR. MCMAHON:  If you can go back a little bit.  I

10  missed it.  One more time.  Can you slow down the speed a

11  little bit.  Did you speed it up on me?

12           That's fine, Judge.  I have a different version of

13  the camera angle and I will do it on my case, but I thank the

14  Government.

15           THE COURT:  Okay.

16           (Video stopped.)

17  Q    After this incident with Mr. Romanello, was there a

18  meeting of the Selimaj family the next day?

19  A    I don't remember, sir.

20           I remember meeting with Nino.

21  Q    Nino, Bruno, Eddie, Toni, several of your sons, you don't

22  remember this meeting?

23  A    I don't remember.

24  Q    This is the very next day.

25  A    It's seven years ago.

1   Q    And at this meeting at which you attended but don't

2   remember, did the family, the Selimaj family come to a

3   consensus agreement that this money has to be paid back and

4   this whole thing gotten rid of?

5   A    It was only me and Nino involved with this, not anybody

6   else.

7   Q    Did you ever meet with Eddie, Toni, and some of your

8   sons?

9   A    I don't remember, sir.

10  Q    Now, by the way, on the evening of the incident, how many

11  employees did you have boring at Lincoln Square?

12  A    I don't remember.  30.  Around 30.

13  Q    30, at least 20, 25 of them are men?

14  A    Yeah.

15  Q    Okay.  So they are all mingling around at the same time

16  that Mr. Romanello is there; is that correct?  These

17  employees?

18  A    No.  They were not there.  They were in the dining room.

19  Romanello's at the bar.

20  Q    That's not that far away?

21  A    No.  It's a completely different dining room.  The bar is

22  separate completely.

23  Q    But you have approximately 25 male employees?

24  A    No, not 25.

25       I say the kitchen, the dishwasher.  It's 10,000

1   square feet of restaurant.  It was 10,000 square feet.

2   Q    On the video, didn't you see a number of employees come

3   and intervene --

4   A    Yes.

5   Q    -- as the altercation was taking place?

6   A    Yes.

7   Q    So you had friends there?

8   A    There were my own workers.

9   Q    Yes.  I know you don't consider them friends but --

10  A    Workers.  Workers.

11  Q    -- they were with you; is that right?

12  A    They were workers, sir.  I pay them.

13  Q    Okay.  Now, you -- did you discuss this incident with

14  your sons?

15  A    Yes.

16  Q    And did they tell you that you should pay?

17       MS. REHNQUIST:  Objection.

18       THE COURT:  Sustained.

19  Q    Does that refresh your recollection about having a

20  Selimaj family meeting with your sons, your brother?

21  A    I don't remember having a meeting.  But I told my son, my

22  wife, my brothers what happened.

23  Q    And then told you to pay the debt --

24       MS. REHNQUIST:  Objection.

25  Q    -- get rid of it?

1   A     Nobody told me.

2         THE COURT:  Sustained.  Sorry, the objection is

3   sustained.

4   Q     So when you went to the police the next day -- the New

5   York City Police Department; is that right?

6   A     Yes.

7   Q     With Nino?

8   A     Yes.

9   Q     Nobody put a gun to your head?

10  A     Well, they put -- Nino told me that he was yelling, not

11  yelling, telling me Bruno, it's going to be ugly, it's going

12  to be nasty, it's going to be bad, it's going to be ugly, it's

13  going to be very bad.  He said you should report.

14  Q     Well, you went to the police precinct the very next day.

15  When did you have time to discuss this with Nino?

16  A     The same night, on May 11th.

17  Q     Okay.  But you did have the meeting with your family and

18  Nino before you went to the police precinct; is that right?

19  A     I don't remember.  I remember doing with Nino everything,

20  Nino instructions.

21  Q     Did anybody force you to go to the precinct?

22  A     Just Nino telling me it's going to be ugly, it's going to

23  be nasty and, I didn't want my family to get hurt by this

24  mafia guys.

25  Q     So that's why you withdrew the complaint?

Shuqeri Selimaj - cross - McMahon                183

1   A    Yes, sir.

2   Q    So everything that you told the police was false?

3   A    At that time, yes.

4   Q    Well, it's false today?

5   A    Today is 110 percent true.

6   Q    When you said then?

7   A    The what?

8        I did -- I lie just to save my family for this mafia

9   people not to hurt my family.  I decide with Nino that I gonna

10  make a lie just to save my family, to not get hurt from this

11  guys.

12  Q    Did Nino tell you to lie?

13  A    Nino didn't tell me, but he say you should withdraw your

14  complaint.

15  Q    But he didn't tell you to lie?

16  A    No.

17  Q    Other than the fourth -- the three times that Rom was at

18  the steakhouse visiting you, around this timeframe, did you

19  ever speak to Rom?

20  A    No.

21  Q    And you haven't spoken to him since?

22  A    No.

23  Q    Now, in October 2019, you went into a federal Grand Jury;

24  is that right?

25  A    Yes.

Shuqeri Selimaj - cross - McMahon                184

1   Q    And you were so happy to go that you didn't even get a
2   subpoena; is that right?
3   A    No, I did get subpoena.
4   Q    Did you?
5   A    Yes, sir.
6   Q    You're sure?
7   A    100 percent.
8   Q    Okay.  Now, you have a particular affinity, likeness for
9   wise guys don't know you?
10  A    What's the question?
11  Q    Do you have a particular likeness -- you like wise guys?
12  A    No, I don't.
13  Q    Well, you had -- you seem to specialize in having wise
14  guys come to your restaurants?
15  A    As I told you, my restaurant is -- when I started
16  restaurant, it was 17 tables; now there are 55 tables.
17  Q    What does that got to do with my question?
18  A    With your question is when I do the piano over there, I
19  believe it was late '80s, this particular guy, Jewish guy
20  playing, then he want to be Frank Sinatra.  He was the best
21  Singer in New York City.  He attract all these wise guy who
22  came over here.  It was nine tables, on the second floor.
23  They were staying to two o'clock in the morning, three o'clock
24  in the morning, drinking wine, drinking cognac, smoking cigar.
25  Q    Guys like John Gotti?

Shuqeri Selimaj - cross - McMahon                    185

1   A    John Gotti came two times.

2   Q    And Danny Marino?

3   A    Danny Marino came.

4   Q    Joe Watts?

5   A    Yes, sir.

6   Q    Those are all Gambinos?

7   A    I don't know who they are.

8   Q    Okay.  And none of the wise guys that came to your

9   restaurant ever tried to shake you down; is that right?

10  A    No.

11  Q    No, no one ever tried to shake you down?

12  A    No one did, yes.

13  Q    Is that because you're an Albanian tough guy?

14  A    I don't know why.  Nobody shake me down.

15  Q    Were they afraid of you?

16  A    They to be afraid from one guy?  They're afraid mafia

17  from mafia.  They kill each other.  They would be afraid for

18  me?  For what?

19          I came here without house.  I built a home in

20  Albania.  I take care of my family, and I take my kids to

21  school.

22  Q    Where are you living in the city?

23  A    I live above the restaurant.

24  Q    You used to live in Chappaqua, didn't you?

25  A    I still have a house in Chappaqua.

1    Q    But you don't live there, do you?

2    A    Weekend I go   there?

3    Q    Do you take care of your family?

4    A    Yes, sir.

5    Q    Do you have a reputation as being a tough guy?

6    A    No, I don't, sir.

7    Q    You don't?

8    A    No, I don't.

9    Q    Can you explain why none of the wise guys that ever came

10   to your restaurant never tried to shake you down?

11              MS. REHNQUIST:  Objection.

12   A    I don't know --

13              THE COURT:  Sustained.  Yeah, the objection is

14   sustained.

15              MR. MCMAHON:  Nothing further, Judge.

16              THE COURT:  Redirect?

17              MS. REHNQUIST:  No redirect, your Honor.

18              THE COURT:  All right.

19              I'm sorry, cross by Mr. Marrone.

20              MR. MARRONE:  Yes.

21              MS. REHNQUIST:  I withdraw the no redirect statement

22   then.

23              THE COURT:  It is withdrawn.

24   CROSS-EXAMINATION

25   BY MR. MARRONE:

1   Q    Mr. Celso, good afternoon.

2   A    Good afternoon.

3   Q    My name is Gerard Marrone.  It's nice to meet you?

4   A    Pleasure.

5   Q    I'm a lawyer and I represent the co-defendant sitting at

6   the table.

7           It's true, sir, you don't know him?

8   A    The first time I saw him was at the Lincoln Square.

9   Q    That was the only time you ever saw him?

10  A    Yes, sir.

11  Q    Do you know his name?

12  A    I didn't know at that time.  I know now.

13  Q    Because you had the case and you had the benefit of

14  speaking with the Government; correct?

15  A    No, sir.  I Goggle my restaurant and my name on Goggle

16  came the case of the....

17  Q    So there came a time that you got to know the name of Mr.

18  Celso, my client; correct?

19  A    Yeah.

20  Q    And my client's face is not up there; correct?

21  A    No.

22  Q    He is not number five; correct?

23  A    No.

24  Q    So your testimony is that the very first time you met my

25  client was the May 11th, 2017 incident between you and Mr.

Shuqeri Selimaj - cross - Marrone                188

1   Romanello; correct?

2   A    Yes.  That I remember, yes.

3   Q    And the night of that incident, Mr. Celso never spoke to

4   you; correct?

5   A    No.

6   Q    You never spoke to him; correct?

7   A    Just to say hello.  Probably Rom introduce me.  I don't

8   remember.  Probably introduce me, but I don't remember.

9   Q    If that?

10  A    If that, yes.

11  Q    If that.  He certainly never hurt you; correct?

12  A    No.

13  Q    He never touched you; right?

14  A    No, sir.

15  Q    Now, you testified on direct that there was a number of

16  visits to your restaurant in Lincoln Square at the time;

17  correct?

18  A    Yes, sir.

19  Q    And you testified that there was the first visit maybe

20  around March of 2017; correct?

21  A    Yes, sir.

22  Q    And that was Michael Regan visit?

23  A    Yes, sir.

24  Q    That's the number five gentleman; right?

25  A    Yes.

1  Q    My client was not there; correct?

2  A    No, he was not.

3  Q    Then there came another visit, the Mr. Romanello visit;

4  correct?

5  A    Yes.

6  Q    And my client was not at that visit; correct?

7  A    He was not there.

8  Q    There came a second visit with Mr. Romanello and a couple

9  another gentlemen; correct?  A second visit?

10  A    Romanello's third visit.

11  Q    Right.  But before the third visit was a second visit;

12  correct?

13  A    Yes, sir.

14  Q    And my client wasn't there?

15  A    Yes.

16  Q    And then my client came to the third visit?

17  A    Correct.

18  Q    It was the first time you ever saw him in your life?

19  A    Yeah.

20  Q    Now, you testified under oath and direct that you were

21  very afraid of the mafia people; correct?

22  A    I was not afraid until I was punched.

23  Q    Okay.  But you know of the mafia people; correct?  In

24  fact, your restaurant is full of mafia people; correct?

25  A    Sir, as I told you, maybe it was three percent of mafia

1  people.  We do thousand people a week.  We don't do thousand

2  mafia guys.  If it's three percent, two percent.

3  Q    Mafia people are good for business, no?

4  A    People like to see them, but they like to see actors,

5  they like to see actors, yeah.

6  Q    It's like an attraction; correct?

7  A    It's an attraction.

8  Q    In fact, in the 1980s John Gotti was an attraction;

9  correct?

10          MS. REHNQUIST:  Objection.

11 A    Not to me.

12          THE COURT:  Sustained.

13 Q    So there was, let's say, four visits; correct?

14 A    Yes.

15 Q    By mafia people?

16 A    Yes.  Well, first of all, I know the guy.  First, but

17 with mafia people, three visit.

18 Q    He's mafia people too?

19 A    I don't know.

20 Q    But he is the bookie?

21 A    I don't know.  I don't know.

22 Q    Why is he not mafia people?  Because he's Irish?

23 A    I don't know.

24          MS. REHNQUIST:  Objection.

25          THE COURT:  Sustained.  Sustained.

1           One person has to talk at a time.

2           And to the extent there are objections.  You have to

3   wait for me to rule on them one way or another.  But that

4   objection is sustained.

5   BY MR. MARRONE:

6   Q    So there's four visits; correct?

7   A    Yes, sir.

8   Q    At no time during those visits did you call the police;

9   correct?

10  A    No, I didn't.

11  Q    You only called the police on the third visit; correct?

12  A    The fourth visit.

13  Q    Right.  The fourth.

14          So all that time goes on, a few months, no police;

15  correct?

16  A    I didn't have a reason to call police.

17  Q    Mafia people come to see you and you don't call the

18  police?

19  A    They didn't threaten me.  They didn't do anything to

20  threaten me those visits.

21  Q    Wait a minute.  Wait a minute.  You testified that Mr.

22  Romanello was screaming at you in the private room?

23  A    But he didn't say I'm going to break your leg, I'm going

24  to kill you, I'm going to shoot you.  He scream.  If I can

25  say, I want my fucking money, I want $86,000.  But he didn't

1   say I'm going to break your legs, I'm going to send somebody

2   over and destroy your family.

3          That's threat to me.

4   Q   Okay.  So he didn't say no threat like that?

5   A   No.

6   Q   Only yell and scream and curse at you?

7   A   He wanted my money, yes.

8   Q   You were okay with that?

9   A   I was okay what I have to do.  I was by myself.  There

10  were four of them.

11  Q   But you no call the cops?

12  A   I didn't call the cops before he hit me.  After he hit

13  me, I call the cops.

14  Q   Okay.  And that's got nothing to do with Mr. Celso

15  sitting there; correct?

16  A   They were group.  They came together.

17  Q   Wait a minute.

18  A   They came together.  I don't know what he came with

19  bodyguard or his soldier.  I don't know.

20          MR. MARRONE:  Objection.  Nonresponsive.

21  Q   Now, let me ask you --

22          THE COURT:  The objection is overruled.

23  Q   Now, Mr. Celso only came the fourth time; correct?

24  A   Yes, sir.

25  Q   Okay.

Shuqeri Selimaj - cross - Marrone                    193

1          MR. MARRONE:  May I kindly ask the Government to put

2     up that video as well?

3          MS. REHNQUIST:  For the record it is

4     Government Exhibit 313-B.

5               (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*S. Selimaj - Cross/Mr. Marrone*                    194

1          MS. RHENQUIST:  For the record, it's
2    Government Exhibit 313-B.
3    Q    So the Government is going to put up the video that you
4    saw on direct.  Also, you saw on cross-examination; is that
5    okay?
6    A    Yes.
7    Q    On direct, if we could just move if --
8          MR. MARRONE:  I'm sorry withdrawn if we could move
9    it up a bit.  Fast forward it a bit.
10         And if we could play that, please, at a little
11   slower speed.
12         (Video file played in open court.)
13         (Video file concludes.)
14   Q    And if we could stop right there, Mr. Selimaj, do you
15   see my client in that still screen?
16   A    Yes, I do.
17   Q    And could you identify who he is?
18   A    He's Joseph.
19   Q    Right.  You are indicating the blue circle around
20   Mr. Celso?
21   A    Yes.
22   Q    And he has to be what, 15 feet away from you?
23   A    I don't know exactly.
24   Q    Pretty far, right?
25   A    Not too far but it's only it's three -- one, two, three

1  stools.

2  Q    Okay.  And then you also -- let me ask you this.

3       You also testified on direct that you had a private

4  conversation with Mr. Romanello, correct?

5  A    Yes, sir.

6  Q    Mr. Celso, Mr. Joe, was not part of that conversation,

7  correct?

8  A    No, it was not.

9  Q    So he doesn't even know what was said in that

10 conversation, correct?

11 A    I don't know about Rom.

12 Q    He wasn't there?

13 A    He was not there.

14 Q    Correct.  Okay.

15           MR. MARRONE:  If we can kindly move the tape a

16 little further.

17           (Video file played in open court.)

18           (Video file concludes.)

19 Q    And you still see Mr. Celso now.  He's sitting down,

20 correct?  Correct?

21 A    Yes.

22 Q    He's now really far from you, correct?

23 A    Yes, sir.

24 Q    If we could stop for a second.  What was Mr. Celso doing

25 right now in this still?

1   A    He's, I think, he's leaning against the call.

2   Q    He's sitting down, correct?

3   A    I don't know if he's sitting or leaning against the

4   wall.  I cannot figure out from here.

5   Q    In fact, sir, he's even further away from you than he

6   was a second before, correct?

7   A    Yes.

8   Q    How far would you estimate he is from you?  How many

9   feet?

10  A    Maybe the table is about 12 feet, 13 feet.  13 feet.

11          MR. MARRONE:  If we can continue, please.

12          (Video file played in open court.)

13          (Video file concludes.)

14  Q    If we could stop right.

15       At this point, Mr. Selimaj, right there, with your hands

16  up, both of your hands up; correct?

17  A    Yes.

18  Q    Are you speaking loudly at that point, if you recall?

19  A    I don't know how loud I was speaking but I was telling

20  both of them, Rom and Exhibit 5, that I'm willing to pay

21  $6,000, I'm not paying $86,000 right there.

22  Q    And it's safe to say you were angry at that moment,

23  correct?

24  A    It was not angry but I didn't have 86,000 in my pocket

25  to give it to them.  First of all, I only want to pay for my

1  nephew.

2  Q    Got that.  Mr. Celso is even further away at that point,

3  correct?

4  A    Yes.

5  Q    Maybe he's 14 feet away?

6  A    I don't know.  But it was the time that he came very

7  close to me is the time.

8  Q    With his hands in his pocket.

9  A    I don't know.  But each time I saw them, like, I was

10  just surrounded.  One guy here, one guy here, one guy here, I

11  was in the middle.  Four of them.

12  Q    But right now you're arguing, correct?

13  A    I'm arguing with -- I don't know arguing, I'm

14  explaining.  I said I only pay you $6,000 for my nephew, I'm

15  not going to pay $80,000 for his brother-in-law.

16  Q    Mr. Selimaj?

17  A    Yes.

18  Q    You're flailing your arms like this?

19  A    Like this.  I say, I'll pay you $6,000 for my nephew.

20  I'm not paying $80,000 for his brother-in-law.

21  Q    Got it.

22  A    Okay.

23  Q    And that gave no reaction to my client.  He didn't move,

24  correct?

25  A    No.

1  Q    You're flailing your arms, my client is sitting 15 feet

2  away from you.  A second prior, he was sitting 13 feet away.

3  As you're getting angrier, sir, my client is not even near

4  you, correct?

5  A    Yes.

6            MS. RHENQUIST:  Objection.

7            MR. MARRONE:  May I proceed Judge?

8            THE COURT:  I'm sorry.  Hold on one second.

9            (A brief pause in the proceedings was held.)

10            THE COURT:  The objection is sustained.  Rephrase

11  question the, please.

12            MR. MARRONE:  That's okay, Judge, withdrawn.

13            If we could move forward on the surveillance video,

14  please?

15  Q    Now, stop for a second.

16       And, again, Mr. Selimaj, you're speaking, animated,

17  let's say.  You understand the word animated?

18  A    No.

19  Q    You're speaking very boisterous with your arms?

20  A    Well, Rom was yelling.  And then if Rom yell, probably I

21  yell, too.

22  Q    So you're yelling, too, at that moment?

23  A    Probably.  Probably.

24  Q    It's okay.  Tell the truth.

25  A    I don't remember, sir.

*S. Selimaj - Cross/Mr. Marrone*                        199

1   Q    And my client is where?

2   A    Still in the back.

3   Q    So I would say, would you agree with me, that a good

4   four seconds pass by.  One, two, three, four, maybe five and

5   there's a commotion, correct?

6   A    I don't know what commotion start.

7   Q    You're in the commotion, correct?

8   A    Was Rom -- he kept saying that he like to punch me.  Rom

9   here, he's the commotion.  He kept saying I like to punch

10  you, I like to punch you.  It's Rom.

11  Q    We got that.  But all of that going on, my client is

12  14 feet away from you; correct?

13  A    Not all the time.

14  Q    Okay.  But right now he is in that moment of in time.

15  A    Even -- this is not big commotion.  The bigger commotion

16  is when he punch me, Rom.  This is not the commotion.

17  Q    Okay.  Can we move forward.

18          (Video file played in open court.)

19          (Video file concludes.)

20  Q    And you're talking, correct?

21  A    Yeah.  And I'm saying I'm willing to pay $6,000 for my

22  nephew but I'm not going to pay 80,000 for the other guy.

23  Q    And time is passing and Mr. Celso is still sitting

24  15 feet away from you, correct?

25  A    Yes, sir.

*S. Selimaj - Cross/Mr. Marrone*                    200

1    Q    Now, he gets up.

2    A    Yes.

3    Q    And where is Mr. Celso's hands?  You see his hands in

4    his pocket, correct?

5    A    Can I not.

6    Q    Stop right there?

7    A    I cannot see if he has his hands in his pocket or not.

8    Q    And he's still -- that's the moment of the punch,

9    correct?

10   A    I don't know what is the moment of the punch.

11   Q    Look at the video?

12   A    Well, let's play it.

13   Q    Well, this is the moment of the punch, no?

14   A    Doesn't show me here.

15   Q    Okay.  Go back a second and start again.  Stop right

16   there.

17        You were just punched, correct?

18   A    Yes, sir.

19   Q    And my client is still not near you, correct?

20   A    Well, it's not too far but it's not near.

21   Q    He's not behind you, correct?

22   A    No, he surround me on that side.

23   Q    Wait.  Wait?

24   A    I'm on the one side here, Rom is over there.  The Number

25   Five is next to Rom and Rom's son is over here.

1  Q    Number Five pushed you, correct?

2  A    Yes, sir.

3  Q    And Mr. Celso is behind Number Five, let's say

4  Mr. Regan, correct?

5  A    Yes.

6  Q    Maybe, approximately, five feet behind Mr. Regan?

7  A    Probably.

8  Q    So he's not threatening you, he doesn't touch you;

9  correct?

10 A    No, he didn't.

11 Q    If we can move forward, please.

12      Now, you're stepping or backing up, correct?

13 A    Yes.

14 Q    And everyone is going to walk out, correct?

15 A    Yes.

16 Q    If we can move forward.

17      And now, if we could stop.  There's a waiter, I would

18 imagine, that came to your aid and is standing next to you;

19 correct, one of your workers?

20 A    I cannot see it, sir.

21 Q    Well, somebody came out, right, is standing next to you?

22 A    I still cannot see myself there.

23 Q    All right.  Maybe we can go back a second and play it.

24 Okay, keep going.

25      And now everyone's walking out, correct?

1   A    Yes, sir.

2   Q    No other trouble after that, correct?

3   A    Yes, sir.

4   Q    Okay.  Okay.  Thank you.

5        Now, there came a time that evening that you called the

6   police, correct?

7   A    Yes, sir.

8   Q    And then you filed a complaint with the police

9   department, correct?

10  A    Yes, sir.

11  Q    Okay.  And you said you lied to the police?

12  A    When I first complain, I didn't lie.

13  Q    Okay.  The next day you lied?

14  A    Next day, after I spoke with my brother, after he kept

15  saying it's going to be bad, it's going to be ugly; it's

16  going to be very bad, it's going to be ugly then I decide to

17  withdraw complaint.

18  Q    Drop the charges, okay.

19  A    Yes.

20  Q    You testified on direct examination, rather, that you

21  called Nino right after the punch; is that correct?

22  A    I don't know exactly but I call him after the punch.

23  Q    So a short time after that?

24  A    Yes, sir.

25  Q    And it was Nino who told you that you should drop the

1   charges, correct?

2   A    I called Nino.  I said, Nino, Rom punched me.  And he

3   said what?  Rom punched me how he do that?  He said, call the

4   police.  I already called the police.  Nino told me, call the

5   police.  I told Nino, I already called the police.

6   Q    And Nino also said when did there come a time when Nino

7   told you to drop the charges?

8   A    It was the next day.

9   Q    What time the next day?

10  A    I don't know exactly the time.

11  Q    In the morning, at night?

12  A    Probably in the morning.

13  Q    And when you had a conversation with Nino and he

14  suggested to you to drop the charges, was that face-to-face

15  or was that on the phone?

16  A    I don't remember, sir.

17  Q    How do you not remember?

18  A    I don't remember, it's 2017.  He came to the restaurant

19  and went over to the police.  Me and Nino went together in

20  police department to detective and I fill out the withdrawal.

21  Nino was next to me.

22  Q    Okay.  So Nino was with you at the police station to

23  withdraw, correct?

24  A    Yes, sir.

25  Q    And it was Nino who suggested to you to withdraw the

1   complaint, yes or no?

2   A    We both figured out that Nino is saying it's going to be

3   dangerous, it's going to be ugly.  It's going to be very bad,

4   it's going to be ugly.  So my understanding was this Mafia

5   guy, they're going to hurt me or my family.  Me, I don't

6   care.  I'm 72 years old, I lived my life.  But my family, my

7   children, my grandchildren, my nephew, my nieces that's what

8   I was worried about.

9   Q    Okay.  And you dropped the charges, correct?

10  A    Yes.

11  Q    At Nino's suggestion, correct?

12  A    It was both of us, me and Nino.

13  Q    Okay.  Regardless of what was in your mind, Nino

14  suggested --

15        MS. RHENQUIST:  Objection.

16  Q    -- to drop the charges and you agreed?

17  A    No, it was both of us.

18        THE COURT:  We're also retreading.

19  Q    When was the last time you spoke to Nino, Mr. Selimaj?

20  A    I spoke with Nino this Saturday.

21  Q    Okay.  You see your brother often?

22        MS. RHENQUIST:  Objection.

23  A    I was at a wedding.

24        THE COURT:  Sustained.  Sorry, sir, when there's an

25  objection --

*Proceedings* 205

1          THE WITNESS:  I'm sorry.

2          THE COURT:  -- made, you need to pause and wait for

3    me.

4          The objection is sustained.

5    Q    When you saw Nino this last Saturday, did you speak to

6    him about this case?

7    A    No, I didn't.

8    Q    You don't speak to him about your testimony?

9    A    No, I didn't.

10   Q    And other than that night, May 11, 2017, you've never

11   seen Mr. Celso after that correct?

12   A    No, I didn't.

13   Q    Other than this afternoon, correct?

14   A    No.

15         MR. MARRONE:  No further questions, your Honor.

16         THE COURT:  Redirect?

17         MS. RHENQUIST:  No redirect.  Thank you.

18         THE COURT:  The witness may step down.  You're

19   excused, sir, thank you.

20         (Witness leaves the witness stand.)

21         THE COURT:  Does the Government want to start

22   another witness?  We could go for another 20 minutes here.

23         MS. RHENQUIST:  I think that would make sense.

24         THE COURT:  Call your next witness.

25         MS. CHEN:  Your Honor, the Government calls Shemsi

1  Selimaj.

2          THE COURT:  Ladies and gentlemen, feel free to

3  stand and stretch if you like while we're waiting for the

4  witness to take the stand.

5          (Witness takes the witness stand.)

6          COURTROOM DEPUTY:  Please raise your right hand.

7  **SHEMSI SELIMAJ**, called by the Government, having been first

8  duly sworn, was examined and testified as follows:

9          THE WITNESS:  Yes, I do.

10          COURTROOM DEPUTY:  Please have a seat.  Take your

11  time.

12          State your name for the record and spell it.

13          THE WITNESS:  Shemsi Selimaj.  S-h-e-m-s-i.  Last

14  name is S-e-l-i-m-a-j.  Nickname Nino, known as Nino,

15  N-i-n-o.

16          MS. CHEN:  Your Honor, may I inquire.

17          THE COURT:  Please.

18  DIRECT EXAMINATION

19  BY MS. CHEN:

20  Q    Good afternoon, Mr. Selimaj.

21  A    Good afternoon.

22  Q    Mr. Selimaj, do you want to be here today?

23  A    Not really.

24  Q    Why are you here?

25  A    Because I was served subpoena.

*S. Selimaj - Direct/Ms. Chen*                                207

1    Q    And do you speak any languages other than English?

2    A    Yes, I do.

3    Q    What languages are those?

4    A    Albanian, Yugoslavian, Italian.

5    Q    Is English your native language?

6    A    No.

7    Q    But are you comfortable proceeding in English today?

8    A    Yes, I am.

9    Q    Okay.  How old are you, Mr. Selimaj?

10   A    I just turned 67.

11   Q    Where do you live?

12   A    I live in New Jersey.

13   Q    And where were you born?

14   A    I was born in ex-Yugoslavia, Montenegro.

15   Q    At some point, did you come to live in the

16   United States?

17   A    Yes.

18   Q    And about how old were you when that happened?

19   A    I was 22.

20   Q    How far did you go in school?

21   A    Finished high school, went to college and never

22   graduated from college.

23   Q    Okay.  After you left college, did you begin working?

24   A    Yes.

25   Q    What did you do for work?

1   A     Before I came to United States, I worked as a tailor.  I

2   worked back home.  Tailor, make suits and pants and shirts.

3   Q     Understood.  Do you currently work?

4   A     Yes, I do.

5   Q     What do you do?

6   A     Run a restaurant.

7   Q     What restaurant is that?

8   A     Nino's Restaurant.

9   Q     Where is Nino's Restaurant?

10  A     1354 First Avenue between 72nd and 73rd Street,

11  Manhattan.

12  Q     How long have you been running Nino's Restaurant?

13  A     33 years now.

14  Q     Do you have any siblings, Mr. Selimaj?

15  A     Yes, I do.

16  Q     Do you have any brothers?

17  A     Yes, I do.

18  Q     And does one of your brothers go by the name Bruno?

19  A     Yes.

20          MR. MARRONE:  If we could, Mr. Rader, just pull up

21  what has been admitted as Government Exhibit 12.

22          COURTROOM DEPUTY:  Computer?

23          MS. CHEN:  Yes.  Thank you, Mr. Jackson.

24  Q     Can you see that on your screen, Mr. Selimaj.  Do you

25  see a photo there?

*S. Selimaj - Direct/Ms. Chen*                    209

1   A    Yes.

2   Q    Do you recognize this?

3   A    Yes.

4   Q    Who is depicted in this exhibit?

5   A    Bruno.

6   Q    Is that the same as what I'm pointing to?

7   A    Yes, it is.

8   Q    Could we also pull up what is in evidence as

9   Government Exhibit 13.

10       Do you recognize this exhibit?

11  A    Yes, I do.

12  Q    And what is it?

13  A    It's myself.

14  Q    Same as this?

15  A    Same as that.

16  Q    Just for the record, I was gesturing to the board that

17  has been published.

18       Do you also have a brother named Besim?

19  A    Yes, I do.

20  Q    What does he do for a living?

21  A    He works in a building on the West Side as a porter, I

22  guess.

23  Q    Does your brother Besim have any children?

24  A    Yes, he does.

25  Q    Does he have any sons?

1    A    Yes, he does.

2    Q    Is one of his sons named Fiton?

3    A    Yes, it is.

4    Q    Can we pull up what's been admitted as

5    Government Exhibit 11, please.

6         Do you recognize this exhibit?

7    A    Yes, I do.

8    Q    And what is this exhibit?

9    A    That's Fiton.

10   Q    Okay.  Does Fiton go by any other names?

11   A    Toni.

12   Q    I want to direct your attention now to May 11, 2017,

13   okay?

14   A    Okay.

15   Q    Did you receive a call from anyone that day that stood

16   out to you?

17   A    Yes, I did.

18   Q    Who did you receive a call from?

19   A    From Bruno.

20   Q    From that call, what did you learn?

21   A    I learned, he called me that Rom and two other guys went

22   there and he got hit.  He told me -- they told him, we're

23   going to see your brother.

24   Q    I want to break down that answer a little bit.

25        You said, "he told you."  That was Bruno, right?

*S. Selimaj - Direct/Ms. Chen*                    211

1    A    Right.

2    Q    When you say, "they're going to see you."  Who do you

3    mean by "they"?

4    A    Mr. Rom and Joe and another person which I don't know

5    whose the other person.

6    Q    Okay.  I want to talk a bit about Rom.  Do you know an

7    individual named Rom?

8    A    Yes, I do.

9    Q    When did you first meet Rom?

10   A    I don't know exactly but it's a long time.  I met him

11   when I was working in Bruno's, 37, 38 years ago.

12   Q    And just to be clear, did you work at Bruno's Restaurant

13   before you started Nino's?

14   A    Yes, 14 years there.

15   Q    Okay.  And may I publish what's in evidence already as

16   Government Exhibit 1.

17        Do you see this exhibit, Mr. Selimaj?

18   A    Yes.

19   Q    Do you recognize this?

20   A    Yes.

21   Q    What does this exhibit show?

22   A    That's Mr. Rom.

23   Q    Same as the exhibit on the board I'm pointing to?

24   A    Yes.

25   Q    Okay.  In the 30-plus years that you've known Rom, have

1   you dealt with Rom in any capacity other than he was a

2   customer at either Bruno's Restaurant or your restaurant?

3   A    I do, but I do recall one week I was gambling with

4   betting and on sports.

5   Q    Okay.  Let me just take a step back.

6        Do you gamble, Mr. Selimaj?

7   A    Yes, I do.

8   Q    How long have you gambled for?

9   A    All my life.

10  Q    And what type of gambling?

11  A    Sports.

12  Q    All right.  Does that mean betting on sports games?

13  A    Correct.

14  Q    All right.  Did you ever stop gambling at any point?

15  A    No.

16  Q    Are you addicted to gambling?

17  A    I would say so.

18  Q    In your experience gambling with Rom, can you explain

19  when, approximately, that was?

20  A    I don't remember exactly but I would say about 2007 or

21  eight, maybe nine.  I don't remember exactly the year.

22  Q    Okay.  How did you first come to gamble with Rom?

23  A    He was coming to my restaurant often, maybe once a week,

24  maybe once every two weeks, once a month.  And he approached

25  me to -- he gave me the number to call in the bets to have to

S. Selimaj - Direct/Ms. Chen                    213

1    give him business, that's called business.

2    Q    Okay.  So he approached you to --

3    A    Correct.

4    Q    -- to gamble with you.

5         Did you know any individuals who worked with Rom in

6    connection with this gambling that you've been describing?

7    A    At that time, no.

8    Q    Okay.  What about at a later time?

9    A    Later time, yes.

10   Q    Who did you understand?

11   A    Joe.

12   Q    May I publish just for the witness and counsel what's

13   been premarked for identification as Government Exhibit 2,

14   please.

15        Do you see that on your screen, Mr. Selimaj?

16   A    Yes, I do.

17   Q    Do you recognize this exhibit?

18   A    Yes, I do.

19   Q    What is this exhibit?

20   A    That's Joe.

21   Q    Is this a true and accurate depiction of who you know to

22   be Joe?

23   A    I'm sorry.

24   Q    Is this a true and accurate depiction of who you know to

25   be Joe?

*S. Selimaj - Direct/Ms. Chen*                    214

1    A    Yes, it is.

2            MS. CHEN:  Your Honor, the Government moves into

3    evidence Government Exhibit 2.

4            MR. MARRONE:  No objection.

5            THE COURT:  It's admitted and you may publish.

6            MS. CHEN:  Thank you, your Honor.

7            (Government's Exhibit 2 was marked in evidence.)

8            MS. CHEN:  Mr. Jackson, if I could switch to the

9    Elmo, actually.

10           I'm also showing you what's been premarked for

11   identification, I'm sorry -- just for the witness, I

12   apologize.  Premarked for identification as

13   Government Exhibit 2-B.

14   Q    And this is a placard.  Does this say Joe, Mr. Selimaj?

15   A    Yes, it does.

16           MS. CHEN:  Your Honor, move to admit

17   Government Exhibit 2-B.

18           THE COURT:  It's admitted.

19           MR. MARRONE:  No objection.

20           MS. CHEN:  May I publish?

21           THE COURT:  You may.

22           (Government's Exhibit 2-B was marked in evidence.)

23   Q    Mr. Selimaj, I believe you were just testifying that you

24   understood Joe to be working with Rom in connection with your

25   gambling with Rom?

*S. Selimaj - Direct/Ms. Chen*                    215

1  A    Correct.

2  Q    Okay.  What did you understand that relationship to be

3  between Joe and Rom?

4  A    I understand that's their business.  Gambling is

5  considered as a business.

6  Q    I guess I'm trying to understand what, if anything,

7  understanding you had as to the relationship between Rom and

8  Joe within that business?

9          MR. MARRONE:  Objection, asked and answered.

10          THE COURT:  Overruled.

11  Q    You can go ahead and answer.

12  A    I understand Rom is his boss.

13  Q    I'm talking about your gambling with Rom.  Would you

14  explain how you would place a bet with Rom's gambling

15  organization?

16  A    Those days I did a phone call.  There was no online with

17  Rom.  And then with Joe, it was everything online.

18  Q    Okay.  When you placed a bet, I think you said you would

19  do it by phone; is that right?

20  A    Online, yes.  On the phone, yes.

21  Q    When you placed a bet, did you have to give Rom or Joe

22  money?

23  A    No.

24  Q    Can you explain how that works?  You were allowed to

25  place a bet without putting up money?

1  A    Usually, they give you a credit line which could be

2  whatever person asks to me.  With Joe, I had a hundred

3  thousand line.

4  Q    When you say "a hundred thousand line," can you explain?

5  A    100,000 a week.  If I lose, by three days I would have

6  to continue to pay before I gamble.  That's the line.

7  Q    Okay.  Did you have any limitations as to how much you

8  could bet per game, per sports event?

9  A    5,000 per game.

10 Q    Okay.  And was this with Joe?

11 A    Yes.

12 Q    Did you have different limits with Rom?

13 A    It was same, 5,000.

14 Q    Okay.  I think you talked about exchanging money kind of

15 a couple days later.  Can you explain how that works?

16 A    Usually, week starts Monday through Sunday.  And at the

17 end of the Sunday, whatever lose or win, next week we will

18 settle.  So...

19 Q    When you say, "the next week," do you mean after the

20 sporting event is over?

21 A    After the Sunday, we will agree before we start what

22 they like to call what day is feasible for me to pay on that.

23 Q    Okay.  Other than gambling, do you know how Rom or Joe

24 made money?

25 A    I don't know.  I -- with Joe, I remember he works in

1    union job he told me.  That's where I know him.

2    Q    Okay.  And all the time that you've known Rom, and

3    actually, can you tell us how long have you known Joe?

4    A    Joe, I will say maybe I know him before, but I remember

5    probably about 17 years.

6    Q    Okay.  In all the time that you've known Rom and Joe,

7    did you understand either of them to be associated with any

8    group or any organization?

9    A    Only what I read in the paper and heard in media and

10   things like that.

11   Q    And what was your understanding?

12   A    They running gambling and it's considered a Mafia.

13   Q    Did Joe also come to Nino's Restaurant or Bruno's

14   Restaurant?

15   A    I don't remember.  He used to come to Bruno's.  I don't

16   remember him coming to Bruno's but Nino's, yes.

17   Q    About how often would Joe come to Nino's Restaurant?

18   A    Sometimes once a week, sometimes once in three weeks.

19   It depends.

20   Q    Okay.  Did you ever see Rom or Joe come to

21   Nino's Restaurant or Bruno's Restaurant with other people?

22   A    Rom, yes.  I seen him with other people, yes.

23   Q    What other people?

24   A    With Tough Tony with other friends which I don't

25   remember their name.

1   Q    Who's Tough Tony?

2   A    Tough Tony was from Corona, Queens.  He had the

3   restaurant and he just died not too long ago.

4   Q    What did you understand Tough Tony's relationship to Rom

5   to be?

6   A    I think they close, either friends or partners or

7   something.  I don't know, I never asked that.

8   Q    Did you ever talk to Rom about the Mafia?

9   A    No.

10  Q    Were you ever approached to join any type of Mafia

11  association?

12  A    One time, yes.

13  Q    Can you tell us about that time?

14  A    I don't remember the year but Rom approached me.  He

15  said, I wish -- you are tough, tough guy.  You're not wimpy

16  like your brother.  I wish you can join our family or

17  something like that.

18  Q    What did you understand family to mean?

19  A    To me understand to join what they do, Mafia.

20  Q    And what did you say in response?

21  A    I said, Mr. Rom, you're great customer.  I don't want to

22  join no one.  I believe in God, only one God.  And if anybody

23  I choose, I will choose you but I don't want to get involved.

24            (Continued on the next page.)

25

1  DIRECT EXAMINATION

2  BY MS. CHEN: (Continuing.)

3  Q    Do you have an understanding as to why Rom started coming

4  to your restaurant?

5  A    Well, Nino's restaurant was in place, a lot of people

6  they used to like to come, so I guess he liked the food, and

7  Tough Tony used to like it and -- or Joe Watts and all those

8  guys, they used to come.

9  Q    Who is Joe Watts?

10 A    I don't know how to describe him.  I know him as the name

11 "Joe Watts."

12 Q    Why did you say Joe Watts used to come and Tough Tony

13 used to like to come?  Does that have any affect on why Rom

14 came to your restaurant?

15 A    I don't know that.

16 Q    Okay.

17        With respect to --

18        THE COURT:  Ms. Chen, you are looking for a natural

19 stopping point.  Any time in the next five minutes or so.

20        MS. CHEN:  Okay.  I'm trying to be mindful of

21 everybody's time.

22 Q    Let's talk about your gambling with Joe in particular.

23        Do you remember when you began gambling with Joe?

24 A    As I said before, maybe about 17 years ago.

25 Q    Okay.  And did you gamble in the same way in terms of you

1  did not have to put money up front when you gambled on a

2  sports game?

3  A    Yes, I did.

4  Q    And can you talk about the exchange of money that would

5  happen after a game was over when you were gambling with Joe?

6  A    After it was over, yes, we will settle all the time in my

7  restaurant.  Either he will come to pick up or to drop off.

8  Depends who -- who wins.

9  Q    Okay.  Did there come a time when you stopped gambling

10 with Joe?

11 A    I did stop, I believe, 2019 maybe.

12 Q    Okay.  Aside from the gambling organization, did you have

13 any understanding as to the relationship between Rom and Joe?

14 A    I'm sorry, repeat that again.

15 Q    Yes.

16       Setting aside the gambling that we've been talking

17 about, did you have an understanding as to the relationship

18 between Rom and Joe?

19 A    As I said before, I understood Rom it's his boss or

20 obviously he works for him.

21 Q    Did you ever see the two of them together?

22 A    Yes.

23 Q    Where was that?

24 A    In Nino's.

25 Q    Is there a nickname for Joe that you know other than Joe,

1  of course?

2  A     No.

3  Q     Do you know where Joe is from?

4  A     Corona, Queens.

5              MS. CHEN:  Your Honor, this might be a good place to

6  stop before I go into another topic.

7              THE COURT:  All right.

8              Ladies and gentlemen, we are going to break for the

9  day now.  Given the relatively late start this morning, I'm

10  going to ask you to be in the jury room at nine o'clock

11  tomorrow sharp, which means in the building at ten of and we

12  will aim to be in with testimony no later than 9:15, so thank

13  you all.  Have a good night.

14             Again, don't discuss the case with each other or

15  anyone else.  Don't do any independent research of any kind.

16  Don't visit any locations about which you've heard, but

17  otherwise have a lovely evening.

18             Thank you.

19             (Jury exits.)

20             THE COURT:  Sir, you can go out this way.

21             (Witness excused.)

22             THE COURT:  All right.  So we've officially split

23  the baby between nine o'clock and 9:30 for tomorrow and we

24  will expect to have the jury in the box at 9:15 sharp.  I will

25  ask the lawyers to be here at 9:00 a.m. or even a few minutes

*Proceedings*                                                      222

1    before to take up the inevitable housekeeping matters that

2    tend to arise.

3              Other than the question about whether we're sitting

4    on Friday, which I think the answer is going to be no to

5    because I don't want to bring the jury in just for two hours

6    of testimony or something, and including that, let's talk

7    about what's on the parties' agendas.

8              MR. McMAHON:  Judge, I have a medical appointment

9    Friday.

10             THE COURT:  Friday morning?

11             MR. McMAHON:  Friday morning.

12             THE COURT:  All right.  So we are not sitting on

13   Friday.

14             How many more witnesses after this second witness

15   does the Government have, approximately?

16             MS. REHNQUIST:  Ten.

17             THE COURT:  Ten witnesses.

18             MS. REHNQUIST:  Ten or thirteen.

19             THE COURT:  Okay.  We are going to push, including

20   by working on to the later side tomorrow, maybe even fully

21   towards 5:30 and what else is on the agenda?

22             MS. REHNQUIST:  Just during cross-examination, I

23   would just appreciate it defense counsel could show us the

24   document or identify the document they're going to show the

25   witness to refresh their memory before they do so.

*Proceedings*                                                          223

1           THE COURT:  Yes, that sounds only appropriate.

2           MS. REHNQUIST:  Your Honor, we may try to stipulate

3    to certain evidence just given sort of the pace of things and

4    trying to be mindful of the jury's time, but in case we are

5    not able to, we may have our first expert tomorrow and I know

6    Your Honor said your preference is not to qualify the witness

7    in front of the jury, and I just wanted to understand what

8    your process is for expert witnesses.

9           THE COURT:  Generally the same foundation that you

10   would regardless when you seek to qualify the witness.

11   Instead of asking, I would like the witness to be qualified as

12   an expert, my preference is that you ask for the witness to be

13   qualified pursuant to Federal Rule of Evidence 702, or

14   whatever it is, which I think means roughly the same thing,

15   that the upshot is they can give opinion testimony and

16   otherwise, but they don't have a stamp on their forehead that

17   says expert as they testify.

18          MS. REHNQUIST:  And then, similarly, I think the

19   standard sort of question in the voir dire is if they then

20   qualified as an expert before, would you like us to say, have

21   you been qualified before in the Eastern District or Southern

22   District?

23          THE COURT:  Yes.  Have you been qualified to give

24   testimony in this same capacity, or anything of that sort is

25   fine.

*Proceedings*                                                    224

1          MS. REHNQUIST:  Given that this may not be an item

2    for this week or maybe we could do it -- Mr. McMahon has an

3    appointment, sorry.  We are going to need to have another

4    charging conference, I think, based on the number of

5    unresolved issues from Tuesday, and I wasn't sure if we should

6    schedule that now.  Admittedly we are going at a bit of a

7    slower pace.

8          THE COURT:  Yes, I think we should schedule that now

9    just so we all know what we're tracking.

10         And I would say let's do that at the end of the day

11   on Tuesday, perhaps?  So 5:00 or 5:30 we'll just stay here and

12   hammer this out as long as it takes.

13         MS. REHNQUIST:  The Government is planning to submit

14   the supplemental Sand instructions and other follow-up

15   requests with the Court on Friday.

16         THE COURT:  Outstanding?  Let me know, again, to the

17   extent you can, the extent to which you are agreed with the

18   defense on the -- I mean, I can't imagine that there are going

19   to be a lot of objections to standard Sand instructions on

20   general topics, but if there are, let me know as soon as you

21   can.

22         MS. REHNQUIST:  And for the record, Your Honor, I

23   believe Defendant Romanello left.  If his attorney could waive

24   his appearance --

25         MR. MARRONE:  He went to the bathroom.

*Proceedings*                                        225

1         THE COURT:  I didn't see that happen.  Thank you for

2    pointing it out.

3         MR. McMAHON:  I'm told he went to the bathroom,

4    Judge.  At the age of 86, I waive his appearance.

5         THE COURT:  At your age of 86 or his age of 86?

6         MR. McMAHON:  I'm 76, Your Honor.

7         THE COURT:  You don't look a day over 75.

8         MR. McMAHON:  Thank you.

9         THE COURT:  Yes, his appearance is waived.  75 is

10   the new 55, we all know that.

11        So, I'm sorry, what were you saying?

12        MS. REHNQUIST:  I can move on to the next

13   housekeeping item.

14        THE COURT:  Yes.

15        MS. REHNQUIST:  With respect to the potential

16   immunized witness --

17        THE COURT:  When is that, as best you can project?

18        MS. REHNQUIST:  Most likely Monday.

19        THE COURT:  Okay.

20        MS. REHNQUIST:  And so I believe we are waiting for

21   the Court's order on the motion whether or not it will be

22   granted so we can share it with defense counsel.

23        THE COURT:  Well, the motion can't be granted until

24   he actually invokes; right?

25        MS. REHNQUIST:  So I believe you can sign it now but

*Proceedings*                                                    226

1   it doesn't come into effect until he invokes.

2          THE COURT:  This is a fairly standard form of order;

3   right?  They don't vary from one case to the next.

4          MS. REHNQUIST:  That's right, Your Honor.

5          THE COURT:  I'm happy to enter that order if and

6   when the preconditions are satisfied.

7          MR. McMAHON:  Over my objection, Your Honor.

8          THE COURT:  Over your objection to the concept of

9   immunizing this witness generally but not to any specific

10  language in the order; right?

11         MR. McMAHON:  Correct.

12         THE COURT:  Okay.  So, yes, we will do that.

13         I don't think I know the basis for your objection

14  other than that it's not fair that they're not also immunizing

15  your witness, but I've invited you, if you want, to make an

16  application to that effect.

17         There was a fairly recent Second Circuit case,

18  actually, I think it's 2022, it's an unpublished opinion.  We

19  looked at it this morning.  It may be called *Melendez* or

20  something like that in which the Second Circuit says, we have

21  never found error in a district judge's refusal to order the

22  Government to immunize the defense witness.  But I think they

23  talk a little bit about the possibility that that might happen

24  one day and, if so, under what circumstances.  I'm

25  paraphrasing here.

1          So, yes, that order will be entered.

2          What else on that?

3          MS. REHNQUIST:  I conferred with some of my

4   colleagues about whether or not the Court needs to provide the

5   jury with the immunized witness instruction in advance of the

6   witness's testimony.  We provided two examples where Judge

7   Ross and Judge Matsumoto did do that.  I believe that Judge

8   Gonzalez did not do that in the Zottola trial.  There was a

9   waiver by defense counsel for the reading of that instruction.

10          THE COURT:  Do you want the instruction in front of

11   the jury?  Assuming the --

12          MR. McMAHON:  Yes.

13          THE COURT:  -- immunity is going to happen?

14          MR. McMAHON:  Well, they're supposed to review it

15   carefully?

16          THE COURT:  I don't remember offhand what the

17   instruction said.  If you want the instruction, I would give

18   something like, I think, what Judge Ross and/or Judge

19   Matsumoto gave, but if you waive it, then I won't.

20          MR. McMAHON:  I want it.

21          MS. REHNQUIST:  So I think that resolves all of the

22   pending immunity issues barring the immunity issues with

23   respect to the jury charge.

24          I don't believe we have any other house -- oh, the

25   only other -- sorry.  The defense had filed a letter

*Proceedings*                                                    228

1    requesting that certain 302s be admitted and the Government

2    filed a response and I believe that we are still waiting for a

3    ruling on that.

4           THE COURT:  And remind me the basis.  I will look at

5    this again tonight, but just give me the context.

6           MR. McMAHON:  Judge, I believe that there are

7    declarations against penal interest.  There's a Second Circuit

8    case saying there -- it's *Carneglia* and it says business

9    records or public records as to the documents themselves.

10          THE COURT:  So am I remembering maybe something I

11   read in the parties' letters -- or I'm remembering this from

12   some other context -- I thought the rule used to be that when

13   the Government wanted to put in somebody's guilty plea

14   allocution, that was admissible as a statement against penal

15   interest.  And then *Crawford* happened and then the

16   confrontation clause was revived to some degree.  But the

17   defense doesn't have a confrontation clause problem the way

18   the Government might, so it may well be that 302s are -- I

19   understand a 302 is not a guilty plea allocution but the 302s

20   are conceivably -- you are going to say they are just not the

21   witness's statements.

22          MS. REHNQUIST:  Just to orient Your Honor, these are

23   the 302 of Luan Bexheti's interviews with law enforcement.

24   And for a variety of reasons, those are not admissible,

25   they're not business records, they lack trustworthiness, they

*Proceedings*                                                229

1   weren't given under oath.  They are actually statements in

2   there that --

3            THE COURT:  But assuming they would come in under

4   the hearsay exception for statements against penal interest --

5            MS. REHNQUIST:  Theoretically, portions of them

6   could come in against a statement of penal interest, but a

7   statement against penal interest is very narrow.  It's a

8   narrow exception to the hearsay rule and the length of the

9   302s --

10           THE COURT:  Right.  I will look at all this tonight.

11           MS. SCHUMAN:  Your Honor, I apologize.  Just to

12  orient Your Honor to the relevant filings, the initial notice

13  from Mr. McMahon was pursuant to Rule 807(b).  That was

14  provided just to the Government.  The Government thereafter

15  filed a motion in limine dated November 25th, 2023.

16           THE COURT:  To exclude.  807(b)?

17           MR. McMAHON:  The residual exception.

18           MS. SCHUMAN:  Yes.

19           THE COURT:  All right.  Has there been a response to

20  the Government's --

21           MR. McMAHON:  There has not, Your Honor.

22           THE COURT:  -- motion to preclude?

23           MS. SCHUMAN:  There was, Your Honor.

24           MR. McMAHON:  Was there?  I'm told there was.

25           MS. SCHUMAN:  Your Honor, on November 25th, the

*Proceedings*                                                    230

1   Government filed its motion in limine.

2           On November 26th, last Sunday -- I'm sorry --

3   Mr. McMahon filed his response.  That response was what led to

4   the discussion about the potential -- the sealing issue.

5           THE COURT:  Yes.

6           MS. SCHUMAN:  The Government, in its response, I

7   think Mr. McMahon expanded on the potential bases by which the

8   302s can be admitted, so then the Government then filed its

9   reply on November 27th.  I believe that is presently the only

10  outstanding motion.

11          THE COURT:  Okay.  Well, I am going to file

12  something in writing on the reputation piece.  I have a draft

13  of that on my desk.

14          Thank you.

15          You may not have been in the room for this.  We

16  already talked about the Government providing its requested

17  redactions on my prior written order regarding motions in

18  limine.  We'll get out the reputation order tonight most

19  likely and get to this question about 302s, statement against

20  penal interest, as quickly as we can.

21          MS. REHNQUIST:  And relatedly, Your Honor, I believe

22  the sealing issue is still outstanding.

23          THE COURT:  Which sealing issue?  Oh, so there is a

24  motion to seal.

25          Have you filed a motion to seal?

1          MS. REHNQUIST:  In our response, we outlined why we

2   believed it was a violation of protective order and a redacted

3   order of Mr. McMahon's motion should be filed on the docket.

4          MR. McMAHON:  Which I disagreed with.

5          THE COURT:  Protective orders apply in discovery.

6   Documents exchanged in discovery are not per se judicial

7   documents under the standard sealing rubric.  Once something

8   is here now, the standard for sealing is a lot higher, and all

9   I'm saying is there's some likelihood -- maybe the whole thing

10  has to be sealed, or maybe there should be more tailored

11  redactions, I don't know.

12         MS. REHNQUIST:  Your Honor, actually I think the

13  point is moot now.

14         THE COURT:  Why?

15         MS. REHNQUIST:  Because it related to Mr. Selimaj's

16  testimony in the grand jury and he just testified to it.

17         THE COURT:  So you withdraw your motion to seal?

18         MS. REHNQUIST:  Yes.

19         THE COURT:  So we should unseal the --

20         MR. McMAHON:  Yes.  By all means.

21         THE COURT:  Okay.  You don't want to call me offline

22  tonight and confirm that or -- no, I'm just kidding.

23         Okay.  We will unseal the previously sealed -- these

24  are the 302s themselves; is that --

25         MS. SCHUMAN:  No, Your Honor.  There's two separate

*Proceedings*                                             232

1    issues.  The Government --

2              THE COURT:  We'll sort this tonight.

3              MS. SCHUMAN:  Okay.

4              THE COURT:  As long as nothing needs to be sealed

5    anymore, we are just unsealing that which was previously

6    sealed.

7              MS. REHNQUIST:  Unsealing that which the Court

8    sealed.

9              THE COURT:  Right.  So it's sua sponte.  I do

10   remember this vaguely.

11             Did you say Danny Marino or Danny Martino?

12             MR. McMAHON:  Marino.  Gambinos, Your Honor.  My guy

13   is supposedly a Genovese.  I thought I would spice it up a

14   little.

15             THE COURT:  I have a case with Richie and Danny

16   Martino, allegedly of the Gambino family.  I thought you may

17   have misspoken.

18             MR. McMAHON:  No.  Danny Marino.

19             Okay.  What else on the defense side?

20             MR. McMAHON:  Nothing, Your Honor.  So we'll be here

21   early tomorrow, notwithstanding I'm checking out of my hotel.

22   I will make arrangements, Judge.

23             THE COURT:  I don't even check out anymore; I just

24   leave, unless I think there's going to be a dispute over the

25   bill.

*Proceedings*                                                   233

1          MR. McMAHON:  I have to pack because I'm not going

2    back.

3          THE COURT:  You can pack tonight even.

4          MR. McMAHON:  God forbid I should prep for cross for

5    Nino.

6          THE COURT:  That's true.

7          Mr. Marrone, anything else?

8          MR. MARRONE:  I'm fine, Judge.

9          Thank you.

10         THE COURT:  Thank you, all.  See you all tomorrow.

11

12         (Matter adjourned to November 30, 2023, 9:00 a.m.)

13

14                  *      *      *      *      *

15

16

17

18

19

20

21

22

23

24

25

234

1                                    <u>INDEX</u>

2

3

4    <u>WITNESS</u>:                                        <u>PAGE</u>:

5              Preliminary Instructions.................    12

6              Opening Statement - Ms. Schuman.........    32

7              Opening Statement - Mr. McMahon.........    37

8              Opening Statement - Mr. Marrone.........    44

9    SHUQERI SELIMAJ

10             DIRECT EXAMINATION

11             BY MS. RHENQUIST.........................    51

12             CROSS-EXAMINATION

13             BY MR. MCMAHON..........................   145

14             CROSS-EXAMINATION

15             BY MR. MCMAHON..........................   172

16             CROSS-EXAMINATION

17             BY MR. MARRONE..........................   186

18   SHEMSI SELIMAJ

19             DIRECT EXAMINATION

20             BY MS. CHEN.............................   206

21

22                            *****

23

24

25

235

1

2                              INDEX OF EXHIBITS

3                                                        PAGE:

4    Government's Exhibit 12 was marked in evidence......    52

5    Government's Exhibits 12-A and 12-B were marked in

6    evidence.........................................    52

7    Government's Exhibits 13, 13-A, and 13-B were

8    marked in evidence...............................    56

9    Government's Exhibits 11, 11-A, and 11-B were

10   marked in evidence...............................    59

11   Government's Exhibit 5 was marked in evidence.......    60

12   Government's Exhibits 1 and 1-B were marked in

13   evidence.........................................    69

14   Government's Exhibit 3-A was marked in evidence ....   105

15   Government's Exhibits 353, 313-A, 313-B, 316-A,

16   319-A, and 323-A were marked in evidence...........   116

17   Government's Exhibits S-2 and 311 through 323 were

18   marked in evidence...............................   116

19   Government's Exhibits 500 and 501 was marked in

20   evidence ........................................   139

21   Government's Exhibit 2 was marked in evidence.......   214

22   Government's Exhibit 2-B was marked in evidence.....   214

23

24                              * * * * *

25