

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS:DR/IC/RMS
F. #2020R01027

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 22, 2024

By ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joseph Celso
Criminal Docket No. 22-194 (EK)

Dear Judge Komitee:

The government respectfully submits this letter in anticipation of defendant Joseph Celso's sentencing in the above-captioned case, which is scheduled for April 29, 2024, at 2:00 p.m. On December 11, 2023, a jury found Celso guilty of conspiring to engage in the extortionate collection of credit in violation of 18 U.S.C. § 894(a)(1). For the reasons set forth below, the government respectfully submits that a term of imprisonment of 51 months, at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range, should be imposed, followed by a term of supervised release. Restitution is mandatory in this case, but the victims elected not to complete loss affidavits. The government has sought entry of a forfeiture money judgment in the sum of $28,666, see ECF No. 170, and also requests that the Court impose a fine consistent with the Probation Department's recommendation of $15,000.

I. Background

A. Defendants' Extortionate Collection of Credit

As proven at trial, Celso and co-defendants Anthony Romanello and Luan Bexheti, along with other uncharged co-conspirators—including Robert Utnick, who worked with Bexheti to take and record bets and money owed, and Michael Regan, who was the "boss" of the gambling operation—were involved in an illegal sports gambling scheme where bets were placed on credit, debts were settled-up on a weekly basis, and individuals, including Romanello and Celso, were called in to help collect on outstanding debts.

The charged extortionate collection of credit conspiracy (Count One) is a part of the broader gambling-credit collection conspiracy, in which the defendants and their co-

conspirators took part. Specifically, in or about 2017, two individuals, Fiton Selimaj, also known as "Toni," and his brother-in-law, began placing sport bets with Bexheti and Utnick. Presentence Investigation Report ("PSR") ¶ 12. Based on the arrangement with Bexheti and Utnick, Toni and his brother-in-law placed bets on credit on a weekly basis, with the amount won or owed to be settled by the following Wednesday or Thursday. Id.[1]

At some point in or about February or March 2017, Toni and his brother-in-law owed approximately $86,000 (the "Debt"). Id. ¶ 13; see also Trial Tr. 523-27, 531-34, 550-51. Bexheti and Utnick attempted to collect the Debt through phone calls, voicemails and even personal visits to Toni's home, but were ultimately unable to collect the Debt. PSR ¶ 14; see also GX 409; GX 410; Trial Tr. 557. For example, during a call on February 27, 2017, Bexheti asked whether Utnick texted and called Toni's brother-in-law, and Utnick confirmed that he did, noting that he "can't do nothing else." GX 411. Bexheti then stated that if they did not collect the Debt from Toni and his brother-in-law before he sees his "boy," i.e., Regan, "it ain't gonna be nice." Id.

On a call with Toni the next day, the situation continued to escalate, and Bexheti stated that his boss was going to need to get involved and it is "serious shit" if Toni and his brother-in-law "do not have the money." PSR ¶ 14; see also GX 413. Then, on March 3, 2017, Bexheti and Utnick again discussed the need to collect the Debt. GX 415. On that call, Bexheti recounted to Utnick what Bexheti had told Toni:

> He needs to pay the whole thing, okay, not just part of it. He needs to f***ing pay the whole thing, or I'm telling you, it's gonna f***ing get ugly. So whatev-- he goes, I'm gonna go and see him tonight. Okay. I, I said, I just want you to know because, uh, uh, the office is f***ing, uh, furious about this shit because they paid him on time, gave him all his money, and now they have to f***ing wait for him . . . . And I said, uh, but I can tell you one thing, if this fucking guy [Toni's brother-in-law] doesn't pay, it's gonna get ugly."

Id. In the call above, Bexheti explained to Utnick that he told Toni that Regan ("the office") is "f***king . . . furious" because when Toni's brother-in-law won a large amount, "they paid him on time" but now that he owes "the office" money he is not paying on time ("they have to f***king wait for him") and that if the money isn't paid soon "it's gonna get ugly." Id. Bexheti and Utnick also discussed approaching Toni's uncle to collect the Debt. PSR ¶ 14. After additional attempts to collect the Debt from Toni and his brother-in-law, Behexti told Utnick to "[r]elay the message whatever, and then, you know, listen, it's only so much you and I can do, we're not the fucking enforcers." GX 418; see also PSR ¶ 16. Ultimately, Bexheti and Utnick failed to collect the Debt by themselves, without the "enforcers." PSR ¶ 17.

After Bexheti and Utnick were unable to collect, additional members of the gambling organization, including Romanello, Celso and Regan, became involved. Specifically,

[1] For clarity, the government will refer to Mr. Selimaj and his relatives by their first names throughout this submission.

Regan approached Toni's uncle, Shuqeri Selimaj, also known as "Bruno," about the repayment of the Debt. Id. ¶¶ 17-18. Among other things, Regan told Bruno that Toni owed a gambling debt and that Romanello and "Tough Tony"—Anthony Federici, previously a captain in the Genovese crime family—say hi. Id. ¶ 18.

In or around March 2017, Romanello, Regan and two other men approached Bruno about the Debt. Id.; see also Trial Tr. 71. During a conversation between Romanello and Bruno that occurred in a private room of Bruno's restaurant, Romanello told Bruno that Toni owed him (Romanello) $86,000, "yell[ed]" at Bruno, and said that he "need[ed] [his] $86,000." Id. Romanello then told Bruno that Tough Tony "said hello" and would "come over to visit [Bruno]." Trial Tr. 72. As Bruno testified at trial, he had known Romanello and Tough Tony for over 30 years and understood both to be members of the "mafia." Id. at 66-67. Bruno understood that Romanello used Tough Tony's name to "intimidate" him. Id. at 72-73.

A few weeks later, Romanello, Regan, Bexheti and another man again confronted Bruno about the Debt. Id. at 104; see also PSR ¶ 19. Again, Romanello spoke with Bruno in a private room of Bruno's restaurant about the outstanding gambling debt. Trial Tr. 105-06. Romanello's tone during that conversation was "higher than the first time," and Romanello "scream[ed]" at Bruno that he "need[ed] [his] money." Id. at 106; see also PSR ¶ 19.

Then, on May 11, 2017, Romanello, Celso, Regan and Romanello's son George Romanello confronted Bruno at his restaurant for a third time to induce payment of the Debt. Id. at 108-13; GX 352. After the four men arrived together at the restaurant, Romanello once again spoke to Bruno in a private room about the Debt. Trial Tr. 108; GX 352. There, Romanello told Bruno that Romanello "want[ed] all [of] [his] money" and that he did not "want to hear" it. Trial Tr. 108-09. When Bruno told Romanello that he would pay the $6,000 that his nephew Toni owed, but not the other portion of the Debt, Romanello "rais[ed]" his voice and said that he "want[ed] all [of] [his] money" and that he did not care. Id. at 109.[2]

After this conversation, Romanello and Bruno returned to the bar area of the restaurant where Celso, Regan, and George Romanello had been waiting. Id.; GX 352. After Bruno reiterated that he would only pay the $6,000 owed by Toni, Romanello repeatedly told Bruno that he "would like to punch" Bruno. Trial Tr. 110. When Bruno responded that Romanello did not have the "guts to punch" him, Romanello punched Bruno in the face, which was captured on video surveillance footage. Id. at 110-11; GX 352. At nearly the same time, Regan grabbed Bruno by the collar and pushed him backwards while Celso and George Romanello surrounded Bruno. Trial Tr. 111-12; GX 352. As captured on the surveillance footage, Romanello and his three co-conspirators then walked forward, encroaching on Bruno as he stumbled backward in attempt to escape. GX 352. It was not until Bruno told Romanello, Celso and the other men that there was a surveillance camera in the restaurant that Romanello and his co-conspirators left the restaurant. Trial Tr. 112; GX 352.

[2] Toni owed approximately $6,000 while his brother-in-law owed approximately $80,000, but because Toni had "vouched" for his brother-in-law, Toni was held responsible for the entire amount of the Debt. Trial Tr. 550-51, 566-67.

Later that night, Bruno filed a police report against Romanello relating to the assault. Trial Tr. 131-32. That same day, Bruno also contacted his brother Shemsi Selimaj, also known as "Nino," to discuss what had happened. Id. at 132. Upon reviewing the surveillance footage, Nino recognized that Celso, with whom Nino had gambled for over five years, was one of the men who came with Romanello to the restaurant. Id. at 250-52. Nino then called Celso, who confirmed he and Romanello "went to collect the money," i.e., the Debt. Id. at 252; see also PSR ¶ 23. Nino and Celso met shortly thereafter, and Celso told Nino that the Debt must be paid. Trial Tr. 253. When Nino mentioned that Bruno had filed the police report, Celso responded that Bruno "better drop the charges" because "[o]therwise it's going to be ugly." Id. Celso further stated that if Romanello were arrested, "somebody is going to pay the price." Id. at 255. Nino subsequently relayed this conversation to Bruno because he was worried about "further escalation problems." Id. Nino then went to the police station with Bruno, who dropped the charges. Id. Nino subsequently informed Celso that the charges had been dropped, to which Celso responded, "that's fine, excellent." Id. Nino also coordinated with Celso to pay off the Debt—which Nino understood to be owed to "Joe and Rom"—and the Debt eventually was repaid in full. Id. at 256-57.

B. Romanello's and Celso's Attempts to Prevent Witnesses From Cooperating With Law Enforcement

In addition to Celso's obstructive effort to induce Bruno to drop the assault complaint against Romanello (which, as discussed above, was successful), Celso attempted to persuade Nino to lie to the federal grand jury after Nino received a subpoena to testify in relation to the above-described conduct. PSR ¶ 28. When Nino mentioned to Celso that he had received a subpoena in November 2019, Celso said, "Go ahead, testify, but keep me away from this." Trial Tr. 264. Nino understood Celso's directive to mean "to lie to [the government's] face," since Celso was "obviously" involved in the collection of the Debt. Id. at 264, 266.[3]

In approximately November 2019 (around the time that Nino received the subpoena to testify before the grand jury), while conducting a separate investigation targeting members of Albanian organized crime, the Federal Bureau of Investigation ("FBI") intercepted telephone calls on a T-III wiretap, in which participants—including known associates of the Genovese Crime Family like Third Party Two—discussed efforts to prevent Bruno from cooperating with the government in relation to the instant case. PSR ¶ 29. For example, below is an excerpt from a telephone call on November 27, 2019, between two third parties:

Third Party One: I send you picture, I have two meetings very, about Bruno, my brothers, and they, because they supposed to meet, he's supposed to meet him this week, but oh, he's sick, he has like mini heart attack in hospital.

Third Party Two: Oh my god.

---

[3] The PSR states that Nino "did not withhold information about Celso to the grand jury." PSR ¶ 28. However, Nino did not testify before the grand jury pursuant to the subpoena he received.

Third Party One: But I talked to all my, all my guys, I talked to all my guys, and I just texted him the picture last night, that was til 12 o'clock with my guys and I tell him to do the right thing.

Id. In the above exchange, Third Party One explained to Third Party Two that Third Party One met with his associates in Albanian organized crime ("all my guys") to discuss Bruno and that Third Party One instructed Bruno to cease his cooperation with the ongoing investigation ("I tell him to do the right thing."). Id. ¶ 30. Third Party One subsequently followed up with Third Party Two on multiple occasions regarding his ongoing attempts to prevent Bruno from cooperating, including during calls on December 5, 2019, and December 13, 2019. Id. During both conversations, Third Party One assured Third Party Two that Bruno would "do [the] right thing," id., i.e., not testify against Romanello.

As another example, on December 13, 2019, following Third Party One's call to Third Party Two about Bruno, Third Party One discussed with Third Party Three his involvement with Romanello and Romanello's associates to prevent Bruno from testifying against Romanello:

Third Party One: Some people from prison are trying calling me daily, wanting me to talk to Bruno. Do you know Bruno?

Third Party Three: Yes.

Third Party One: A week ago some very big ones called me! Do you know the Italian [Romanello] that hit Bruno, they beat him up at steakhouse?

Third Party Three: Yes.

Third Party One: Now, he was in jail with me. They called me a week ago and said he is Albanian, and we are told you are friends with him. And he, they sued, and now he is going to trial. The Italian [Romanello] was arrested and they have introduced a tape, because he was giving money with interest rate, you know, to Bruno.

Third Party Three: Yes, yes.

Third Party One: And also because that he beat him up, he was arrested. But he now will go to trial, do you know when people go to trial and spy, do you know about it?

Third Party Three: Yes, yes.

Third Party One: And this Bruno will go to trial for them. The old man who beat him is 70 years and he has been 20 years in jail. They called me a week ago but I told them, I, I, he was my friend, but I don't want to get involved with him, I can't go tell him

anything. Because if I go tell him anything then, they can screw me like I am threatening him or something. And, today some other Italians called me and I said, one of them said if he puts my brother in jail, he [Bruno] is going to have problems. Do you understand? Because he is testifying in the trial; because he is going to trial.

…

Third Party One: He was arrested and now he is going to trial and he will be in front of him, testify in the trial and wanted me to talk to him not go to trial. But, I said no, I can't tell him, he is, he is, I have nothing to do with him but, he is Albanian and he has said before he is your friend.

…

Third Party One: I swear if he puts the old man in jail he is going to have problems, I am telling you.

…

Third Party One: I swear someone told, next week, the other ones, one of them told me, if they send him to prison, he is a big one, and if they send him to prison, it's better for him to go to Montenegro . . . .

Id. ¶ 31. In the above exchange, Third Party One detailed his participation with Romanello ("the old man") and others to influence and prevent Bruno's cooperation with the investigation ("calling me daily, wanting me to talk to Bruno"). Id. ¶ 32. Third Party One explained that because Bruno is an Albanian American, like Third Party One himself, members of Italian organized crime ("some very big ones") contacted Third Party One to reach out to Bruno to prevent his testimony or cooperation with the investigation ("wanted me to talk to him not go to trial"). Id. Third Party One further explained that he was told by "some other Italian" that if Bruno "puts my brother in jail, he is going to have problems . . .because he is testifying in the trial." Id. Third Party One finished the conversation, noting, "if they send him [Romanello] to prison, he is a big one, and if they send him to prison, it's better for him [Bruno] to go to Montenegro," making clear Third Party One's understanding of the willingness of Romanello and his associates to both obstruct justice and violently retaliate against Bruno for cooperating in the instant case. Id. As disclosed in the material produced to pursuant to 18 U.S.C. § 3500 for Brno, there was at least one attempt by Third Party One to prevent Bruno from testifying in the instant case.

C. Celso's Arrest and Subsequent Conviction

For his actions, Celso was charged with conspiring to engage in the extortionate collection of credit, in violation of Title 18, United States Code, Section 894(a)(1) (Count One), engaging in the extortionate collection of credit in violation of 18 U.S.C. § 894(a)(1) (Count

Two) and obstruction of justice in violation of Title 18, United States Code, Section 1512(c) (Count Three). ECF No. 1. He was arrested and arraigned on May 3, 2022. PSR ¶ 36.

On December 11, 2023, following a jury trial, Celso was found guilty of Count One and acquitted of Counts Two and Three. See ECF No. 134 (jury verdict); see also PSR ¶ 37.

## II. Applicable Law

The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable the United States Sentencing Guidelines (the "Guidelines") range. Gall v. United States, 552 U.S. 38, 49 (2007). Though advisory, see United States v. Booker, 543 U.S. 220, 264 (2005), the Guidelines nonetheless are "the starting point and the initial benchmark," Gall, 552 U.S. at 49; see also Molina-Martinez v. United States, 578 U.S. 189, 198–99 (2016) (explaining that "[t]he Guidelines are the framework for sentencing and anchor the district court's discretion").

After calculating the applicable Guidelines range, the court must consider the factors outlined in § 3553(a), see Gall, 552 U.S. at 49, and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing," United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) directs the court "in determining the particular sentence to impose" to evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. "[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Rueda-Zarate, 291 F. App'x 364, 366 (2d Cir. 2008) ("A Guidelines sentence will in the ordinary case 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting Kimbrough, 552 U.S. at 109)); United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

## III. Discussion

### A. The Guidelines Calculation

As an initial matter, see Gall, 552 U.S. at 49; Molina-Martinez, 578 U.S. at 198–99, the government submits that the Guidelines calculation contained in the PSR is accurate, see PSR ¶¶ 52–60, with a total offense level of 22, see id. ¶ 60. Because Celso falls in Criminal History Category I, see id. ¶ 64, the applicable Guidelines range is 41 to 51 months' imprisonment, see id. ¶ 118.

Celso disputes the applicability of the two-point enhancement for obstructing or impeding the administration of justice, arguing that U.S.S.G. § 3C1.1 cannot apply because he was acquitted of obstruction of justice at trial. See ECF No. 166 ("Def. Mem."), at 2. However, it is well-established that courts can—and often do—consider conduct underlying an acquitted charge when imposing a sentence. See, e.g., United States v. Watts, 519 U.S. 148, 157 (1997) (concluding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proven by a preponderance of the evidence"); United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct"); cf., e.g., United States v. Bailey, No. 20-CR-293 (WFK), ECF No. 752 (calculating Guidelines range to include consideration of acquitted conduct). While the jury did not convict Celso on the obstruction count, there was sufficient evidence at trial—as discussed above, see Trial Tr. 265-66; PSR ¶ 28—to provide beyond a preponderance of the evidence that he, in fact, "attempted to obstruct or impede, the administration of justice with respect to the [instant] investigation[ and] prosecution," U.S.S.G. § 3C1.1(1).

### B. A Sentence of 51 Months' Imprisonment Is Appropriate

The government respectfully submits that a sentence of 51 months, the top of the applicable Guidelines range, is appropriate in this case and would be sufficient, but not greater than necessary, to serve the statutory purposes of sentencing.

While Celso has repeatedly claimed he was a mere observer and minimal participant in this case, see, e.g., Def. Mem. 1, the evidence at trial shows that the nature of the offenses and Celso's role in the offense conduct is much more than that. The charges in this case stem from an illegal gambling operation, which in and of itself is a crime. Then, in order to collect the $86,000, Romanello visited Bruno again and again, with Celso accompanying him on the third confrontation—the one that led to repayment of the Debt. Together, Celso and Romanello used their reputation as members of the mafia as well as the name of a fellow member of the Genovese crime family to intimidate Bruno and make him fear for his family's safety to ensure they collected the $86,000 they demanded. As Bruno testified:

> [T]his Mafia guy, they're going to hurt me or my family. Me, I don't care. I'm 72 years old, I lived my life. But my family, my children,

> my grandchildren, my nephew, my nieces that's what I was worried about.

Trial Tr. 204. After Romanello punched Bruno in the face, Celso move in toward Bruno as he stumbled backwards and tried to escape. Following the confrontation and assault of Bruno on May 11, 2017, Celso met with Nino numerous times until each dollar was collected. Celso again capitalized on his reputation to ensure that he and Romanello would not be caught for their actions, engaging in not one, but two efforts to obstruct justice in connection with the Debt. First, Celso threatened Nino that things would "get ugly" if the police report against Romanello were not withdrawn. Then, in 2019, Celso told Nino to lie to the grand jury, again seeking to disrupt the criminal justice system and silence victims to ensure that Celso and his co-defendants would go free.

A 51-month sentence also appropriately accounts for the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1).[4] Celso is long-time member of the Genovese crime family who has failed to take seriously the charges in this case and instead has thumbed his nose at the Court. Indeed, in flagrant violation of the court-ordered conditions of supervised released in this case, see ECF No. 25 (ordering that Celso not have contact with "known associates and affiliates of organized crime"), Celso continued to associate with members of the Genovese crime family, including during the pendency of the trial itself. For example, on December 9, 2023, while the jury was deliberating, the FBI was conducting surveillance of certain members of the Genovese crime family at a holiday party at a restaurant. There, agents observed Celso with the underboss of the Genovese crime family and a number of other members of the Genovese crime family. Shortly after the agents ran into Celso in the bathroom of the restaurant, a round of drinks was sent over to the agents as they continued their surveillance. Separately, on February 6, 2024, the FBI executed a search warrant in connection with an investigation into Carmelo "Carmine" Polito, an acting captain in the Genovese crime family, and seized, among other things, two cellular telephones from Polito's person. At the time, Polito was on pretrial release following an August 2022 indictment that charged him with racketeering, gambling, money laundering and attempted extortion. See United States v. Macario, et al., No 22-CR-356 (ENV) (E.D.N.Y.).[5] A subsequent search of one of the telephones seized from Polito revealed extensive contact between Polito and Celso via WhatsApp and text messages throughout 2023. Notably, many of these communications appear to have occurred during trial in the instant case, as the FBI's review revealed WhatsApp contacts between Polito and Celso as recently as November 28, 2023, and December 3, 2023.

Moreover, a 51-month sentence will also serve to afford deterrence and to protect the community from the defendant. See 18 U.S.C. § 3553(a)(2)(B). It is important for the

---

[4] It bears mention that while Celso does not have any prior convictions, he was charged with murder in 1991 after a witness identified him as one of the perpetrators who beat a victim to death with a baseball bat. PSR ¶ 67. Celso was acquitted at trial in 1993 after—according to public reporting—the main witness against Celso fled to Italy before trial and refused to return.

[5] On April 5, 2024, Polito pled guilty to racketeering.

Court's sentence to send a message to other members of organized crime families who engage in callous acts of extortion that such conduct will not be tolerated. In addition, Celso's age, stable upbringing and teenaged daughter—all cited by Celso in support of his request for a below-Guidelines sentence, see Def. Mem. 1, 3—demonstrate that circumstances that normally dissuade individuals from criminality were insufficient to mitigate against this defendant's decision to engage in criminal conduct.[6] Celso also cites to his charitable work, see Def. Mem. 3, but however commendable his philanthropic pursuits may be, these acts are unexceptional and insufficient to warrant the below-Guidelines sentence he requests, see U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (noting that the defendant's "record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence"); United States v. Gilmore, 2012 WL 1377625, at *7 (W.D. La. Apr. 18, 2012) (noting that the defendant "has done good works in the community, but so have many others who have appeared before this [c]ourt"). Further, as noted above, neither the indictment, the court-ordered conditions of pretrial release, nor the trial in the instant case dissuaded Celso from engaging with members of organized crime. A serious sentence is needed to deter Celso—who has shown a blatant disregard for not only the seriousness of the charges but the Court's orders—from future crime.

In light of the media interest surrounding this case, others seeking to engage in the same conduct surely will notice what repercussions follow a conviction for extortionate collection of credit, that engagement in such behavior is not victimless, and that threatening others with bodily harm to induce payment of an illegal gambling debt is not something that will be taken lightly. A serious sentence here is needed to deter others from such harmful, illegal conduct. Further, Celso's multiple efforts to obstruct justice in the instant matter necessitate a sentence at the top of the applicable Guidelines range to ensure that Celso and others similarly situated are appropriately deterred from committing like crimes and intimidating victims and government witnesses.

Finally, where, as here, a defendant "has not taken responsibility or expressed remorse for his actions," a substantial custodial sentence is appropriate to promote respect for the law and to provide just punishment for the offense. See, e.g., United States v. McLean, No. 08-CR-789 (RJS), 2022 WL 1125946, at *6 (S.D.N.Y. Apr. 15, 2022), aff'd, No. 22-1176, 2023 WL 8253680 (2d Cir. Nov. 29, 2023); accord United States v. Livingston, 404 F. App'x 685, 692 (3d Cir. 2010) (concluding that the district court's consideration that the defendant had not "taken responsibility for any of the [criminal] conduct of record" was a "rational application of the § 3553(a) factors"). The defendant has shown absolutely zero remorse or contrition for his

---

[6] Celso's submission notes that counsel has received character letters on Celso's behalf, see Def. Mem. at 3, but it does not appear that any such letters were attached to his filing. While the Court can and should consider letters that may be submitted on behalf of Celso, it bears emphasis that such letters are not atypical and often are of less value in fashioning a sentence than other factors. See, e.g., United States v. Deason, 622 F. App'x 350, 358 (5th Cir. 2015) (upholding refusal to vary based upon, inter alia, "letters of support submitted by his friends and family").

conduct in this case, the Court's sentence should reflect the defendant's brazen attitude toward Court orders and ensure that the defendant is unable to harm the community again.

For these reasons, a term of imprisonment at the top of the applicable Guidelines range is appropriate.

## IV. Conclusion

For the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment of 51 months, followed by a term of supervised release, impose a fine, and enter a forfeiture money judgment in the sum of $28,666.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Dana Rehnquist
Irisa Chen
Rebecca M. Schuman
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (EK) (by ECF)
Counsel of Record (by ECF and Email)
Frank Nikolaidis, U.S. Probation Officer (by Email)