

U.S. Department of Justice

United States Attorney
Eastern District of New York

JRS:DR/IC/RMS
F. #2020R01027

271 Cadman Plaza East
Brooklyn, New York 11201

April 22, 2024

By ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Anthony Romanello
                Criminal Docket No. 22-194 (EK)

Dear Judge Komitee:

The government respectfully submits this letter in anticipation of defendant Anthony Romanello's sentencing in the above-captioned case, which is scheduled for April 29, 2024, at 11:00 a.m. On December 11, 2023, a jury found Romanello guilty of conspiring to engage in the extortionate collection of credit (Count One) and engaging in the extortionate collection of credit (Count Two), each in violation of 18 U.S.C. § 894(a)(1). For the reasons set forth below, the government respectfully submits that a term of imprisonment of 71 months, at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range, should be imposed, followed by a term of supervised release. Restitution is mandatory in this case, but the victims elected not to complete loss affidavits. The government has sought entry of a forfeiture money judgment in the sum of $28,666. See ECF No. 170.

I.    Background

    A.    Romanello's Longstanding Association and Membership with the Genovese Crime Family

Romanello is a member of the Genovese crime family, at times serving as an acting captain and solider within the family. See PSR, dated March 30, 2012, and addendum to PSR, dated June 12, 2012, in United States v. Romanello, No. 10-CR-929 (S-1) (ILG) (together, the "2012 PSR") ¶ 16 ("At various times, Anthony Romanello was an acting captain, soldier and associate within the Genovese crime family.").

The Genovese crime family's primary purpose was to generate money for its members and associates, which they accomplished through various criminal activities, including

drug trafficking, robbery, extortion, illegal gambling and loansharking. 2012 PSR ¶ 12. The members and associates of the Genovese crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, just as Romanello did in this case. Id.

### B. The Defendants' Extortionate Collection of Credit

As proven at trial, Romanello and co-defendants Joseph Celso and Luan Bexheti, along with other uncharged co-conspirators—including Robert Utnick, who worked with Bexheti to take and record bets and money owed, and Michael Regan, who was the "boss" of the gambling operation—were involved in an illegal sports gambling scheme where bets were placed on credit, debts were settled-up on a weekly basis, and individuals, including Romanello and Celso, were called in to help collect on outstanding debts.

The charged extortionate collection of credit conspiracy (Count One) is a part of the broader gambling-credit collection conspiracy, in which the defendants and their co-conspirators took part. Specifically, in or about 2017, two individuals, Fiton Selimaj, also known as "Toni," and his brother-in-law, began placing sport bets with Bexheti and Utnick. PSR ¶ 13. Based on the arrangement with Bexheti and Utnick, Toni and his brother-in-law placed bets on credit on a weekly basis, with the amount won or owed to be settled by the following Wednesday or Thursday. Id.[1]

At some point in or about February or March 2017, Toni and his brother-in-law owed approximately $86,000 (the "Debt"). Id. ¶ 14; see also Trial Tr. 523-27, 531-34, 550-51. Bexheti and Utnick attempted to collect the Debt through phone calls, voicemails and even personal visits to Toni's home, but were ultimately unable to collect the Debt. PSR ¶¶ 14-18; see also GX 409; GX 410; Trial Tr. 557. For example, during a call on February 27, 2017, Bexheti asked whether Utnick texted and called Toni's brother-in-law, and Utnick confirmed that he did, noting that he "can't do nothing else." GX 411. Bexheti then stated that if they don't collect the Debt from Toni and his brother-in-law before he sees his "boy," i.e., Regan, "it ain't gonna be nice." Id.

On a call with Toni the next day, the situation continued to escalate, and Bexheti stated that his boss was going to need to get involved and it is "serious shit" if Toni and his brother-in-law "do not have the money." PSR ¶ 15; see also GX 413. Then, on March 3, 2017, Bexheti and Utnick again discussed the need to collect the Debt. GX 415. On that call, Bexheti recounted to Utnick what Bexheti had told Toni:

> He needs to pay the whole thing, okay, not just part of it. He needs to f***ing pay the whole thing, or I'm telling you, it's gonna f***ing get ugly. So whatev-- he goes, I'm gonna go and see him tonight. Okay. I, I said, I just want you to know because, uh, uh, the office is f***ing, uh, furious about this shit because they paid him on time,

---

[1] For clarity, the government will refer to Mr. Selimaj and his relatives by their first names throughout this submission.

2

> gave him all his money, and now they have to f***ing wait for him
> . . . . And I said, uh, but I can tell you one thing, if this fucking guy
> [Toni's brother-in-law] doesn't pay, it's gonna get ugly."

Id. In the call above, Bexheti explained to Utnick that he told Toni that Regan ("the office") is "f***king . . . furious" because when Toni's brother-in-law won a large amount, "they paid him on time" but now that he owes "the office" money he is not paying on time ("they have to f***king wait for him") and that if the money isn't paid soon "it's gonna get ugly." Id. Bexheti and Utnick also discussed approaching Toni's uncle to collect the Debt. PSR ¶ 15. After additional attempts to collect the Debt from Toni and his brother-in-law, Behexti told Utnick to "[r]elay the message whatever, and then, you know, listen, it's only so much you and I can do, we're not the fucking enforcers." GX 418; see also PSR ¶ 17. Ultimately, Bexheti and Utnick failed to collect the Debt by themselves, without the "enforcers." PSR ¶ 18.

After Bexheti and Utnick were unable to collect, additional members of the gambling organization, including Romanello, Celso and Regan, became involved. Specifically, Regan approached Toni's uncle, Shuqeri Selimaj, also known as "Bruno," about the repayment of the Debt. Id. ¶¶ 18-19. Among other things, Regan told Bruno that Toni owed a gambling debt and that Romanello and "Tough Tony"—Anthony Federici, previously a captain in the Genovese crime family—say hi. See id. ¶ 19.

In or around March 2017, Romanello became involved in collecting the Debt. Id. ¶ 20. First, Romanello, Regan and two other men approached Bruno about the Debt. Id.; see also Trial Tr. 71. During a conversation between Romanello and Bruno that occurred in a private room of Bruno's restaurant, Romanello told Bruno that Toni owed him (Romanello) $86,000, "yell[ed]" at Bruno, and said that he "need[ed] [his] $86,000." Trial Tr. 71. Romanello then told Bruno that Tough Tony "said hello" and would "come over to visit [Bruno]." Id. at 72. As Bruno testified at trial, he had known Romanello and Tough Tony for over 30 years and understood both to be part members of the "mafia." Id. at 66-67. Bruno understood that Romanello used Tough Tony's name to "intimidate" him. Id. at 72-73.

A few weeks later, Romanello, Regan and Bexheti and another man again confronted Bruno about the Debt. Id. at 104. Again, Romanello spoke with Bruno in a private room of Bruno's restaurant about the outstanding gambling debt. Trial Tr. 105-06. Romanello's tone during that conversation was "higher than the first time," and Romanello "scream[ed]" at Bruno that he "need[ed] [his] money." Id. at 106.

Then, on May 11, 2017, Romanello, Celso, Regan and Romanello's son George Romanello confronted Bruno at his restaurant for a third time to induce payment of the Debt. Id. at 108-13; GX 352. After the four men arrived together at the restaurant, Romanello once again spoke to Bruno in a private room about the Debt. Trial Tr. 108; GX 352. There, Romanello told Bruno that Romanello "want[ed] all [of] [his] money" and that he did not "want to hear" it. Trial Tr. 108-09. When Bruno told Romanello that he would pay the $6,000 that his nephew Toni

3

owed, but not the other portion of the Debt, Romanello "rais[ed]" his voice and said that he "want[ed] all [of] [his] money" and that he did not care. Id. at 109.[2]

After this conversation, Romanello and Bruno returned to the bar area of the restaurant where Celso, Regan, and George Romanello had been waiting. Id.; GX 352. After Bruno reiterated that he would only pay the $6,000 owed by Toni, Romanello repeatedly told Bruno that he "would like to punch" Bruno. Trial Tr. 110. When Bruno responded that Romanello did not have the "guts to punch" him, Romanello punched Bruno in the face, which was captured on video surveillance footage. Id. at 110-11; GX 352. At nearly the same time, Regan grabbed Bruno by the collar and pushed him backwards while Celso and George Romanello surrounded Bruno. Trial Tr. 111-12; GX 352. As captured on the surveillance footage, Romanello and his three co-conspirators then walked forward, encroaching on Bruno as he stumbled backward in attempt to escape. GX 352. It was not until Bruno told Romanello, Celso and the other men that there was a surveillance camera in the restaurant that Romanello and his co-conspirators left the restaurant. Trial Tr. 112; GX 352.

Later that night, Bruno filed a police report against Romanello relating to the assault. Trial Tr. 131-32. That same day, Bruno also contacted his brother Shemsi Selimaj, also known as "Nino," to discuss what had happened. Id. at 132. Upon reviewing the surveillance footage, Nino recognized that Celso, with whom Nino had gambled for over five years, was one of the men who came with Romanello to the restaurant. Id. at 250-52. Nino then called Celso, who confirmed he and Romanello "went to collect the money," i.e. the Debt. Id. at 252; see also PSR ¶ 24. Nino and Celso met shortly thereafter, and Celso told Nino that the Debt must be paid. Trial Tr. 253. When Nino mentioned that Bruno had filed the police report, Celso responded that Bruno "better drop the charges" because "[o]therwise it's going to be ugly." Id. Celso further stated that if Romanello were arrested, "somebody is going to pay the price." Id. at 255. Nino subsequently relayed this conversation to Bruno because he was worried about "further escalation problems." Id. Nino then went to the police station with Bruno, who dropped the charges. Id. Nino subsequently informed Celso that the charges had been dropped, to which Celso responded, "that's fine, excellent." Id. Nino also coordinated with Celso to pay off the Debt—which Nino understood to be owed to "Joe and Rom"—and the Debt eventually was repaid in full. Id. at 256-57.

      C.      <u>Romanello's and Celso's Attempts to Prevent Witnesses From Cooperating With Law Enforcement</u>

In addition to Celso's obstructive effort to induce Bruno to drop the assault complaint against Romanello (which, as discussed above, was successful), Celso attempted to persuade Nino to lie to the federal grand jury after Nino received a subpoena to testify in relation to the above-described conduct. PSR ¶ 29. When Nino mentioned to Celso that he had received a subpoena in November 2019, Celso said, "Go ahead, testify, but keep me away from this."

---

[2] Toni owed approximately $6,000 while his brother-in-law owed approximately $80,000, but because Toni had "vouched" for his brother-in-law, Toni was held responsible for the entire amount of the Debt. Trial Tr. 550-51, 566-67.

Trial Tr. 264. Nino understood Celso's directive to mean "to lie to [the government's] face," since Celso was "obviously" involved in the collection of the Debt. Id. at 264, 266.[3]

In approximately November 2019 (around the time that Nino received the subpoena to testify before the grand jury), while conducting a separate investigation targeting members of Albanian organized crime, the Federal Bureau of Investigation ("FBI") intercepted telephone calls on a T-III wiretap, in which participants—including known associates of the Genovese Crime Family like Third Party Two—discussed efforts to prevent Bruno from cooperating with the government in relation to the instant case. PSR ¶ 30. For example, below is an excerpt from a telephone call on November 27, 2019, between two third parties:

| Third Party One: | I send you picture, I have two meetings very, about Bruno, my brothers, and they, because they supposed to meet, he's supposed to meet him this week, but oh, he's sick, he has like mini heart attack in hospital. |
|---|---|
| Third Party Two: | Oh my god. |
| Third Party One: | But I talked to all my, all my guys, I talked to all my guys, and I just texted him the picture last night, that was till 12 o'clock with my guys and I tell him to do the right thing. |

Id. In the above exchange, Third Party One explained to Third Party Two that Third Party One met with his associates in Albanian organized crime ("all my guys") to discuss Bruno and that Third Party One instructed Bruno to cease his cooperation with the ongoing investigation ("I tell him to do the right thing."). Id. Third Party One subsequently followed up with Third Party Two on multiple occasions regarding his ongoing attempts to prevent Bruno from cooperating, including during calls on December 5, 2019, and December 13, 2019. Id. ¶ 31. During both conversations, Third Party One assured Third Party Two that Bruno would "do [the] right thing," id., i.e., not testify against Romanello.

As another example, on December 13, 2019, following Third Party One's call to Third Party Two about Bruno, Third Party One discussed with Third Party Three his involvement with Romanello and Romanello's associates to prevent Bruno from testifying against Romanello:

| Third Party One: | Some people from prison are trying calling me daily, wanting me to talk to Bruno. Do you know Bruno? |
|---|---|
| Third Party Three: | Yes. |

---

[3] The PSR states that Nino "did not withhold information about Celso to the grand jury." PSR ¶ 29. However, Nino did not testify before the grand jury pursuant to the subpoena he received. While the jury did not convict Celso on the obstruction account, the government submits there was sufficient evidence at trial to provide beyond a preponderance of the evidence that this conduct took place.

5

| | |
|---|---|
| Third Party One: | A week ago some very big ones called me!  Do you know the Italian [Romanello] that hit Bruno, they beat him up at steakhouse? |
| Third Party Three: | Yes. |
| Third Party One: | Now, he was in jail with me.  They called me a week ago and said he is Albanian, and we are told you are friends with him.  And he, they sued, and now he is going to trial.  The Italian [ Romanello] was arrested and they have introduced a tape, because he was giving money with interest rate, you know, to Bruno. |
| Third Party Three: | Yes, yes. |
| Third Party One: | And also because that he beat him up, he was arrested.  But he now will go to trial, do you know when people go to trial and spy, do you know about it? |
| Third Party Three: | Yes, yes. |
| Third Party One: | And this Bruno will go to trial for them.  The old man who beat him is 70 years and he has been 20 years in jail.  They called me a week ago but I told them, I, I, he was my friend, but I don't want to get involved with him, I can't go tell him anything.  Because if I go tell him anything then, they can screw me like I am threatening him or something.  And, today some other Italians called me and I said, one of them said if he puts my brother in jail, he [Bruno] is going to have problems.  Do you understand?  Because he is testifying in the trial; because he is going to trial. |

…

| | |
|---|---|
| Third Party One: | He was arrested and now he is going to trial and he will be in front of him, testify in the trial and wanted me to talk to him not go to trial.  But, I said no, I can't tell him, he is, he is, I have nothing to do with him but, he is Albanian and he has said before he is your friend. |

…

| | |
|---|---|
| Third Party One: | I swear if he puts the old man in jail he is going to have problems, I am telling you. |

…

6

> Third Party One:  I swear someone told, next week, the other ones, one of them told me, if they send him to prison, he is a big one, and if they send him to prison, it's better for him to go to Montenegro . . . .

Id. ¶ 32.  In the above exchange, Third Party One detailed his participation with Romanello ("the old man") and others to influence and prevent Bruno's cooperation with the investigation ("calling me daily, wanting me to talk to Bruno").  Id. ¶ 33.  Third Party One explained that because Bruno is an Albanian American, like Third Party One himself, members of Italian organized crime ("some very big ones") contacted Third Party One to reach out to Bruno to prevent his testimony or cooperation with the investigation ("wanted me to talk to him not go to trial").  Id.  Third Party One further explained that he was told by "some other Italian" that if Bruno "puts my brother in jail, he is going to have problems . . .because he is testifying in the trial."  Id.  Third Party One finished the conversation, noting, "if they send him [Romanello] to prison, he is a big one, and if they send him to prison, it's better for him [Bruno] to go to Montenegro," making clear Third Party One's understanding of the willingness of Romanello and his associates to both obstruct justice and violently retaliate against Bruno for cooperating in the instant case.  Id.  As disclosed in the material produced to pursuant to 18 U.S.C. § 3500 for Brno, there was at least one attempt by Third Party One to prevent Bruno from testifying in the instant case.

This conduct is consistent with Romanello's 2007 conviction for conspiring to obstruct justice, in violation of 18 U.S.C. § 1512(b) & (k).  Id. ¶ 71.  Similarly, in that case, Romanello tried to convince an individual not to be truthful with the FBI when that individual was interviewed by the FBI and served with a grand jury subpoena as a part of an investigation into Romanello's extortion.  Id.; see also 2012 PSR ¶¶ 79-80.

E.   Romanello's Arrest and Subsequent Conviction

For his actions, Romanello was charged with conspiring to engage in the extortionate collection of credit, in violation of Title 18, United States Code, Section 894(a)(1), and engaging in the extortionate collection of credit in violation of 18 U.S.C. § 894(a)(1).  ECF No. 1.  He was arrested and arraigned on May 3, 2022.  PSR ¶ 37.

On December 11, 2023, following a jury trial, Romanello was found guilty of all crimes with which he was charged.  See ECF No. 134 (jury verdict); see also PSR ¶ 39.

F.   Romanello's Criminal History

As discussed below and in the PSR, id. ¶¶ 65-72, Romanello has been previously convicted of 23 crimes, including in connection with his role as a soldier and acting captain within the Genovese crime family.  For these 23 crimes, he has served a total of 36 months' and five days' imprisonment.

These convictions include, among others, 12 counts of bribery in the second degree and one count of conspiracy in the third degree.  PSR ¶ 67.  In connection with those convictions, between December 1972 and February 1974, Romanello and others paid bribes to

7

police officers to influence their actions in investigating organized crime activities, including illegal gambling. Id. For these crimes, Romanello was sentenced in 1976 to conditional discharge and a $250 fine. Id.

In 1983, Romanello was convicted of conspiracy, theft of goods from interstate commerce, smuggling, and interstate transportation of stolen property. Id. ¶ 70. In particular, he staged a gunpoint robbery to conceal the smuggling of approximately $900,000 worth of gold jewelry. Id. Romanello was found guilty at trial and ultimately resentenced to 36 months' imprisonment in 1985. Id.

Romanello also has been convicted for several crimes in connection with being a soldier and acting captain in the Genovese crime family. As discussed above, in 2007, the defendant was convicted of one count of obstruction of justice for trying to convince an individual to not be truthful in connection with an FBI investigation into his criminal activity. Id. ¶ 71. He was sentenced to two years' probation, including six months' home confinement, in connection with that conviction. Id.

Further, in 2012, Romanello pled guilty to racketeering conspiracy in connection with engaging in a pattern of racketeering activity of the Genovese crime family and was sentenced to four years' probation. Id. ¶ 72. In connection with his 2012 conviction, Romanello admitted that in 1999, he and others agreed to engage in violence to collect money from an individual blamed for causing a financial loss to the Genovese crime family. Id. ¶ 72; see also 2012 PSR ¶ 20. Specifically, on an intercepted phone call, Romanello was captured explaining his plan and enlisting the help of co-conspirators:

> So why don't I (unintelligible) to [John Doe]. We going to go to [John Doe]? Monday morning, we might get up early and tell that f***, Jimmy too. I got to get that c***sucker. Me, you and Jimmy might go get up early Monday. I might come out here and meet yous right out there by Joe's house or something. We gotta (unintelligible). We got to punch him around, or Jimmy's got to punch him around. I can't let him get away with that. Taking the money and putting the gun to his head. (Unintelligible) the gun to his head. We gotta get the c***sucker. Even if we don't get the money, we gotta punch the motherf***er around (unintelligible). Believe you me. I can't let him get away with that. Look, we got to get there early Monday morning.

PSR ¶ 72; see also 2012 PSR ¶ 21.

In a separate charged racketeering act,[4] in the 1990s, Romanello engaged in the extortionate collection of payments on a gambling debt on behalf of Anthony Federici, also known as "Tough Tony," who was a member of the Genovese crime family. PSR ¶ 72; see also 2012

---

[4] Though the defendant did not plead guilty to this racketeering act, it was included as relevant conduct in connection with his 2012 conviction.

8

PSR ¶ 22.  Romanello received payments of that gambling debt owed to "Tough Tony."  PSR ¶ 72; see also 2012 PSR ¶ 22.

II.     Applicable Law

The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable the United States Sentencing Guidelines (the "Guidelines") range.  Gall v. United States, 552 U.S. 38, 49 (2007).  Though advisory, see United States v. Booker, 543 U.S. 220, 264 (2005), the Guidelines nonetheless are "the starting point and the initial benchmark," Gall, 552 U.S. at 49; see also Molina-Martinez v. United States, 578 U.S. 189, 198–99 (2016) (explaining that "[t]he Guidelines are the framework for sentencing and anchor the district court's discretion").

After calculating the applicable Guidelines range, the court must consider the factors outlined in § 3553(a), see Gall, 552 U.S. at 49, and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing," United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).  Section 3553(a) directs the court "in determining the particular sentence to impose" to evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  "[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Rueda-Zarate, 291 F. App'x 364, 366 (2d Cir. 2008) ("A Guidelines sentence will in the ordinary case 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting Kimbrough, 552 U.S. at 109)); United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").  That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."  Rita v. United States, 551 U.S. 338, 348 (2007).

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

III.    Discussion

    A.   The Guidelines Calculation

As an initial matter, see Gall, 552 U.S. at 49; Molina-Martinez, 578 U.S. at 198–99, the government submits that the Guidelines calculation contained in the PSR is accurate, see

9

PSR ¶¶ 54–61, with a total offense level of 24, see id. ¶ 62.  Notwithstanding Romanello's bare assertion to the contrary in his objections to the PSR, a four-level enhancement under U.S.S.G. § 3B1.1(a) is appropriate because the evidence at trial demonstrated that the criminal activity led by Romanello involved—at the very least—himself, Celso, Regan, Bexheti, Utnick, and George Romanello.

Because Romanello falls in Criminal History Category II, see PSR ¶ 75, the applicable Guidelines range is 57 to 71 months' imprisonment, see id. ¶ 132.

### B.    A Sentence of 71 Months' Imprisonment Is Appropriate

The government respectfully submits that a sentence of 71 months, the top of the applicable Guidelines range, is appropriate in this case and would be sufficient, but not greater than necessary, to serve the statutory purposes of sentencing.

While Romanello has repeatedly derided this prosecution as a one-punch case, the evidence elicited at trial shows that the nature of the offenses is much more than that.  The charges in this case stem from an illegal gambling operation, which in and of itself is a crime.  Then, in order to get "his" $86,000, Romanello visited Bruno again and again, using his own reputation as a member of the mafia as well as the name of a fellow member of the Genovese crime family to intimidate Bruno and make him fear for his family's safety.  As Bruno testified:

> [T]his Mafia guy, they're going to hurt me or my family.  Me, I don't care.  I'm 72 years old, I lived my life.  But my family, my children, my grandchildren, my nephew, my nieces that's what I was worried about.

Trial Tr. 204.  So while Romanello certainly did punch Bruno in the face, he is also responsible for instilling fear and terror in a business owner who "was afraid because nobody jokes with Mafia."  Id. at 74.  As Bruno explained, "I know that if they don't pay the debts, they get killed."  Id.

A 71-month sentence also appropriately accounts for the history and characteristics of the defendant.  See 18 U.S.C. § 3553(a)(1).  Romanello is long-time member of the Genovese crime family.  His last legitimate employment was in the 1960s, which makes clear that the vast majority of his adult life—continuing well into his 70s—has been dedicated to that criminal organization.  Age thus cannot be a shield to appropriate punishment under § 3553(a), cf. United States v. Donato, No. 03-CR-929 (NGG), 2020 WL 3642854, at *2 (E.D.N.Y. July 6, 2020) (considering § 3553(a) in the context of a compassionate release motion filed by a member of the Bonanno crime family and noting "[h]e is entirely capable of returning to organized crime activities at 62 years old"), aff'd, 848 F. App'x 485 (2d Cir. 2021), particularly given that it has been Romanello's choice to repeatedly engage in criminal activity at an advanced age.

Further, Romanello has been convicted of 23 crimes, demonstrating his commitment to a life a crime and more specifically the Genovese crime family.  PSR ¶¶ 65-72.  His two most recent convictions—the 2007 federal conviction for conspiracy to obstruct justice and 2012 federal conviction for racketeering conspiracy—are grounded in his membership in the

Genovese crime family. Id. ¶¶ 71-72. Moreover, Romanello's admitted racketeering activity in the 2012 conviction—committed when he was in his 60s—strongly resembles the conduct at issue here, given that Romanello was responsible for collecting gambling debts owed to a gambling organization run by Genovese crime family member "Tough Tony," id. ¶ 72, the same individual that Romanello and Regan both used to intimidate Bruno.

Moreover, a 71-month sentence will also serve to afford deterrence and to protect the community from the defendant. See 18 U.S.C. § 3553(a)(2)(B). It is important for the Court's sentence to send a message to other members of organized crime families who engage in such callous acts of extortion that such conduct will not be tolerated. As counsel for Romanello has repeatedly highlighted, Romanello's most recent convictions resulted in sentences of probation. Cf. PSR ¶¶ 71-72. That fact further supports the need for an incarceratory sentence here since Romanello has proven himself to be undeterred by non-incarceratory sentences. His prior convictions—including for similar conduct—clearly have had no deterrent effect, as he has continued to engage in crime in connection with the Genovese crime family well into his 70s.

In addition, Romanello's advanced age and his stable family life, including multiple children and grandchildren, demonstrate that circumstances that normally dissuade individuals from criminality were insufficient to mitigate against this defendant's consistent decision to engage in criminal conduct. Indeed, in seeking a 71-month term of imprisonment, the government is not seeking an upward departure, which the PSR notes may be warranted given that Romanello's criminal history category substantially under-represents the seriousness of his criminal history and the likelihood that the defendant will commit more crimes. Id. ¶ 145. As noted above, despite being previously convicted of 23 crimes—ranging in severity from disorderly conduct to bribery in the second degree to racketeering conspiracy—Romanello has served only approximately three years in prison. A serious sentence here is necessary to specifically deter this defendant from continuing his life of crime.

In light of the media interest surrounding this case, others seeking to engage in the same conduct surely will notice what repercussions follow a conviction for extortionate collection of credit, that engagement in such behavior is not victimless, and that threatening others with bodily harm to induce payment of an illegal gambling debt is not something that will be taken lightly. A serious sentence here is needed to deter others from such harmful, illegal conduct. Further, Romanello's applicable Guidelines range does not account for his efforts to obstruct justice throughout this matter—including the successful efforts by Romanello's associates to intimidate Bruno into withdrawing the police report against him and unsuccessful efforts to prevent Bruno from cooperating in the instant prosecution.

Romanello's efforts to intimidate Bruno in the instant prosecution concerningly mirrors Romanello's conduct that resulted in his 2007 conviction for conspiring to obstruct justice, in violation of 18 U.S.C. § 1512(b) & (k). Id. ¶ 71. In that case, the FBI was investigating Romanello and the Genovese crime family for participating in extortion, and when an individual was interviewed by the FBI as a part of that investigation and served with a grand jury subpoena, Romanello tried to convince the individual not to be truthful with the FBI's investigation. Id.; see also 2012 PSR ¶¶ 79-80; United States v. Romanello, No. 06-CR-08 (LAK) (S.D.N.Y.), ECF No. 589 (charging Romanello with agreeing with others "to corruptly persuade a person . . . to withhold information from federal law enforcement officers and truthful

11

testimony in an official proceeding, which information and testimony related to an attempted extortion . . . by members and associates of the Genovese Organized Crime Family"). As such, a sentence at the top of the applicable Guidelines range is necessary to ensure the Romanello and others similarly situated are appropriately deterred from committing like crimes and intimidating victims and government witnesses.

Finally, where, as here, a defendant "has not taken responsibility or expressed remorse for his actions," a substantial custodial sentence is appropriate to promote respect for the law and to provide just punishment for the offense. See, e.g., United States v. McLean, No. 08-CR-789 (RJS), 2022 WL 1125946, at *6 (S.D.N.Y. Apr. 15, 2022), aff'd, No. 22-1176, 2023 WL 8253680 (2d Cir. Nov. 29, 2023); accord United States v. Livingston, 404 F. App'x 685, 692 (3d Cir. 2010) (concluding that the district court's consideration that the defendant had not "taken responsibility for any of the [criminal] conduct of record" was a "rational application of the § 3553(a) factors"). The defendant has shown absolutely zero remorse or contrition for his conduct in this case or for his life of crime. His history demonstrates that nothing other than incapacitation will keep him from preventing other serious crimes. The Court's sentence should reflect that lifelong commitment to crime and ensure that the defendant is unable to harm the community again.

For these reasons, a term of imprisonment at the top of the applicable Guidelines range is appropriate.

IV. Conclusion

For the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment of 71 months, followed by a term of supervised release, and enter a forfeiture money judgment in the sum of $28,666.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Dana Rehnquist
Irisa Chen
Rebecca M. Schuman
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (EK) (by ECF)
       Counsel of Record (by ECF and Email)
       Frank Nikolaidis, U.S. Probation Officer (by Email)